# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

MONDRIAN GLOBAL EQUITY FUND,
L.P., MONDRIAN INTERNATIONAL
EQUITY FUND, L.P., MONDRIAN
FOCUSED INTERNATIONAL EQUITY
FUND, L.P., MONDRIAN ALL
COUNTRIES WORLD EX-US EQUITY
FUND, L.P., and MONDRIAN GROUP
TRUST, on behalf of themselves and all
others similarly situated,

Plaintiffs,

v.

BP PLC, BP AMERICA, INC., BP
EXPLORATION & PRODUCTION, INC.,
ANTHONY B. HAYWARD, ROBERT W.
DUDLEY, CARL-HENRIC SVANBERG,
and WILLIAM CASTELL,

Defendants.

No.: **16 CV 2719**

Jury Trial Demanded

# COMPLAINT

# TABLE OF CONTENTS

I.  NATURE OF THE ACTION ........................................................................... 6

II.  JURISDICTION AND VENUE ................................................................... 11

III.  THE PARTIES............................................................................................ 12

    A.  Plaintiffs............................................................................................. 12

    B.  Defendants ......................................................................................... 15

        1.  Corporate Defendants ............................................................ 15

        2.  Individual Defendants ............................................................ 17

IV.  ADDITIONAL BP PERSONNEL OF SIGNIFICANCE................................ 19

V.  CONFIDENTIAL WITNESSES ................................................................. 23

VI.  BP PURPORTEDLY TOOK EXTENSIVE MEASURES TO RECTIFY ITS OPERATIONAL HISTORY RIFE WITH SAFETY VIOLATIONS ............................ 24

    A.  BP's Relevant Operations ................................................................... 24

    B.  BP Is No Stranger to Catastrophic Industrial Incidents ......................... 25

        1.  BP's Flawed Process Safety Controls Cause Grangemouth Incidents............................................................................... 25

        2.  Unsafe Deepwater Drilling Operations.................................... 25

        3.  BP's Thunder Horse PDQ Operated With Pipeline Cracks That Could Have Been Catastrophic ................................... 27

        4.  Safety Lapses Cause an Explosion at BP's Texas Refinery ..... 28

        5.  Widespread Corrosion Causes Leaks in BP's Alaskan Pipeline Operations in Prudhoe Bay ...................................... 30

        6.  BP Purports to Adopt the Baker Panel Recommendations....... 32

        7.  BP Creates the Group Operations Risk Committee and the Safety, Ethics and Environment Assurance Committee to Implement and Monitor Process Safety Systems............... 35

        8.  SEEAC Closely Monitored BP's Safety Performance Including OMS Implementation............................................ 37

        9.  BP Launches OMS to Purportedly Implement the Baker Panel's Recommendations, but Exempts OMS's Application from Rigs that BP Did Not Fully-Own ....................... 40

        10.  Defendant Hayward Knew That Drilling in the Gulf of Mexico Itself Was Highly Risky and That a Deepwater Blowout Was the Highest Risk Facing BP in the Gulf of Mexico ......................................................... 44

i

11. Contrary To Defendants' Assertions, the Gulf of Mexico Had Not Completed The Transition to OMS At The Time Of The Deepwater Horizon Disaster .................................................. 45

VII. DEFENDANTS' KNOWLEDGE OR RECKLESS DISREGARD OF FACTS RENDERING THEIR STATEMENTS AND OMISSIONS FALSE AND MISLEADING ..................................................................................... 49

A. Defendants' Knowledge Or Reckless Disregard Regarding Their Statements and Omissions About BP's Operational Safety And Its Deepwater Drilling Operations .................................................... 49

1. Faulty Cementing Jobs and Other Stability Issues Were Known as the Most Frequent Causes of Well Control Problems ............................. 51

2. Defendants Knew or Recklessly Disregarded That BOPs Were Known to Fail, Yet Did Not Adjust Their Process Safety Procedures Accordingly ................................................................... 52

3. BP Received No Less Than One Hundred Safety Warnings for its Safety Protocol Lapses in its North Sea Deepwater Drilling Operations ................................................................................. 56

4. BP's Internal Reporting Structures Mandated that the CEO and Board Review Process Safety and Risk ....................................... 58

5. SEEAC Approved BP's Publications Regarding Safety ......................... 61

6. Defendants Consciously Limited The Scope of Safety & Operations Audits So As Not To Apply To The Majority Of BP's Deepwater Drilling Fleet.................................................................. 63

B. Defendants' Knowledge Or Reckless Disregard Regarding Their Statements and Omissions Is Further Established By Their Disregard of Safety and Operational Concerns.................................................... 65

1. Defendants Knew of, or Recklessly Disregarded, Significant Process Safety Problems with Third-Party Rigs and, in Particular, Rigs Leased From Transocean ................................................. 66

2. Concerns about the Integrity of Safety Processes in Alaska.................... 67

3. Afraid-a-spill E-mail Raises Complaints about Alyeska's Operations ................................................................................. 69

4. Aftermath of BP's 2007 Criminal Plea ..................................... 70

C. Defendants' Knowledge Or Reckless Disregard Regarding Their Statements and Omissions Is Further Established By BP's Retaliation Against Individuals Who Raised Concerns About Its Operational Safety and Integrity ................................................................................. 72

1. Whistleblower Retaliation in the Gulf of Mexico.................................... 72

2. Whistleblower Retaliation in Alaska ..................................... 75

D.   Defendants' Knowledge Or Reckless Disregard In Making Post-Spill Misrepresentations And Omissions To Congress, Law Enforcement, Emergency Responders, and Investors About The Oil Flow Rate Into The Gulf Of Mexico From The Blown Macondo Well ................................. 78

    1.   Defendants' Publicly Stated Estimates Of Oil Spilling Into The Gulf Were Contradicted By Contemporaneous Internal BP Documents, Data, Estimates, and Calculations ......................................... 78

    2.   Defendants Misrepresented the Scope of the Leak in a Brazen Attempt to Whittle Down the Amount BP Would Owe in Fines ............ 86

    3.   BP Agreed To Pay The Third-Highest Civil Fine In The SEC's History - $525 Million – To Settle The SEC's Well-Pled Allegations That It And Its Executives Hid From Investors, Including Plaintiffs and the Class Members, Critical Information About the Spill ........................................................................................ 86

    4.   BP Pled Guilty to Felony Manslaughter, Environmental Crimes and Felony Obstruction of Congress And Agreed to Pay The Largest Criminal Fine in U.S. History – $4 Billion – To Resolve A DOJ Investigation That Revealed Defendants' Concealment Of Critical Spill Information From Congress And The Public ..................... 88

    5.   The U.S. EPA Barred BP From New Contracts With The U.S. Government ................................................................................................ 98

E.   Additional Allegations Regarding Defendants' Knowledge Or Reckless Disregard As To The Falsity Of Their Class Period Statements And Omissions .................................................................................................... 99

VIII.   THE MATERIALIZATION OF THE UNDISCLOSED RISKS – DEEPWATER HORIZON OIL SPILL AND ITS AFTERMATH ......................................... 101

A.   BP's Systematic Failures Caused the Explosion on and the Sinking of the *Deepwater Horizon Rig* ................................................................... 101

    1.   BP Acquires the Rights to the Macondo Well and Began Its Preparation to Drill Despite Having an Inadequate and Error-Filled Oil Spill Response Plan ...................................................................... 101

    2.   Casing and Cementing the Well ..................................................... 106

    3.   BP Begins the Temporary Abandonment Process ................................. 111

    4.   Explosion on the Deepwater Horizon ..................................................... 116

    5.   BP Continues to Attempt to Activate the BOP Following the Abandonment of the Deepwater Horizon ................................................ 118

B.   BP Was Wholly Unprepared to Contain the Oil Spill .......................................... 119

    1.   BP Was Knowingly or Recklessly Unprepared to Manage and Respond to a Spill in the Gulf of Mexico ................................................ 119

    2.   The Failed Use of Unprecedented Amounts of Dispersants .................. 123

3.     The Failed Use of A Cofferdam...................................................... 126

4.     The "Top Kill" and "Junk Shot" Efforts Fail........................................... 128

5.     The "Top Hat" Failed to Collect the "Vast Majority" of the
Spewing Oil ............................................................................. 129

6.     The Well Is Finally Capped .......................................................... 131

IX.     DEFENDANTS MADE MATERIALLY FALSE AND MISLEADING
STATEMENTS AND OMITTED MATERIAL FACTS DURING THE CLASS
PERIOD ..................................................................................... 133

A.     ████████████████████████████████████████████
████████████████████████████████
...................................................................... 133

B.     ████████████████████████████████████████████
█████████████████████ ........................................ 137

X.     DEFENDANTS' CONDUCT CAUSED PLAINTIFFS' AND THE CLASS
MEMBERS' LOSSES .................................................................... 140

XI.     NO SAFE HARBOR APPLIES TO DEFENDANTS' FALSE AND
MISLEADING STATEMENTS......................................................... 159

XII.     PLAINTIFFS' AND THE CLASS MEMBERS' DIRECT RELIANCE ON
DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND
MATERIAL OMISSIONS ............................................................... 160

XIII.    ADDITIONAL RELIANCE ALLEGATIONS: (A) DEFENDANTS' INTENT
TO INDUCE PLAINTIFFS' AND THE CLASS MEMBERS' RELIANCE; (B)
PRESUMPTIONS OF RELIANCE; AND (C) RELIANCE ON DEFENDANTS'
MISSTATEMENTS AND OMISSIONS THROUGH DIRECT RELIANCE ON
THE PRICE INTEGRITY OF BP SECURITIES ....................................... 166

XIV.    THE CLAIMS ARE TIMELY.......................................................... 170

XV.     CLASS ACTION ALLEGATIONS .................................................... 170

XVI.    PLAINTIFFS' CLAIMS, PRAYER FOR RELIEF, AND DEMAND FOR JURY
TRIAL ON THEIR BEHALF AND ON BEHALF OF THE CLASS MEMBERS....... 173

FIRST CAUSE OF ACTION .................................................................. 173

PRAYER FOR RELIEF ...................................................................... 175

DEMAND FOR JURY TRIAL ............................................................... 175

Mondrian Global Equity Fund, L.P., Mondrian International Equity Fund, L.P., Mondrian Focused International Equity Fund, L.P., Mondrian All Countries World Ex-US Equity Fund, L.P., and Mondrian Group Trust (altogether referred to herein as "Plaintiffs"), on behalf of themselves and all others similarly situated, make the following allegations upon personal knowledge as to their own acts and upon information and belief as to all other matters.  Plaintiffs' information and belief are based on their counsel's ongoing investigation.   The investigation of counsel is predicated upon, *inter alia*: a review of public filings by BP plc ("BP"), and its subsidiaries and affiliates, with the United States Securities and Exchange Commission ("SEC"), including, among other things, reports filed on Forms 6-K and 20-F; press releases and public statements issued by BP and its subsidiaries and affiliates; media reports about the same entities; publicly available data relating to the prices and trading volumes of securities; reports issued by securities analysts who followed BP; factual allegations in pleadings and other documents filed in the criminal action and plea deal between the U.S. Department of Justice ("DOJ") and BP, in the enforcement action and settlement between the SEC and BP, and in other civil lawsuits; testimony and documents produced in *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, MDL 2179 (E.D. La.) and *In re BP plc Securities Litigation*, MDL 2185 (S.D. Tex.); and the Court's orders denying in part Defendants' motions to dismiss the claims in *In re: BP p.l.c. Securities Litig.*, No. 4:10-md-02185 (S.D. Tex.) (the "Class Action"), *Alameda County Employees' Ret. Assoc., et al. v. BP p.l.c., et al.*, No. 4:12-cv-1256 (S.D. Tex.) (the "Alameda Action"), *Connecticut Ret. Plans and Trust Funds, et al. v. BP p.l.c., et al.*, 4:12-cv-1272 (S.D. Tex.) (the "Connecticut Action"), *HESTA Super Fund v. BP p.l.c., et al.*, 4:13-cv-0129 (S.D. Tex.), *Stichting Pensioenfonds Metaal En Techniek, et al. v. BP p.l.c., et al.*, 4:13-cv-0069 (S.D. Tex.), *Nova Scotia Health Employees' Pension Plan v. BP p.l.c., et al.*, 4:13-cv-3397 (S.D. Tex.), *KBC*

*Asset Mgmt., et al. v. BP p.l.c., et al.*, 4:13-cv-0517 (S.D. Tex.), *Deutsche Asset Mgmt. Investmentgesellschaft MBH v. BP p.l.c., et al.*, 4:13-cv-0887 (S.D. Tex.), *Avalon Holdings, Inc., et al. v. BP p.l.c., et al.*, 4:12-cv-3715 (S.D. Tex.) (the "Avalon Action"), and *South Yorkshire Pensions Auth., et al. v. BP p.l.c., et al.*, 4:12-cv-2362 (cons.) (S.D. Tex.) (the "South Yorkshire Action").  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.      NATURE OF THE ACTION

1.      This action brought by four Delaware limited partnerships and an ERISA-compliant group trust established under applicable United States ERISA and tax laws seeks recovery, for themselves and all other similarly situated institutional investors in the proposed Class (defined below) that purchased BP ordinary shares on the London Stock Exchange ("LSE") during the period February 7, 2007 through June 25, 2010 (the "Class Period").

2.      Plaintiffs and the members of the Class lost large sums of money as a result of false and misleading statements and omissions made by Defendants in direct, face-to-face meetings during the Class Period regarding, *inter alia*: (i) the extent of BP's "focus" on "safety and performance," which Defendants claimed to have implemented, at the behest of regulators and experts, in the wake of catastrophic prior safety lapses caused by a "profits first" corporate culture; (ii) implementation across BP's global operations of key purported safety reforms, including a "consistent operations system or a 'BP way'"; and, as the Class Period progressed, that there was a "clear and increasing focus on safety" and that "BP's standardized processes were being rolled out successfully throughout the company."  These misstatements and omissions predated the Deepwater Horizon rig explosion and resultant oil spill in the Gulf of Mexico.

3.      On April 20, 2010, as the crew aboard BP's Deepwater Horizon oil rig drilled the exploratory Macondo well 3.5 miles under the waters of the Gulf, high-pressure gas from the well

shot up through the pipe that led to the surface.  The gas was released onto the rig, ignited, and engulfed the rig in flames.  The fire killed 11 workers, critically injured seven others, and sank the rig.

4.      This tragic April 20 Explosion was the manifestation of a much deeper problem that lay at the bottom of the Gulf.  BP had cut so many safety corners constructing the Macondo well that it was now spewing 2.3 million gallons of oil, *every day*, into the Gulf.  In just five days, the well spilled more oil than was released during the entire Exxon Valdez disaster.  Worse yet, BP had no plan or ability to quickly stop the spill.  By the time the well was capped almost three months later, 206 million gallons had been released into the Gulf, blackening the southern U.S. shoreline and crippling the local tourism and fishing economy.  It was the worst environmental disaster in the history of marine oil exploration.

5.      This catastrophic spill, and its causes, were not a surprise to Defendants.  Long before the Class Period, BP's corporate culture consistently placed cutting costs above protecting lives and the environment as evidenced by a rash of oil spills, accidents, and governmental warnings from the year 2000 to 2006.

6.      In the wake of these accidents and at the insistence of federal regulators, BP established an independent panel to review and improve its safety procedures. Former U.S. Secretary of State James Baker, III was selected to chair the panel (the "Baker Panel").  After completing its investigation, the Baker Panel issued a report on January 16, 2007 (the "Baker Report"), finding, in the words of a Presidential Commission that subsequently investigated the spill (the "Presidential Commission Report"), that "***BP management had not distinguished between occupational safety – concern over slips, sprains, and other workplace accidents – and process safety: hazard analysis, design for safety, material verification, equipment maintenance,***

7

*and process-changing reporting*. And the [Baker P]anel further concluded that BP was not investing leadership and other resources in managing the highest risks." More specifically, the Baker Panel found that: "*from the top of the company, starting with the Board and going down . . . BP has not provided effective process safety leadership and has not adequately established process safety as a core value*."

7. The Baker Panel singled out organizational problems as the root cause of BP's failure to learn from, and respond to, major incidents, finding "a lack of operating discipline, toleration of serious deviations from safe operating practices, and apparent complacency toward serious process-safety risks." The Baker Panel identified 10 specific recommendations that BP could implement "*to help bring about, sustainable improvements in process safety performance*."

8. Defendants immediately professed their commitment to implementing the Baker Panel's recommendations. Lord Edmund John Philip Browne, BP's then CEO, mirroring his repeated prior mantra about BP's commitment to improving safety, responded to the Baker Panel's recommendations with the following statements, among others: "*BP gets it. And I get it too*." He continued: "*BP's workforce is ready, willing and able to participate in a sustained Group-wide effort to move BP towards excellence in process safety*. *BP's safety lapses have been chronic*."

9. Lord Browne's acknowledgement, in the wake of the Baker Panel's report, of BP's troubled past – and his pledge to investors that BP would be a different company going forward – signaled a purported sea change in BP's operations. Throughout the Class Period, Defendants repeatedly returned to this pledge and the recommendations of the Baker Panel, assuring investors that BP had learned its lesson, that its operations were now safe and reliable, and that it was

prepared to address an oil spill in the Gulf.  They went so far as to say that BP strived to be an industry leader in process safety and managing risk.

10.     Unfortunately, none of this was true.  For example, an internal BP strategy document dated December 2008, not known to Plaintiffs, the Class members, or other BP investors, specifically warned BP executives of serious process safety "gaps" in the Gulf:

> *It's become apparent that process-safety major hazards and risks are not fully understood by engineering or line operating personnel. Insufficient awareness is leading to missed signals that precede incidents and response after incidents, both of which increases the potential for and severity of process-safety related incidents*.

The document concluded that BP employees needed "major hazard awareness" training.

11.     Indeed, the Presidential Commission Report concluded that BP had no adequate process safety procedures in place with regard to well testing in deep sea drilling.  The first conclusion of the Presidential Commission Report was simple yet powerful: "*[t]he explosive loss of the Macondo well could have been prevented.*" As the commission explained, "*the blowout was not the product of a series of aberrational decisions made by rogue industry or government officials that could not have been anticipated or expected to occur again. Rather, the root causes are systemic*" to BP.

12.     Equally damning, the Presidential Commission Report found that, contrary to Defendants' representations, Defendants had not implemented the recommendations made by the Baker Panel:  BP's "*approach to managing safety has been on individual worker occupational safety but not on process safety. These incidents and subsequent analyses indicate that the company does not have consistent and reliable risk-management processes – and thus has been unable to meet its professed commitment to safety*."

13.     Throughout the Class Period, Defendants' misrepresentations deceived Plaintiffs and the Class members as to BP's true risk profile in deep sea drilling causing them to purchase BP securities at prices artificially inflated by those misrepresentations.

14.     The April 20 Explosion and oil spill at the Macondo well partially revealed the falsity of Defendants' prior representations about these matters.  It also presented Defendants with a moment of truth.  On the one hand, they could immediately come clean about their prior misrepresentations, tell investors everything they knew about BP's actual commitment to safety, disclose all the information they had about the scope and seriousness of the disaster, and admit that BP had little to no plan or ability to contain the situation.  On the other hand, they could continue misrepresenting the facts in an effort to prop up BP's stock price, which was under enormous pressure as investors worried about the impact of the spill on BP's profitability. Defendants chose the latter course of conduct, doubling down on their campaign of deceit.

15.     Defendants minimized the magnitude of the oil spill, overstated BP's ability to control it, and understated the amount of money BP would have to pay to clean it up.   In a string of post-spill emails, for example, a BP official urged lower level employees to conceal BP's internal flow-rate projections – which were sixty times or more higher than the 1,000 barrels/day projection Defendants had initially released to the public at large, including Plaintiffs and the Class members.  As Defendants knew, but concealed, containing the spill was like trying to toss a hat on a fire hose.

16.     As the truth slowly emerged, BP's American Depository Shares ("ADSs") and BP ordinary shares plunged in value. From the date of the April 20 Explosion through June 25, 2010, these BP securities fell in value by roughly 50%.   This lawsuit seeks to hold Defendants

accountable for the misrepresentations they made to Plaintiffs and the Class members and the economic losses they caused Plaintiffs and the Class members to suffer on their BP investments.

## II.     JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction over Plaintiffs' English law claims pursuant to the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1349(b)(1), which confers subject matter jurisdiction over claims such as those asserted by Plaintiffs, as successfully argued previously by Defendants in other courts and as held, *inter alia*, in *In re: Deepwater Horizon*, No. 12-300012, Document 00512542591 (5th Cir. Feb. 24, 2014).

18.     This Court has personal jurisdiction over each Defendant named herein.  Each Defendant is either a corporation that conducts business, and maintains operations in this District, or is an individual who resides in this District or has sufficient minimum contacts with this District, State, or the United States to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.  For example, the Individual Defendants, defined below, oversaw in whole or in part BP's U.S. operations including those within this district; issued false and misleading statements from the United States, including during the aftermath of the April 20 Explosion, when they worked from BP's "crisis center" and/or from the Unified Command created to address the spill and issued misleading statements regarding the magnitude and BP's responsibility for the oil spill.

19.     This Court has personal jurisdiction over Defendants BP, BP America and BP E&P, defined below.  BP has its principal office in the U.S., while both BP America and BP E&P are headquartered in the U.S., and all three are authorized to do business in New York.  BP regularly transacts business in New York and derives substantial revenue within New York from its business, such as BP's brands of Castrol and BP's gas stations.  The registered agent for BP, BP America, and BP E&P in New York is CT Corporation System, 111 Eighth Avenue, New York,

11

NY 10011.  BP's ADSs traded on the New York Stock Exchange.  BP America is registered to do business in New York, and its registered agent is CT Corporation System, 111 Eighth Avenue, New York, NY 10011.

20.     Venue is proper in this Court because a significant part of the alleged wrongdoing occurred in this Judicial District, where BP has a presence.  Venue for the English law claims is proper in this Court because BP's securities traded on the New York Stock Exchange during the Class Period.  Perhaps most importantly, numerous other institutional plaintiffs, including the Bank of America Pension Plan, as well as the New York City Employees' Retirement System, Teachers' Retirement System of The City of New York, New York City Police Pension Fund, New York City Fire Department Pension Fund, New York City Board of Education Retirement System, Teachers' Variable Annuity Funds, and the New York City Group Trust all filed related actions in this District regarding the same facts at issue.  *See The Bank of Am. Pension Plan v. BP PLC, et al.*, No. 1:14-cv-02806 (S.D.N.Y.) and *New York City Employees' Ret. Sys., et al. v. BP p.l.c., et al.*, No. 1:13-cv-02551 (S.D.N.Y.).  While these actions were transferred for coordinated *pretrial* proceedings to the United States District Court for the Southern District of Texas, upon the conclusion of such proceedings, they will return to this District for a trial on the merits.  The amended pleadings filed in those cases while pending before the Southern District of Texas raise *identical* claims based on *identical* facts at issue as those presented herein.  *See*, *e.g.*, No. 4:14-cv-01280 (S.D. Tex.), Docket Nos. 25 and 28.  Thus, the facts and claims at issue herein will unavoidably be tried before this Court.

## III.    THE PARTIES

### A.     Plaintiffs

21.     Plaintiffs are institutional investors who purchased BP securities during the Class Period, as follows:

(a)     Plaintiff Mondrian Global Equity Fund, L.P. is a Delaware limited partnership, whose General Partner is Mondrian Investment Group (U.S.), Inc.  Both the fund and the General Partner reside in Wilmington, Delaware.  Plaintiff Mondrian Global Equity Fund, L.P. purchased BP ordinary shares on the LSE during the Class Period and was damaged by Defendants' misconduct as alleged herein.  Plaintiff Mondrian Global Equity Fund, L.P. engaged in least 12 transactions in BP common stock during the Class Period, including 10 purchases during the following months: April 2008, August 2008, November 2008, January 2009, April 2009, May 2009, June 2009, August 2009, and October 2009.  Due to the misconduct alleged herein, Plaintiff suffered monetary damages in excess of $75,000.

(b)     Plaintiff Mondrian International Equity Fund, L.P. is a Delaware limited partnership, whose General Partner is Mondrian Investment Group (U.S.), Inc.  Both the fund and the General Partner reside in Wilmington, Delaware.  Plaintiff Mondrian International Equity Fund, L.P. purchased BP ordinary shares on the LSE during the Class Period and was damaged by Defendants' misconduct as alleged herein.  Plaintiff Mondrian International Equity Fund, L.P. engaged in least 49 transactions in BP common stock during the Class Period, including 44 purchases during the following months: March 2007, April 2007, September 2007, December 2007, April 2008, June 2008, July 2008, August 2008, September 2008, October 2008, January 2009, February 2009, April 2009, June 2009, July 2009, August 2009, and September 2009.  Due to the misconduct alleged herein, Plaintiff suffered monetary damages in excess of $75,000.

(c)     Plaintiff Mondrian Focused International Equity Fund, L.P. is a Delaware limited partnership, whose General Partner is Mondrian Investment Group (U.S.), Inc.  Both the fund and the General Partner reside in Wilmington, Delaware.  Plaintiff Mondrian Focused International Equity Fund, L.P. purchased BP ordinary shares on the LSE during the Class Period and was

damaged by Defendants' misconduct as alleged herein.  Plaintiff Mondrian Focused International Equity Fund, L.P. engaged in least 16 transactions in BP common stock during the Class Period, including 11 purchases during the following months: March 2008, September 2008, October 2008, November 2008, April 2009, November 2009, January 2010, and April 2010.  Due to the misconduct alleged herein, Plaintiff suffered monetary damages in excess of $75,000.

(d)    Plaintiff Mondrian All Countries World Ex-US Equity Fund, L.P. is a Delaware limited partnership, whose General Partner is Mondrian Investment Group (U.S.), Inc.  Both the fund and the General Partner reside in Wilmington, Delaware.  Plaintiff Mondrian All Countries World Ex-US Equity Fund, L.P. purchased BP ordinary shares on the LSE during the Class Period and was damaged by Defendants' misconduct as alleged herein.  Plaintiff Mondrian All Countries World Ex-US Equity Fund, L.P. engaged in least 31 transactions in BP common stock during the Class Period, including 27 purchases during the following months: February 2007, December 2007, January 2008,March 2008, May 2008, June 2008, August 2008, October 2008, November 2008, December 2008, April 2009, July 2009, and May 2010.  Due to the misconduct alleged herein, Plaintiff suffered monetary damages in excess of $75,000.

(e)    Plaintiff Mondrian Group Trust is an ERISA-compliant group trust established under applicable United States ERISA and tax laws.  Its Custodial Trustee resides in the United States.  Its Investment Manager is Mondrian Investment Partners Limited, which resides in London, United Kingdom.  Plaintiff Mondrian Group Trust purchased BP ordinary shares on the LSE during the Class Period and was damaged by Defendants' misconduct as alleged herein. Plaintiff Mondrian Group Trust engaged in least 4 transactions in BP common stock during the Class Period, including 4 purchases during the following months: September 2009, October 2009,

and March 2010.  Due to the misconduct alleged herein, Plaintiff suffered monetary damages in excess of $75,000.

**B.     Defendants**

**1.     Corporate Defendants**

22.     Defendant BP plc ("BP" or the "Company") is a U.K. corporation with long-running and extensive contacts in the United States.  As BP's corporate website boasts:

> BP's roots in the United States go deep, starting in 1866 with the founding of the Atlantic Petroleum Storage Company in Pennsylvania oilfields.  Since then, our heritage has come to embody some of the most famous names in American energy: Amoco, ARCO, and Standard Oil.

> BP's portfolio of US business functions is extremely broad, encompassing virtually all aspects of the company's global business: onshore and offshore exploration and production of oil and gas, refining, marketing, retailing, alternative energy and more.

23.     Indeed, BP's corporate website makes clear that "The US is vital to BP."  BP's extensive U.S. contacts include: (a) BP is the largest oil and gas producer in the U.S. and both the largest leaseholder and largest producer in the deepwater U.S. Gulf of Mexico; (b) BP has invested $52 billion in U.S. energy development since 2007, more than BP invested in any other country and $20 billion more than any competitor invested here; (c) BP employs 23,000 people in the U.S., representing nearly 30% of its global workforce and more than it employs in any other country; (d) BP's current CEO, Defendant Dudley, is an American; (e) BP produces over 770,000 barrels of oil equivalent every day in the U.S., representing more than 20% of BP's global daily production; (f) BP operates 13 fields on Alaska's North Slope, which together equate to roughly two-thirds of Alaskan oil production; (g) BP's North America Gas business is the sixth-largest natural gas producer in the U.S., operating in seven of the U.S.'s leading gas basins; (h) BP operates five modern refineries in the U.S., processing up to 1.5 million barrels of crude oil daily; (i) BP markets over 17 billion gallons of gasoline annually in the U.S. coast-to-coast through more

than 11,000 BP-branded service stations (BP and ARCO); (j) BP owns and operates CASTROL, which it touts as being "one of the world's most recognized lubricant brands"; (k) BP Pipelines North America is the U.S.'s second-largest liquids pipeline company, transporting over 1.6 million barrels daily of oil and refined products, natural gas liquids, carbon dioxide, and chemicals; (l) BP operates three chemical plants in the U.S., including one at Texas City; (m) owns and operates significant energy infrastructure throughout the U.S., including thousands of oil and gas wells, wind farms and refineries in Texas; and (n) BP has spent more than $4 billion in the U.S. on alternative energy projects.

24.     BP also has a massive impact on U.S. investment markets.  Nearly 40% of BP shareholders are based in the U.S.  BP is subject to the informational requirements of the Exchange Act, and in accordance therewith, files annual reports, periodic financial statements, and other information with the SEC.

25.     During the Class Period, in particular following the Macondo well oil spill, BP's top executives and senior engineers, including the Individual Defendants, worked and made statements from the Gulf states in the U.S.  Throughout the Class Period, BP controlled, directly or indirectly, Defendants BP Exploration & Production, Inc. and BP America, Inc.

26.     Defendant BP America, Inc. ("BP America"), a wholly-owned subsidiary of BP, is a Delaware corporation with its principal place of business in Houston, Texas.  BP America produces oil and natural gas products in the U.S.  Throughout the Class Period, BP America controlled Defendant BP E&P and that entity's issuance of material information to the public.

27.     Defendant BP Exploration & Production, Inc. ("BP E&P" or "BP Exploration"), a wholly-owned subsidiary of BP, is a Delaware corporation with its principal place of business in Houston, Texas.

28.     Defendants BP, BP America and BP E&P are collectively referred to hereinafter as "BP."

### 2.     Individual Defendants

29.     Defendant Anthony B. Hayward ("Hayward") served as BP's Chief Executive Officer ("CEO") from May 2007 until October 2010, and served as an executive director of BP from 2003 to November 2010.  From 2002 to 2007, Hayward served as the CEO of BP E&P's business segment, which oversaw exploration and drilling in the Gulf, among other places. Defendant Hayward was a member of BP's executive management, and was responsible for the day-to-day running of BP.  Starting in 2006, Hayward headed the Group Operations Risk Committee ("GORC"), an executive committee that reviewed BP's safety protocols, including BP's Operating Management System ("OMS"), and responded to safety incidents in BP's operations.  Hayward also was the executive liaison to the Safety and Ethics & Environment Assurance Committee ("SEEAC"), which is BP's Board of Directors' committee responsible for ensuring that BP's safety protocols are implemented and followed, including the implementation of the Baker Panel's recommendations.  GORC prepared regular safety reports for SEEAC, including quarterly reports called the Health Safety Environment & Operations Integrity Report, otherwise known as the "Orange Book."  During the Class Period, Hayward signed certain BP Annual Reports, and made many of the other false and/or misleading statements as alleged herein. Defendant Hayward's conduct as alleged herein is attributable to Defendant BP throughout the Class Period and to BP E&P from the outset of the Class Period through May 2007.  Defendant Hayward directly or indirectly controlled BP, BP E&P, and BP America throughout the Class Period.

30.     Defendant Robert W. (Bob) Dudley ("Dudley") became Group Chief Executive of BP p.l.c. on October 1, 2010 and has served as an Executive Director on BP's Board of Directors

since April 6, 2009.  Between June 23, 2010 and September 30, 2010, Dudley served as the President and CEO of BP's Gulf Coast Restoration Organization in the U.S.  From April 6, 2009 until June 22, 2010, Dudley was an Executive Vice President and a member of the executive management team with responsibility for the group's activities in the Americas and Asia.  Prior to that, Dudley served a variety of top roles at BP, including from 2003-2008 at President and CEO of TNK-BP, the joint venture between BP and Russian partners.  During the facts at issue surrounding the Deepwater Horizon explosion and the Macondo well oil spill, Dudley was BP's Managing Director and one of the top BP officials coordinating BP's spill response.  Defendant Dudley's conduct as alleged herein is attributable to Defendant BP throughout the Class Period.  Defendant Hayward directly or indirectly controlled BP, BP E&P, and BP America since at least April 6, 2009.

31.     William Castell ("Castell") joined BP's Board of Directors in 2006 as the chairman of SEEAC.  At each SEEAC meeting, Castell and other SEEAC members were provided a report from GORC, usually presented in person by Defendant Hayward, and each quarter SEEAC received the Orange Book.  Additionally, SEEAC was provided with regular reports on the implementation of the Baker Panel's recommendations and reports on the development and implementation of OMS.  During the Class Period, Castell met or otherwise spoke with directly with investors in communications in which false and misleading statements and omissions were made, which are attributable to BP.

32.     Carl-Henric Svanberg ("Svanberg") served as a non-executive member of BP's Board of Directors and its Chairman (succeeding Sutherland) during the Class Period.  During the Class Period, Svanberg met or otherwise spoke with directly with investors in communications in

which he and others made false and misleading statements and omissions, which are attributable to BP.

33.     Defendants Hayward, Dudley, Castell, and Svanberg are collectively referred to hereinafter as the "Individual Defendants."  The Individual Defendants, because of their positions with BP, possessed the power and authority to control the contents of BP's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.* the market.  Each Individual Defendant was provided with copies of BP's reports and press releases on pertinent topics prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made regarding BP's operations were then materially false or misleading when made.  Each Individual Defendant herein made materially false or misleading statements, or omitted to disclose material facts, to investors in the U.S. and disseminated such material misstatements through the use and means of interstate commerce within the U.S. and caused U.S. investors to purchase BP securities at artificially inflated prices.

34.     The Defendants are collectively referred to as "Defendants."

## IV.     ADDITIONAL BP PERSONNEL OF SIGNIFICANCE

35.     Lord Edmund John Philip Browne, Baron Browne of Madingley ("Lord Browne" or "Browne") served as BP's CEO from 1995 until April 2007, during which time he made repeated false and misleading statements about BP's commitment to improving the safety of its operations, which are attributable to BP.  Lord Browne joined BP as an apprentice in 1966 and held various positions, including Managing Director and CEO of BP E&P.  Lord Browne was a

member of BP's executive management.  During the Class Period, Lord Browne also served as an executive member of BP's Board of Directors and as the Head of the BP Group Chief Executive's Committee.

36.     Andrew G. Inglis ("Inglis") served as the CEO of BP E&P and as an executive director of BP from February 2007 until October 2010.  Beginning in July 2004, Inglis was Executive Vice President and Deputy Chief Executive Officer of BP E&P.  Inglis was a member of BP's executive management.  As CEO of BP E&P, Inglis attended SEEAC meetings to report on topics specific to BP E&P.  Inglis also served as GORC member, provided special reports on BP E&P to the Chairman of GORC (Defendant Hayward), and received quarterly Orange Book reports that monitored the progress of OMS implementation across BP.  Inglis considered himself at the apex of responsibility during the Relevant Period (with the possible exception of Defendant Hayward) for BP E&P's activities worldwide.

Q.     Do you feel any responsibility, sir, at all for what happened on April 20th of 2010?

A.     As the CEO of the exploration and production company, I am responsible for the safe and reliable operations across all of the E&P operations globally.

* * *

Q.     And that, of course, would include Gulf of Mexico, correct?

A.     Again, as I said, I was responsible for the—safety and reliability of—of our operations globally.  So that would include the Gulf of Mexico operations.

* * *

Q.     All right.  And in terms of safety for drilling and exploration in the Gulf of Mexico and worldwide insofar as safety is concerned, other than perhaps Dr. Hayward, you would have been the highest in line of authority; is that true?

A.     In terms of the—the responsibility for their safe and reliable operations, yes.

Inglis Dep. at 75:24-76:5; 79:18-24; 80:13-22.  Inglis's conduct as alleged herein is attributable to Defendants BP and BP E&P throughout the Relevant Period.   Inglis directly or indirectly controlled BP E&P throughout the Relevant Period.

37.     David Rainey ("Rainey") was BP America's Vice President of Exploration for the Gulf of Mexico.   Rainey was the person within BP who had "ultimate accountability" for implementing OMS in the Gulf of Mexico and he participated in the Gulf of Mexico gap assessment in 2009 that identified significant risks to BP in the Gulf of Mexico.  Rainey was also a member of BP's executive management.   In the days after the Deepwater Horizon disaster, Rainey served on behalf of BP as Deputy Incident Commander at Unified Command, headquartered in Robert, Louisiana, in the Eastern District of Louisiana.   Unified Command consisted of representatives from the U.S. government as well as BP and Transocean Ltd., the designated "responsible parties" for purposes of responding to the spill.  Led by the United States Coast Guard, Unified Command coordinated the oil spill response.   Rainey was BP's second highest-ranking representative at Unified Command. Rainey's conduct as alleged herein is attributable to BP and BP America throughout the Relevant Period.  Rainey directly or indirectly controlled BP America and BP E&P during the Relevant Period.  Rainey left BP by May or June 2011.

38.     Douglas Suttles ("Suttles") served as Chief Operating Officer for BP E&P from January 2009 through the end of the Relevant Period.  In January 2007, he was named President of BP Exploration (Alaska) Inc. (a position he left when he became BP E&P's COO) and joined BP's Board of Directors.   During the Relevant Period, Suttles made false and/or misleading statements as alleged herein.  Suttles's conduct as alleged herein is attributable to Defendants BP and BP E&P throughout the Relevant Period.  Suttles directly or indirectly controlled BP E&P

from at least January 2009 through the end of the Relevant Period.  Suttles left his position as COO of BP Exploration and as a member of BP's Board of Directors in or about January 2011, suspicious timing.

39.     Sir Ian Prosser ("Prosser") served as BP's Deputy Chairman during the Class Period.  During the Class Period, Prosser met or otherwise spoke with directly with investors in communications in which false and misleading statements and omissions were made, which are attributable to BP.  Prosser retired as Deputy Chairman and senior independent Director on BP's Board in April 2010.

40.     Dr. DeAnne Julius ("Julius") served on BP's Board of Directors during the Class Period.  During the Class Period, Julius met or otherwise spoke with directly with investors in communications in which false and misleading statements and omissions were made, which are attributable to BP.

41.     Byron Grote ("Grote") served as BP's CFO during the Class Period and was an executive member of BP's Board of Directors.  During the Class Period, Grote met or otherwise spoke with directly with investors in communications in which he and others made false and misleading statements and omissions, which are attributable to BP.

42.     John Manzoni ("Manzoni") served as BP's Chief Executive, Refining and Marketing, as an executive member of BP's Board of Directors, and as a member of the BP Group Chief Executive's Committee during the Class Period, having assumed those roles in 2002-2003.  During the Class Period, Manzoni met or otherwise spoke with directly with investors in communications in which false and misleading statements and omissions were made, which are attributable to BP.  Manzoni left BP in August 2007.

43.     Fergus MacLeod ("MacLeod") served as BP's Head of Investor Relations during the Class Period.  During the Class Period, MacLeod met or otherwise spoke directly with investors in communications in which he and others made false and misleading statements and omissions, which are attributable to BP.

## V.     CONFIDENTIAL WITNESSES

44.     As alleged in the Second Consolidated Amended Class Action Complaint for All Purchasers of BP ADS Securities (the "ADS Complaint") in No. 4:10-md-02185 (S.D. Tex.) (the "ADS Action"), Confidential Witness # 1 ("CW1") is a confidential witness on process safety and risk assessment and management.  Through 2005, CW1 consulted directly with the BP Board of Directors and executive management.  Specifically, CW1 acted as a safety systems and risk assessment consultant for, among other things, deepwater platforms and offshore drilling, including but not limited to the Gulf of Mexico.  Subsequent to the consultation, through the present, CW1 has been apprised of information related to BP's process safety and risk assessment and management in the Gulf of Mexico operations.

45.     As alleged in the ADS Complaint, Confidential Witness # 2 ("CW2") is a former BP senior manager and an expert in the offshore oil and gas drilling and completions.  CW2 possessed information related directly to BP's Gulf of Mexico deepwater exploration, including but not limited to process safety implementation.  Prior to separating from BP in 2009, CW2 reported directly to senior BP executives and indirectly to Inglis.

46.     As alleged in the ADS Complaint, Confidential Witness #3 ("CW3") is an oil industry operational safety expert and former consultant to the BP Board of Directors.  CW3 presented information and analyses directly to non-party Lord Browne and Defendant Hayward on issues, including but not limited to implementation of process safety and risk management practices.

**VI.    BP PURPORTEDLY TOOK EXTENSIVE MEASURES TO RECTIFY ITS OPERATIONAL HISTORY RIFE WITH SAFETY VIOLATIONS**

**A.    BP's Relevant Operations**

47.    BP is a global oil and gas company and is the third-largest energy company in the world. BP is active in every area of the oil and gas industry, including drilling exploration and production, refining, distribution and marketing, petrochemicals, power generation and trading. With operations in over 80 countries, BP produces around 3.8 million barrels of oil equivalent per day. Its largest division is BP America, which is the biggest producer of oil and gas in the U.S.

48.    BP's exploration and production segment, BP E&P, includes oil and natural gas exploration, field development and production, and marketing and trading of natural gas. It has exploration and production activities in Angola, Azerbaijan, Canada, Egypt, Libya, the Russian Federation, Trinidad and Tobago, Norway, the United Kingdom, and the U.S. (including the Gulf of Mexico), as well as in the Asia Pacific, Latin America, North Africa, and the Middle East.

49.    Throughout the Class Period, BP touted its Exploration and Production business and, more specifically, its operations in the deepwater Gulf of Mexico, a region BP hailed as a "profit centre" and a "high margin" production area. BP described the Gulf of Mexico as "an important source of domestic energy, and offshore deepwater developments" and told investors that oil from that region accounted for one-sixth of all oil produced in the U.S.

50.    Specifically, in the 2008 Annual Report filed on Form 20-F on March 4, 2009, BP highlighted the safety and success of its operations in the Gulf of Mexico, emphasizing the fact that it was one of the largest deepwater operators in the world. At the same time, BP failed to disclose that it had not implemented safety measures for its Gulf of Mexico operations, and BP also failed to disclose that it had disregarded safety warnings about its operations and that it lacked robust risk management processes that left BP dangerously exposed to a catastrophic accident.

### B.    BP Is No Stranger to Catastrophic Industrial Incidents

51.    BP is no stranger to catastrophic industrial incidents, including incidents related to its off shore drilling operations.

### 1.    BP's Flawed Process Safety Controls Cause Grangemouth Incidents

52.    Between May 29 and June 10, 2000, BP's Grangemouth storage and refining complex in Scotland experienced three major incidents. These included a power failure leading to the emergency shutdown of the oil refinery; the rupture of a key steam pipe; and a fire in the refinery's catalytic cracker unit, which produces gasoline. The UK Health and Safety Executive "HSE" investigated the incidents and issued a report in 2003 finding in all three incidents "weaknesses in [BP's] safety management systems on-site over a period of time." BP carried out an internal investigation, which concurred in many of the UK HSE's findings. BP later pled guilty to criminal charges stemming from the incidents and paid over £1 million in fines.

### 2.    Unsafe Deepwater Drilling Operations

53.    In 2002, the *Ocean King,* a drilling rig under BP's operational control in the Gulf of Mexico, experienced two separate blowout incidents within a three-month span, raising questions about BP's process safety and well design procedures and practices.

54.    The first incident occurred in August 2002, when the *Ocean King* suffered a gas blowout while drilling a well in the Gulf of Mexico's Grand Isle block near Louisiana. The crew's efforts to contain the well failed, and they soon evacuated the rig because of the high level of airborne gas. The flow of gas and other material exploded, causing a fire on the rig and $2 million in damage.

55.    During its investigation of BP's safety practices, the U.S. Department of the Interior's Minerals Management Services ("MMS") discovered that BP had inexplicably installed a non-compliant blowout diverter system, which contributed to the explosion and fire, rather than

the one specifically designed and approved for the rig. MMS also found that the fire's effects were intensified because BP personnel had stored pressurized containers of flammable gas too close to the diverter output. Worse still, the investigation revealed that BP engineers, because of a nearby well drilling project, knew that there was a shallow gas pocket at 2,700 feet beneath the sea floor surface, the precise depth which the rig had reached when the well blew out. The incident was both caused by and revealed a host of systemic safety issues involving BP's failures to build and execute wells as designed, ensure the proper design of the drill rig, and keep accurate up-to-date designs of their equipment.

56.     Just three months later, in November 2002, after the *Ocean King* had undergone major repairs and returned to the Grand Isle block, a second incident occurred, similar to the first. After cementing the steel casing in another newly drilled well hole, mud and gas began to flow onto the rig, indicating a failed cementing job. After an unsuccessful effort to contain the well, the crew evacuated. The MMS issued a harsh critique of the second incident, noting the flawed attempt to bring the well under control, and serious deficiencies in BP's safety protocols and knowledge of equipment.

57.     The two incidents in 2002 resulted in MMS issuing a special "Safety Alert" to all drilling companies in the Gulf of Mexico regarding the serious risk of a blowout in the event of a failed cementing job. The Safety Alert specifically mentioned MMS's findings about BP during the *Ocean King* incident, cautioning others in the industry about "erroneous chain of decisions, inadequate training of personnel or knowledge of the diverter system, and inadequate planning."

58.     In May 2003, BP suffered a near blowout not far from the Macondo well. In that incident, the Transocean *Discoverer Enterprise,* on contract with BP, drifted off its drill site just as a well was being completed, breaking the riser pipe linking the rig to the ocean floor. The

breaking of the riser was strikingly similar to what occurred on the *Deepwater Horizon* after it exploded. Fortunately for BP, the backup "deadman" switch on the rig's blowout preventer ("BOP") worked: the BOP's rams closed, preventing the flow of oil or gas into the Gulf of Mexico from the damaged riser. A subsequent inspection, however, showed that pieces of broken riser pipe were leaning up against the BOP, close to its control lines, and that the BOP itself was partially damaged – demonstrating that the "fail safe" BOP device, regardless of its immediate effectiveness, was subsequently vulnerable to damage or incapacitation by a falling riser pipe – an outcome which in fact occurred during the *Deepwater Horizon* incident.

59.     In August 2004, BP experienced a blowout in the Nile delta, off the coast of Egypt, when the *GSF Adriatic IV,* a gas drilling rig leased from Global Santa Fe (which, in 2007, merged with Transocean) exploded while completing a well for a joint consortium, which included BP. The fire raged for over a week before the well was brought under control.  Analysts later said that Egypt's natural gas production was reduced by 10-15 percent because of the incident. As with the *Deepwater Horizon* incident, the blowout occurred after a final cementing job failed.

### 3.     BP's Thunder Horse PDQ Operated With Pipeline Cracks That Could Have Been Catastrophic

60.     In July 2005, BP's massive and newly-deployed production and drilling rig in the Gulf of Mexico, *Thunder Horse PDQ* ("Thunder Horse")*,* was evacuated for a passing hurricane and almost capsized after a key internal valve, which had been installed backwards, allowed ballast water to accumulate in one section of the rig, causing a dangerous tilt. When the rig was later put in dry-dock for repairs, cracks were discovered in the underwater pipelines beneath the rig. A senior engineering consultant who worked on the Thunder Horse project later told *The New York Times* that the pipeline cracks: "could have been catastrophic." He continued by noting that: "You would have lost a lot of oil a mile down before you would have even known. It could have been a

helluva spill – much like the *Deepwater Horizon."* The Thunder Horse repairs took three years to complete.

### 4.    Safety Lapses Cause an Explosion at BP's Texas Refinery

61.    On March 23, 2005, an explosion occurred at BP's Texas City refinery. Fifteen people were killed and approximately 170 were injured. The U.S. Environmental Protection Agency's ("EPA") criminal investigative division launched a criminal investigation, as did the U.S. Occupational Safety and Health Administration ("OSHA"), EPA civil inspectors, the CSB, and the Texas Environmental Quality Commission ("TCEQ").

62.    The next day, Lord Browne flew to Texas City and held a press conference at which he acknowledged the gravity of the incident, saying, "Yesterday was a dark day in BP's history. It is the worst tragedy I have known during my 38 years with the company."  While asserting that BP believed that the Texas City explosion was unrelated to previous incidents, he pledged to "leave nothing undone in our effort to determine the cause of the tragedy" and to carry out any reforms necessary.

63.    In April 2005, OSHA placed BP under its Enhanced Enforcement Program for employers who are "indifferent to their obligations under the OSHA Act." EPA civil inspectors entered into a settlement with BP, laying out a timeline and plan to bring the refinery's operations into compliance with EPA regulations. TCEQ reached a similar agreement with BP in mid-2006.

64.    On April 15, 2005, Lord Browne referred to Texas City as "the saddest and most moving day of my entire career at BP."  Later, in May 2005, he told the Houston Chronicle, "BP takes responsibility for what happens at its sites.  We want BP to be a safe place to work.  So as well as mourning for those we have lost, we are determined to learn from this tragedy and improve our safety record."

65.     In mid-2005, the CSB recommended that BP appoint an independent commission to investigate BP's internal safety culture and uncover the causes of the incident as well as to investigate other general concerns with BP's safety environment. Lord Browne issued a statement saying that BP would comply with the recommendation.  He added, "The Texas City explosion was the worst tragedy in the recent history of BP, and we will do everything possible to ensure nothing like it happens again.  Today's recommendation from the CSB is a welcome development, and we take it seriously."

66.     In response to the CSB's recommendation, in October 2005, BP announced the formation of the "U.S. Refineries Independent Safety Review Panel," chaired by former Secretary of State James Baker. Lord Browne said in a prepared statement, "The panel will have BP's full support and cooperation.  We are determined to do everything possible to prevent a tragedy like this from ever happening again by ensuring that safety practices at our operations are effective and comprehensive."  The Baker Panel began conducting investigations in October 2005 and issued its final report on January 16, 2007.

67.     While the Baker Panel's work was underway, on October 24, 2006, Lord Browne stated, "The fire and explosion at Texas City have forever heightened our awareness of safety."

68.     In March 2007, CSB completed its investigation of the Texas City incident and issued its report on March 22, 2007. The report flagged weaknesses in BP's safety culture. It criticized BP's management for its lack of "focus on controlling major hazard risk," finding that managers provided "ineffective corporate leadership and oversight." CSB's report also identified BP's failures to heed warning signs and internal concerns raised by its own staff, writing that BP's managers "provided ineffective leadership and oversight" and "did not implement adequate safety oversight, provide needed human and economic resources, or consistently model adherence to

29

safety rules and procedures." The CSB found a direct correlation between the blast and BP's cuts in safety and staffing budgets, concluding: BP "did not effectively evaluate the safety implications of major organizational, personnel, and policy changes." Finally, the CSB report criticized BP for failing to learn from its earlier, similar mistakes.

### 5. Widespread Corrosion Causes Leaks in BP's Alaskan Pipeline Operations in Prudhoe Bay

69.     In early 2006, an oil spill of 210,000 to 260,000 gallons occurred on BP's Prudhoe Bay pipelines on Alaska's North Slope, facing the Arctic Sea. The pipeline had been leaking for weeks and was first discovered on March 2, 2006. Joint federal and state investigations, encompassing both criminal and civil matters, began in March 2006. The investigations ultimately addressed not only the March 2006 leak, but also addressed weaknesses in other parts of the pipeline, and a subsequent leak that occurred on another part of the pipeline in August 2006.

70.     On July 25, 2006, Lord Browne told analysts and investors that Texas City and the oil spill in Alaska had caused "great shock within BP."  He took personal responsibility, stating, "These are things I want to apologize for.  These caused a lot of stress and distress to people, and to some families irreparable damage."  He stated, "First and foremost, we are committed to safety, integrity and the environment.  We're redoubling our efforts in this sphere, notably in North America."  He added that BP did not want to wait for the outcome of governmental investigations before acting, and that it would devote another $1 billion, in addition to $6 billion already committed over four years, to upgrade safety at BP's U.S. refineries and to replace infield pipelines in Alaska.  As regards Texas City and the Alaskan pipeline spill, he said, "We have to get the priorities right, and Job 1 is to get these things that have happened, get them fixed and get them sorted out.  We don't just sort them out on the surface, we get them fixed deeply."  He also underscored the importance of BP's having safe operations in the U.S., stating, "BP has some 40

percent of its assets and its staff in the United States… We are the largest indigenous producer of oil and gas combined. It is of vital importance to BP and to Americans who depend significantly on us for secure energy supplies that our U.S. businesses operate to the highest standards of safety and integrity."

71. An EPA criminal investigation concluded that widespread corrosion in the pipelines had led to the March and August leaks (and other points of corrosion uncovered in the investigation) and that BP could have prevented the leaks by maintaining and inspecting its pipelines. It further concluded that the duration of the spill revealed BP's criminal neglect of the pipeline.

72. In 2007, BP pled guilty to a criminal charge in connection with the March 2006 spill, admitting that BP's "criminal negligence" caused the corrosion – and thus the spill itself. BP was sentenced to three years of probation and fined 22 million dollars.

73. The 2006 spill was BP's second criminal plea in the U.S. in a decade: in the late 1990s BP had been indicted because its engineers were injecting dangerous materials into a well casing to dispose of the materials. In response, BP had pled guilty in 2000, had been put on five years of probation, and had entered into a compliance agreement with the EPA's debarment division.

74. In March 2007, BP received warnings about the deficiencies in its safety-related corporate governance from the consulting firm Booz Allen Hamilton ("Booz Allen"). In the wake of the 2006 spill on its Prudhoe Bay pipeline, BP retained Booz Allen to "identify potential organizational, process, and governance issues" that related or contributed to the incident. The Booz Allen report found that BP's executive management and Board of Directors had created a culture focused on cost-cutting and ensuring that budget targets were met, while ignoring safety

issues and critical maintenance. Among other findings, Booz Allen found major shortcomings in BP's internal communications culture noting, in particular, that "critical risk data" and concerns about major risks were not properly communicated within BP. More specifically, the report noted that "[r]isk-related vertical and horizontal communications do not elevate critical risk data to senior leadership." Booz Allen effectively put Defendants on notice that they could not rely on BP's internal reporting mechanisms to receive "critical risk data" and thus understand the risk of catastrophic operating failure.

75.     In May 2007, the CSB chairman, Carolyn Merritt, testified before Congress about similarities between the Booz Allen report on Alaska and the CSB's report on Texas City, noting that "[v]irtually all of the seven root causes identified for the Prudhoe Bay incidents have strong echoes in Texas City," and identified "common findings" that included "flawed communication of lessons learned, excessive decentralization of safety functions and high management turnover. BP focused on personal safety statistics but allowed catastrophic process safety risks to grow."

### 6.     BP Purports to Adopt the Baker Panel Recommendations

76.     In 2005, at the CSB's urging, BP established its own independent panel to review and improve its safety procedures, chaired by former U.S. Secretary of State James Baker, III (the "Baker Panel").  After completing its investigation, the Baker Panel issued a report on January 16, 2007 (the "Baker Report"), finding, in the words of the Presidential Commission, that "***BP management had not distinguished between occupational safety – concern over slips, sprains, and other workplace accidents – and process safety: hazard analysis, design for safety, material verification, equipment maintenance, and process-changing reporting***". And the [Baker P]anel further concluded that BP was not investing leadership and other resources in managing the highest risks." More specifically, the Baker Panel found that: "***from the top of the company, starting with the Board and going down . . . BP has not provided effective process safety leadership and has***

*not adequately established process safety as a core value*." Indeed, even then-BP CEO Lord John Browne admitted that BP had failed to adequately address process safety issues prior to the Texas City disaster and that it was those failures that led to the explosion. For example, Lord Browne stated, in part, that:

> We had emphasized that individuals had to be safe as they went about their daily work – "personal safety." That led to dramatic improvements. *But we had not emphasized that processes and equipment had to be safe under all circumstances and operated in a safe way at all times – "process safety."*

77.     The Baker Panel singled out organizational problems as the root cause of BP's continued failure to learn from, and respond to, major incidents, finding "a lack of operating discipline, toleration of serious deviations from safe operating practices, and apparent complacency toward serious process-safety risks."

78.     On January 16, 2007, the Baker Panel released its Report which contained 10 recommendations "*to help bring about, sustainable improvements in process safety performance*."

> RECOMMENDATION #1 – PROCESS SAFETY LEADERSHIP – The Board of Directors of BP p.l.c, BP's executive management (including its Group Chief Executive), and other members of BP's corporate management must provide effective leadership on and establish appropriate goals for process safety. Those individuals must demonstrate their commitment to process safety by articulating a clear message on the importance of process safety and matching that message both with the policies they adopt and the actions they take.
>
> RECOMMENDATION #2 – INTEGRATED AND COMPREHENSIVE PROCESS SAFETY MANAGEMENT SYSTEM – BP should establish and implement an integrated and comprehensive process safety management system that systematically and continuously identifies, reduces, and manages process safety risks at its U.S. refineries.
>
> RECOMMENDATION #3 – PROCESS SAFETY KNOWLEDGE AND EXPERTISE – BP should develop and implement a system to ensure that its executive management, its refining line management above the refinery level, and all U.S. refining personnel, including managers, supervisors, workers, and contractors, possess an appropriate level of process safety knowledge and expertise.

33

RECOMMENDATION #4 – PROCESS SAFETY CULTURE – BP should involve the relevant stakeholders to develop a positive, trusting, and open process safety culture within each U.S. refinery.

RECOMMENDATION #5 – CLEARLY DEFINED EXPECTATIONS AND ACCOUNTABILITY FOR PROCESS SAFETY – BP should clearly define expectations and strengthen accountability for process safety performance at all levels in executive management and in the refining managerial and supervisory reporting line.

RECOMMENDATION #6 – SUPPORT FOR LINE MANAGEMENT – BP should provide more effective and better coordinated process safety support for the U.S. refining line organization.

RECOMMENDATION #7 – LEADING AND LAGGING PERFORMANCE INDICATORS FOR PROCESS SAFETY – BP should develop, implement, maintain, and periodically update an integrated set of leading and lagging performance indicators for more effectively monitoring the process safety performance of the U.S. refineries by BP's refining line management, executive management (including the Group Chief Executive), and Board of Directors. In addition, BP should work with the U.S. Chemical Safety and Hazard Investigation Board and with industry, labor organizations, other governmental agencies, and other organizations to develop a consensus set of leading and lagging indicators for process safety performance for use in the refining and chemical processing industries.

RECOMMENDATION #8 – PROCESS SAFETY AUDITING – BP should establish and implement an effective system to audit process safety performance at its U.S. refineries.

RECOMMENDATION #9 – BOARD MONITORING – BP's Board should monitor the implementation of the recommendations of the Panel . . . and the ongoing process safety performance of BP's U.S. refineries. The Board should, for a period of at least five calendar years, engage an independent monitor to report annually to the Board on BP's progress in implementing the Panel's recommendations . . . . The Board should also report publicly on the progress of such implementation and on BP's ongoing process safety performance.

RECOMMENDATION #10 – INDUSTRY LEADER – BP should use the lessons learned from the Texas City tragedy and from the Panel's report to transform the company into a recognized industry leader in process safety management. The Panel believes that these recommendations . . . can help bring about sustainable improvements in process safety performance at all BP U.S. refineries.

79.     Following the release of the Baker Panel recommendations, BP consistently stated that it would implement the mandates across all lines of its business. In a January 16, 2007 press conference responding to the findings of the Baker Report, Lord Browne announced:

> If I had to say one thing which I hope you will all hear today it is this 'BP gets it.' And I get it too. This happened on my watch and, as Chief Executive, I have a responsibility to learn from what has occurred. ***I recognise the need for improvement and that my successor, Tony Hayward, and I need to take a lead in putting that right by championing process safety as a foundation of BP's operations***.
>
> * * *
>
> The list of what we have done since the accident ***shows how seriously we take process safety***.

80.     Yet the truth, as described herein, is not only that BP did not "get it," but that Defendants knew of or recklessly disregarded their continued failure to implement the process safety programs and procedures either as promised or necessary to avoid the recurrence of similarly preventable deep sea drilling incidents. The occurrence of the worst industrial incident in history, along with the Presidential Commission's finding that BP has not met "it's professed commitment to safety" belied BP's public representations concerning its professed commitment to ensuring the safety of its deep sea drilling operations.

> **7.     BP Creates the Group Operations Risk Committee and the Safety, Ethics and Environment Assurance Committee to Implement and Monitor Process Safety Systems**

81.     As part of BP's professed commitment to process safety, BP told investors that OMS was designed to address the Baker Panel's recommendation to establish and implement an integrated and comprehensive system that would systematically identify, reduce and manage process safety risks. In connection with this public mandate, BP set up a committee called GORC – Group Operations Risk Committee – tasked with oversight and implementation of OMS, among other responsibilities. GORC met monthly and included sectional CEOs, with Defendant Hayward

as Committee Chair. GORC's role was to educate Defendant Hayward, the CEOs, and to insure that operational risks were identified and properly managed. A document prepared for the March 1, 2007 GORC meeting states "GORC is the overall steward of the OMS implementation project."

82. Defendant Hayward and Inglis both testified that they were knowledgeable about the scope and implementation of OMS through their participation in GORC. Inglis testified:

> A. The group operations – Group Operations Risk Committee was set up by – by Tony Hayward to monitor our safety and integrity performance. It was there to act as a vehicle for continuing to improve our performance. That was through OMS. So part of it was to actually look at how OMS was being implemented. It connected into the OMS audit function, so that reported in to GORC.

Inglis Dep. at 279:21-280:4.

83. Similarly, as the CEO of BP and Chairman of GORC, Hayward was responsible for overseeing OMS development and implementation, which gave him detailed knowledge in these areas:

> Q. And you are very familiar with process safety because of your position as Chair of the Group Operating Risk Committee, aren't you?
>
> A. I am.
>
> * * *
>
> Q. And one of the responsibilities you had . . . as Chair of [GORC] . . . tell me whether I read this correctly, quote, "Oversight of development and implementation of BP's Operating Management System . . ."
>
> A. That's correct.

Hayward Dep. at 149:10-13; 163:14-21.

84. Defendant Hayward, Inglis, and other members of GORC received regular status updates concerning the scope and implementation of OMS via the "Orange Book." As described by Inglis, the purpose of the Orange Book was to provide members of GORC with key performance indicators concerning implementation of OMS:

> Q.     What was the purpose of the Orange Book?
>
> A.     The Orange Book actually started in the upstream [synonymous with "Exploration & Production"]. It was sort of under my leadership, and then it got introduced as something that would apply across the whole of the – of the group, but, in essence, it was to provide a – a performance monitoring in – performance monitoring information around safety and operational integrity. So it had in it key performance indicators, indicators of progress on various initiatives, whether they be the six-point plan, the implementation of OMS. So it was a – a compendium of all the information that you could use to assess progress on our safety and operation integrity agenda.

Inglis Dep. at 286:24-287:15.

85.     Inglis testified that he monitored the implementation of OMS through the Orange Book: "There was then a very rigorous process for [OMS'] implementation, as I've described to you. I monitored the implementation of that through the – the Orange Book and the three stages of [g]ap assessment, prioritization, and MOC [Management of Change]." Inglis Dep. at 379:11-16.

86.     Defendant Hayward further admitted that the Orange Book provided a clear indication of what areas of BP's operations had or had not implemented OMS:

> Q.     And what other areas would not have had OMS fully implemented until the end of 2010, other than the Gulf of Mexico?
>
> A.     I can't remember the list, but, you know, we have a list that's in many of these reports, that – that document – if you refer to the thing called the Orange Book, it's very clear which areas are complete, which areas are in – in transition.

Hayward Dep. at 791:7-11.

### 8.     SEEAC Closely Monitored BP's Safety Performance Including OMS Implementation

87.     BP's Safety, Ethics and Environment Assurance Committee ("SEEAC") was a board-level committee. SEEAC was created to ensure that company publications concerning environmental, safety, and ethical matters were accurate. It purportedly carried out that purpose

by obtaining reports from Defendant Hayward, a Special Liaison to SEEAC, who regularly reported to SEEAC concerning issues within the purview of GORC, including the status of OMS implementation. SEEAC also independently monitored progress in BP's process safety efforts. Inglis also reported to SEEAC, from time to time, concerning matters relating to his Exploration and Production unit. SEEAC met regularly (more than quarterly) – eight times in 2008, seven times in 2009, and nine times in 2010 – and was continuously updated with respect to BP's implementation of OMS. Indeed, Hayward attended each of these meetings up until the time of the blowout.

88.     William Castell, the chairman of SEEAC, testified that "the duties and obligations [of SEEAC] are set out in [BP's] Annual Report." BP's 2008 Annual Report, published on March 4, 2009, defined SEEAC responsibilities as including: "[r]eviewing material to be placed before shareholders that addresses environmental, safety and ethical performance and make [*sic]* recommendations to the Board about their adoption and publication." It defined "the main tasks and requirements for SEEAC" to include "monitoring and obtaining assurance that the management or mitigation of material non-financial risks [was] appropriately addressed by the group chief executive." Castell testified that non-financial risks include safety-related risks.

89.     The 2008 Annual Report also discussed the types of information received by SEEAC: "[SEEAC] receives information on agenda items from both internal and external sources, including internal audit, the safety and operations function, the group compliance and ethics function, and Ernst & Young. Like other board committees, SEEAC can access independent advice and counsel if it requires, on an unrestricted basis."

90.     Moreover, Castell testified that SEEAC members received the Orange Book on a quarterly basis, and that it contained detailed data concerning BP's safety performance:

Q.    Now, the Reports you get, that's the Orange Book; is that right?

A.    We receive an Orange Book on a quarterly basis, sir.

Q.    Yes. And tell us what that is. What is the Orange Book?

A.    The Orange Book is a compilation of Operations and Risk data which is – which is received by the Group Operations Risk Committee, which is the mechanisms of formal reporting to the GORC Committee as to the level of safety achieved, the lead and lag factors, the major incidents reported. These are all consolidated. So on a quarterly basis, there is a consolidated document that refers to the last quarter's performance.

* * *

Q.    Is it metrics?

A.    It's metrics, and it's – well, it goes beyond metrics, sir. There are Reports that highlight where there have been major incidents. There are verbal Reports from Upstream and Downstream, and there are Reports on Audit, so not always metrics. There are also, you know, comments on audits, audit closeouts, et cetera.

* * *

Q.    I'm trying to understand at what level the seriousness of an incident would come to your Committee, the SEEAC Committee. How – how bad does it have to be before your Committee finds out about it?

* * *

A.    I think you've seen from the data, sir, that we have the data that comes to us. When you say, "How bad does it have to be," the – the data in the Orange Book goes down to lost days of work. So if they lost days at work, we can see it.

Castell Dep. at 377:23-378:12, 378:15-22, 380:22-381:1, 381:4-8.

91.    According to an April 2008 report of BP's independent expert concerning board-level monitoring of safety at BP, SEEAC had: extensively liaised with Defendant Hayward and Inglis (through GORC); received regular reports regarding the Safety & Operations ("S&O") audit function; and, received detailed process safety and OMS implementation information through quarterly dissemination of the Orange Book. The report also stated that SEEAC – which was

formerly referred to as the "EEAC" – was re-designated in Autumn 2006 as SEEAC (Safety, Ethics and Environment Assurance Committee) to emphasize its monitoring role in safety matters. The report went on to note: "Executive management's attendance at meetings of this Committee is now led by the Chief Executive [Tony Hayward], sending a further strong signal to management and staff of the Board's focus on, and the Chief Executive's commitment to, safety." It stated further that "SEEAC has received regular reports on the implementation of the Six Point Plan and the development and implementation of OMS. These are now monitored in the Orange Book."

9.      **BP Launches OMS to Purportedly Implement the Baker Panel's Recommendations, but Exempts OMS's Application from Rigs that BP Did Not Fully-Own**

92.     In 2007, BP introduced OMS at 12 representative pilot sites and by early 2008 BP purportedly sought to implement OMS company-wide. OMS was supposedly the cornerstone of BP's efforts at improving its process safety protocols and preventing major accidents in the wake of the Texas City disaster. According to Ellis Armstrong, CFO of BP Exploration and Fed. R. Civ. P. 30(b)(6) witness in the MDL 2179 action, BP's executive management made the determination to extend the Baker Panel process safety recommendations across the entire panoply of the BP Group, including Exploration and Production in the Gulf of Mexico, rather than limiting implementation to its refineries. Armstrong Dep. at 57:1-13. Defendant Hayward repeatedly and publicly referred to OMS as the means by which BP would improve its process safety performance.

93.     BP's 2006 Sustainability Report, made publicly available on May 9, 2007, represented that "OMS is a comprehensive system that covers ***all aspects*** of our operations . . . ." The Report further represented that "[t]he new OMS will apply to ***all operations***" and BP stated in its 2007 Annual Review that "OMS is the foundation for a safe, effective, and high-performing BP."

40

94.     On September 25, 2007, Inglis spoke at the Sanford Bernstein 4th Annual Strategic Decisions Conference and misleadingly stated: "One aspect of our focus on safe and reliable operations that I mentioned earlier is our new standardised Operating Management System (OMS). This will provide a blueprint for safety and ***all aspects of operations*** throughout BP."

95.     On May 20, 2008, BP released its 2007 Sustainability Report. In the "Group chief executive's introduction" to that report, Defendant Hayward noted that BP was "still learning lessons from" Texas City and had "agreed to implement all [the Baker Panel's] recommendations and we are now working to do so." Describing BP's efforts in that regard, Hayward stated, "[w]e are also now introducing our new operating management system (OMS), designed to bring greater consistency to our operations. My executive team continues to monitor closely our safety performance." In that regard, the 2007 Sustainability Report further noted that the Hayward-led GORC met 14 times in 2007.

96.     On February 24, 2009, BP released its 2008 Annual Review. In the section titled, the "Group Chief Executive's Review," Defendant Hayward noted that "[t]he BP operating management system (OMS) turns the principle of safe and reliable operations into reality by governing how ***every BP project, site, operation, and facility is managed."*** Similarly, on March 4, 2009, BP released its 2008 Annual Report filed on Form 20-F, which was signed by Defendant Hayward. According to the 2008 20-F, OMS was a "***framework for operations across BP*** that is integral to improving safety and operating performance in ***every site.***"

97.     Contrary to Defendants' representations, however, and as admitted by BP, OMS did not apply to BP's operations on rigs unless the rig was fully-owned by BP. This included six out of seven wells in the Gulf of Mexico during early 2010, among them the Transocean-owned

*Deepwater Horizon. See* MTD Hr'g Tr. (Dkt. No. 304), No. 4:10-md-02185 (S.D. Tex.) at 66:6-68:20.

98.     Indeed, BP never intended for OMS to apply to the entirety of BP's operations and OMS was specifically not applicable to drilling rigs that BP did not fully-own. Massive portions of BP's riskiest and potentially most profitable exploration and production projects were largely exempt from OMS because the well sites were physically drilled by contracted drilling rigs. Indeed, BP used contracted rigs to drill the majority of wells in the deepwater Gulf of Mexico. Armstrong Dep. at 247:18-248:4. This practice and the intent to exclude contracted drilling rigs from OMS coverage meant that OMS did not apply to the vast majority of BP's deepwater drilling operations in the Gulf of Mexico, including the Transocean-owned *Deepwater Horizon.*

99.     The deposition testimony of several key BP personnel in the MDL 2179 action confirms this reality. John Mogford ("Mogford"), BP's former Global Head of Safety & Operations and a GORC member testified that "OMS was designed for BP owned and operated institutions, so the focus was on BP production facilities where BP had people . . . according to the guidance for where it was to be applied, on – OMS was not designed to be implemented on contractor sites or vessels." Mogford Dep. at 150:13-19. According to Mogford, this key limitation of the OMS was known to GORC, including Defendant Hayward and Inglis, because the "OMS document, it was approved, and the scope was approved . . . at the GORC." *Id.* at 461:18-19. Mogford testified that GORC held "a discussion that the scope was that [OMS] applied to BP owned and operated and controlled sites." *Id.* at 461:23-25.

100.     Likewise, in his deposition in MDL 2179, Defendant Hayward testified that BP's OMS and safety systems did not apply to third-party contractors in the Gulf of Mexico, including the *Deepwater Horizon:*

> Q.    And, again, the effective well control system, is that something that is both part [Transocean]'s and part BP's?
>
> A.    Yes, ***very largely Transocean, because it is a Transocean Drilling Team that implement the well control procedures. There's no one from BP involved in implementing well control procedures.*** So what we have to do is determine that the well control procedures that Transocean has and that are documented as their well control procedures are appropriate, and, of course, that they're . . . followed.
>
> Q.    Okay. But if there are well control procedures and process procedures in place in the gulf of Mexico, BP procedures, those are applicable as well as the [Transocean] procedures?
>
> A.    Well, I don't want to be pedantic, ***but BP doesn't have well control procedures to manage a well that is beginning to flow, because we're not actually drilling any of the wells that our contractors are.*** So what we want to verify is that those procedures are in place, and they're deemed to be appropriate, and people have been trained such that they know them, and when a situation occurs, that they implement and follow them to control the well.

Hayward Dep. at 668:7-669:5.

101.    John Baxter, Group Head of Engineering for BP and member of GORC, testified that OMS did not apply to the *Deepwater Horizon,* and that as a result numerous safety and risk management procedures instituted in direct response to the Baker Panel recommendations were not applicable to the majority of BP's drilling fleet in the Gulf of Mexico, including the *Deepwater Horizon.* Baxter Dep. at 175:14-15. For example, BP did not apply its Integrity Management, Major Accident Risk ("MAR") analysis, Safety & Operations Audits, or Control of Work to the majority of its drilling rig fleet, including the *Deepwater Horizon,* because OMS was limited to rigs that were fully owned by BP. *Id.* at 175:11-12; 186:24-187:8; 191:20-192:23; 2 10:3-10. This was confirmed by Pat O'Bryan, Vice President of Drilling & Completions, who testified that "[t]he only drilling rig that we had in our fleet [in the Gulf of Mexico] that would fall under the BP OMS is the BP-owned rig the PDQ on Thunderhorse." O'Bryan Dep. at 413:6- 9.

102.     Several BP employees familiar with BP's drilling and completions in the Gulf of Mexico revealed that upstream operations – *i.e.* drilling rigs, including the *Deepwater Horizon* – did not receive information on OMS. For instance, John Guide, Wells Team Leader for the *Deepwater Horizon,* testified that he had no formalized training on OMS until January 2011. Guide Dep. at 433:5-8. Ronnie Sepulvado, Well Site Leader on the *Deepwater Horizon* since 2003, stated that he didn't know what the Gulf of Mexico local OMS was, that he had only "heard" of process safety, and he was completely unfamiliar with 13 policies that were ostensibly part of the Gulf of Mexico Local OMS. Sepulvado Dep. at 357:16-20, 391:6-394:10. Additionally, Cheryl Grounds, Chief Engineer of Process and Process Safety, stated that "[m]y understanding is it was frequently stated in the company is [*sic]* that drilling managed their own work. And we had a lot of work to do in process safety elsewhere, so that was prioritized. So I focused on producing assets and major capital projects[.]" Grounds Dep. at 88:18-24. These statements confirm that the scope of OMS was never intended to apply to some of BP's most critical projects involving drilling rigs that were not fully-owned by BP.

### 10.     Defendant Hayward Knew That Drilling in the Gulf of Mexico Itself Was Highly Risky and That a Deepwater Blowout Was the Highest Risk Facing BP in the Gulf of Mexico

103.     Defendant Hayward stated that BP's cornerstone process safety program (OMS) in the Gulf of Mexico, would apply "across all of BP's operations," that BP had "completed the transition to OMS in" the Gulf of Mexico and that OMS "turns the principle of safe and reliable operations into reality by governing how every BP project, site, operation and facility is managed." These and other similar statements were, at a minimum, severely reckless, considering his knowledge that a deepwater blowout was the highest risk facing BP in the Gulf of Mexico. Not only did Defendant Hayward know that his misrepresentations concerning OMS implementation were false, but he also knew that those misrepresentations concerned the highest risk that BP faced

in the Gulf of Mexico, and one of the highest risks facing the company. As Hayward testified in his deposition in the MDL 2179 Action:

> Q.   Well, what you did know, though, was that DEEP WATER blowout was the highest risk across the entire corporation and that it was the highest risk for your Exploration and Production Unit, wasn't it?
>
> A.   It was certainly one of the highest risks for the corporation. It was the highest risk in the Gulf of Mexico and one of the highest risks for the Ex – for the Exploration and Production Unit.

Hayward Dep. at 196:10-18.

### 11.   Contrary To Defendants' Assertions, the Gulf of Mexico Had Not Completed The Transition to OMS At The Time Of The Deepwater Horizon Disaster

104.   BP's 2008 and 2009 Annual Reports on Form 20-F included Defendants' representations that OMS was in place at BP's exploration and production projects in the Gulf of Mexico. BP stated unequivocally that, "[e]ight sites completed the transition to OMS in 2008," including "the Gulf of Mexico." In reality, however, as BP conceded at oral argument, this statement was false when made. MTD Hr'g Tr. (Dkt. 304), No. 4:10-md-02185 (S.D. Tex.) at 58: 15-2 1 ("The statement here that the Gulf of Mexico completed the transition to OMS in 2008, that that is a statement of specific fact . . . that the plaintiffs have alleged and that I will admit to the Court is not accurate").

105.   During the Class Period, BP and Defendants presented specific information about OMS, including the number of sites in which the program was supposedly implemented, specific sites where it was supposedly already implemented, and statistical percentages demonstrating that BP was supposedly on track with implementation. BP presented this hard data on OMS implementation – and the benefits that OMS had allegedly already begun to achieve – alongside BP's expectations for continued success in its Gulf of Mexico operations. However, the transition

to OMS in the Gulf of Mexico was not complete in 2008 and was not even complete at the time of

the *Deepwater Horizon* disaster.

106.     As Defendant Hayward testified at his deposition in the MDL 2179 action, he knew

that OMS was not fully implemented in the Gulf of Mexico as of April 2010:

Q.     Go back to an old familiar subject, the OMS. Did you know in April of
2010, that the OMS had not been fully implemented in the Gulf of Mexico?

A.     I – yeah. I believe I was aware that it had not been fully implemented. It
was in the process of being implemented as it was in other parts of BP.

Q.     But specifically with respect to the Gulf of Mexico, that's your answer?

A.     Yes.

Q.     Okay. When did you come to learn that?

A.     I would have been aware of it prior to the – you know, in the course of
doing my – my job.

Q.     Okay.

A.     Because we had a – as I've explained a number of times through this
deposition, the Group Operations Risk Committee was looking at the
progress of implementation.

Q.     So you were getting reports as to where it was implemented, where it was
not yet implemented?

A.     And where it – where it was entrained, so to speak.

Hayward Dep. at 662:25-663:20.

107.     Hayward further testified that BP did not even begin to implement OMS in the Gulf

of Mexico until the Fall of 2009 and that he did not expect implementation to be complete until

the end of 2010:

Q.     [Y]ou said that you were on target to implement OMS in the Gulf of Mexico
in 2009?

A.     I – my recollection is that we began the process of cutover to OMS in the
Fall of 2009.

* * *

> Q.     And your recollection also is that you would have completed that implementation in the Gulf of Mexico by the end of 2010?
>
> A.     That's correct.

Hayward Dep. at 789:11-14, 789:17-20.

108.    BP's failure to complete implementation of OMS in the Gulf of Mexico had enormous repercussions. Hayward testified that the *Deepwater Horizon* tragedy potentially could have been avoided if OMS had been fully implemented in the Gulf and/or applicable to the *Deepwater Horizon*.

> Q.     If OMS had been implemented in the Gulf of Mexico before April 20, 2010, is there not the potential for having avoided this terrible catastrophe?

* * *

> A.     There is possible potential –

* * *

> A.     Undoubtedly.

Hayward Dep. at 793:25-794:8.

109.    Likewise, SEEAC Chairman Castell fully understood that implementation of OMS had not been completed in the Gulf of Mexico by 2008. Castell testified, "I believe OMS started its integration in the Gulf in 2009. I would be personally surprised – and I don't know, but I'd be surprised if it had been fully integrated with all the legacy systems [as of April 20, 2010]." Castell Dep. at 71:11-14.

110.    Moreover, in February of 2009, Defendant Hayward received a report directly from Inglis confirming that the Gulf of Mexico had not completed the transition to OMS by the conclusion of 2008.

47

111.     Indeed, according to CW2, BP's OMS lagged far behind its peers (*e.g.* Chevron and Exxon) in 2009, and by 2010, the program was still in its pilot phase and yet to be fully implemented in the Gulf of Mexico.

112.     According to CW1, there was a company failure to implement an OMS protocol that would have ensured that the individual decision makers at the rig level understood how cost-savings and corner-cutting could affect the process safety of the *Deepwater Horizon.*

113.     In the fourth quarter of 2009 and in January 2010, BP, as part of a global cost-cutting restructuring, reorganized the drilling operations unit for the Gulf of Mexico. According to CW2, the global reorganization was attributable to decisions made by Inglis and Suttles. A consequence of the restructuring was the termination or forced transfer for those chiefly responsible for BP's Gulf of Mexico Operations, including but not limited to safety processes and the implementation of BP's OMS in the Gulf of Mexico.   Indeed, the people charged with implementing OMS in the Gulf of Mexico were transferred or terminated in Q4 2009 and Q1 2010.

114.     Further as described below, the individuals brought in to implement BP's OMS and manage BP's Gulf of Mexico Operations lacked the knowledge, experience and expertise of those they were replacing. In fact, in September 2009 a non-public BP rig audit of the *Deepwater Horizon* found that safety goals were not commonly known or properly communicated to employees and not all relevant rig personnel were knowledgeable about drilling and well operations practices.

115.     According to CW2, the restructuring of BP's Gulf of Mexico operations was undertaken despite concerns raised by CW2 and other senior BP employees to top-level management with direct reporting responsibilities to BP's board of directors. These concerns related to BP's ability to operate safely in the Gulf.

116.    Ian Little was the Gulf of Mexico wells manager for BP. Little was replaced by David Sims who, according to CW2, lacked Little's knowledge and expertise. Despite this, Sims was required to make decisions regarding not only management of the well, but also the response to the *Deepwater Horizon's* explosion.

117.    Prior to becoming Vice President of Drilling and Completions, London in December 2009, Harry Thierens served from 2006-2009 as the well director for the Gulf of Mexico. He managed the engineering and operations group in the Gulf of Mexico. Thierens was replaced by David Rich, who according to CW2 lacked the expertise of Thierens.

118.    Kevin Lacy was the vice president of Drilling and Completions for BP until December 15, 2009 when he left BP. Lacy, who worked in exploration and production for thirty years, was replaced by Patrick O'Bryan.

119.    According to CW1 and CW2, O'Bryan lacked Lacy's experience and expertise. According to CW2, by 2009 and 2010, BP still had not implemented a robust operations management system to ensure offshore processes could be managed effectively for both exploration and risk. Given the difficulties of Gulf of Mexico exploration, this invited disaster.

## VII.    DEFENDANTS' KNOWLEDGE OR RECKLESS DISREGARD OF FACTS RENDERING THEIR STATEMENTS AND OMISSIONS FALSE AND MISLEADING

### A.    Defendants' Knowledge Or Reckless Disregard Regarding Their Statements and Omissions About BP's Operational Safety And Its Deepwater Drilling Operations

120.    Throughout the Class Period, Defendants made repeated statements and repeatedly omitted information from statements, regarding the operational safety reforms purportedly implemented after the Baker Report, including the implementation of OMS across BP's operations.  Numerous examples occurred in public-record statements on, *inter alia*, January 16, 2007; March 16, 2007; on or before April 7, 2007; May 9, 2007; May 16, 2007; July 24, 2007;

September 25, 2007; October 25, 2007; November 8, 2007; on or before November 23, 2007; February 22, 2008; March 4, 2008; April 17, 2008; on or before June 10, 2008; on or before December 5, 2008; December 17, 2008; February 24, 2009; March 4, 2009; March 10, 2009; April 16, 2009; June 30, 2009; on or before October 23, 2009; November 19, 2009; February 26, 2010; March 5, 2010; March 22, 2010; March 23, 2010; and April 15, 2010.

121.    Yet, throughout the Class Period Defendants were aware, or recklessly disregarded, that their statements to investors regarding BP's commitment to safety were not true and that their statements touting the importance of deepwater drilling in the Gulf of Mexico omitted material information regarding BP's highly risky and unsafe practices in its deep sea operations.  When they spoke, Defendants knew or recklessly disregarded that BP's process safety procedures did not adequately address the known risks of deepwater drilling – risks that materialized at the Macondo well when the *Deepwater Horizon* rig exploded and sank.

122.    The Presidential Commission found that there was no "comprehensive and systematic risk-analysis, peer-review, or management of change process" for any of the following key decisions, amongst others:

- Failing to wait for the correct amount of centralizers;
- Failing to wait for the foam stability test results and/or redesigning slurry; Failing to run a cement evaluation log;
- Failing to use the correct spacer to avoid disposal issues;
- Failing to recognize the dangers inherent in displacing the mud from the riser before the surface cement plug had been set;
- Failing to properly place the cement plug at the appropriate level and instead placing it 3,000 feet before the mud line;
- Failing to install additional physical barriers during the temporary abandonment procedure;
- Failing to perform further well integrity diagnostics in light of the troubling and unexplained negative pressure test failures; and
- Failing to monitor the mud pits and conducting other simultaneous operations during mud displacement.

50

123.    The Presidential Commission then concluded that:  "*The evidence now available does not show that the BP team members (or other companies' personnel) responsible for these decisions conducted any sort of formal analysis to assess the relative riskiness of available alternatives.*

### 1.    Faulty Cementing Jobs and Other Stability Issues Were Known as the Most Frequent Causes of Well Control Problems

124.    As early as 2003, BP knew or recklessly disregarded risks associated with oil spills in offshore drilling related to the failure of cementing at various stages of well development, from the cementing around well casings and annuluses to the cementing of plugs, or shoes, to block pressure during the process of "temporary well abandonment."

125.    BP was aware – though it failed to disclose its awareness to the investing public – that as early as 2003, MMS had determined that failed cement jobs were associated with 33 blowout or well kick incidents in the Gulf of Mexico since 1973, some of which involved "well loss" and "rig and platform destruction by fire." Indeed, an October 22, 2003 MMS alert noted that "*[a]nnual flow related to cementing surface casing has been identified as one of the most frequent causes of loss of control incidents in the Gulf of Mexico.*"

126.    Lord Browne knew of these developments and the others alleged herein which arose during his tenure as CEO and concerned BP's extensive, dangerous record of repeated safety violations and incidents, which cost the company billions of dollars from fines, lawsuits, and lost productivity costs and, in the case of the Texas City refinery explosion, cost the lives of 15 workers in addition to the roughly 200 more who were injured.

127.    BP had experienced cementing failures and knew of similar failures on other companies' rigs prior to and during the Class Period. Additionally, BP experienced, but did not

disclose, its own problems with a faulty cement job on one of its deepwater wells in the Caspian Sea, off the coast of Azerbaijan, in September 2008.

128.    More specifically, on or around September 17, 2008, BP experienced a gas leak at one of its central production platforms in the Azeri-Chirag-Guneshi ("ACG") field in the Caspian Sea – which is the largest of BP's deepwater drilling operations in Azerbaijan. Shortly thereafter, another rig in the field, called *B-i 7,* suffered a blowout, causing gas, water, and mud to shoot onto the rig floor, raising the possibility of an explosion. *B-i 7* was evacuated and its well was sealed, either by annular rams or because the well simply "bridged" (collapsed on itself or otherwise stopped flowing on its own). As a result, BP shut down most of the entire field's operations, cutting daily production by over 600,000 barrels per day ("barrels per day" or "bopd"). In later communications, BP told U.S. officials that they suspected that numerous wells had a "bad cement job."

129.    BP made no announcement or disclosure of this incident at the time it occurred. In fact, BP's Form 20-F for 2008 merely mentioned a "subsurface gas release" on September 17, 2008 and notably omitted references to the blowout on *B-i 7,* the fact that gas alarms went off on the field's central production platform, and the possibility that cementing jobs on other wells were faulty as well. As noted by *The Wall Street Journal* on December 17, 2010: "BP had been 'exceptionally circumspect in disseminating information' about the [ACG gas] leak, both to the public and [to] its partner." Moreover, according to the same article, several of BP's partners "were upset with BP for allegedly withholding information from them about the incident."

### 2.    Defendants Knew or Recklessly Disregarded That BOPs Were Known to Fail, Yet Did Not Adjust Their Process Safety Procedures Accordingly

130.    As early as 2000, and on a continuous basis throughout the Class Period, Defendants were aware of or recklessly disregarded the substantial and known risks associated

with relying on a single blind shear ram in a BOP to prevent an uncontrolled oil or gas release. Indeed, Defendants were well aware that blind shear rams were highly untrustworthy and failed nearly 50% of the time.

131.   A BOP is a large, five-story device typically set on the ocean floor at the so-called "mud line," beneath the riser connecting the rig to the sea floor and on top of the cement surface casing that seals around the "annulus," which runs down further into the earth toward the "pay sands" in which oil and gas are found.

132.   More specifically, Defendants knew, or recklessly disregarded, that, in the event the BOP needed to be activated, the following should occur:

- Closure of the "variable rams," which would seal the area around the drill pipe in the well (or, with "annular rams" or "blind rams," if no pipe lay in the well), thereby sealing oil and gas in the annulus below the BOP; and then attempting to pump drilling mud into the annulus to outweigh and balance the pressure of rising oil and gas; or

- In a worse scenario, and if the method described above did not work, activate the BOP's "blind shear rams," which are intended to cut through drill pipe in the well and then seal the oil down in the annulus below the BOP; or

- In an emergency setting, set the BOP to activate all of its rams – variable, annular, and blind shear – and disconnect from the riser, preventing further gas or oil from rising to the rig above.

133.   As set forth below, as early as 2000, and on a continuous basis throughout the Class Period, Defendants knew, or were reckless in not knowing, that various components of BOPs in use (both on their own rigs and Transocean-owned rigs) had high probabilities of failure, especially in deepwater and ultra-deepwater settings, where drill piping is thicker and more difficult to cut and where hydrostatic pressures affect hydraulic systems which control the BOP rams.

134.   In July 2001, the analyst group SINTEF, the largest independent research organization in Scandinavia, provided the MMS with a report recommending that all deepwater and ultra-deepwater drilling rigs in operation in the Gulf of Mexico be equipped with not one, but

53

*two* separate blind shear rams, because of the significant risk that one might fail. The SINTEF report, while not publicly released, was shared with BP and other industry operators.

135.   In both December 2002 and September 2004, MMS provided to BP and other industry operators several reports written by West Engineering Services revealing serious deficiencies with blind shear rams. In particular, the reports mentioned:

- The incapacity of shears to cut through many newer types of drill pipe, which tend to be thicker than older pipes;

- The certainty with which the shears that close on the thick joints that connect the sections of pipe together (rather than simply closing on the pipe itself) fail; and

- The significantly lower capabilities of shears to cut pipe at extreme depths, for instance, in excess of 5,000 feet, because of the effect of hydrostatic pressure on BOPs' hydraulic systems.

136.   The studies noted above, although not known to the general public, including Plaintiffs and the Class members, were shared with and made available to industry members, including senior BP managers and directors involved in drilling operations, and were discussed at industry conferences that occurred during the Class Period, including, but not limited to, conferences held by the Society of Petroleum Engineers ("SPE") and the International Association of Drilling Contractors ("IADC") in New Orleans, February 2-4, 2010 and in Amsterdam in 2009. Senior BP drilling managers routinely attended SPE and IADC conferences, including those noted above.

137.   In April 2000, an independent expert report by EQE International, a risk and insurance consulting group, conducted an extensive analysis of the BOP to be installed on the *Deepwater Horizon.* The report, which was not publicly disclosed until June 20, 2010, identified a serious flaw in the BOP's design – despite extensive back-up systems, or so-called "redundancies," in the BOP's layout – there was a particular component in the unit's hydraulic

system, a single "shuttle valve," which had no backup. In response, EQE noted the potential for a "single point failure" of the shuttle valve and explained that if the shuttle valve failed, the remaining redundancies built into the BOP would be rendered irrelevant.

138.    Significantly, throughout the Class Period, BP actually utilized the services of West Engineering, the company that carried out the research for MMS on BOP reliability, to carry out specific studies for BP on risk issues relating to BOP testing. In both 2008 and early 2010, BP specifically requested, as a member of the joint industry group focused on deepwater drilling issues, that West Engineering carry out research projects on BOP reliability and testing, and integrate past studies analyzing BOPs and their device failures.

139.    A July 2009 report also put BP on notice that BOPs were unreliable. BP's partner, Transocean, commissioned the report, which analyzed past BOP performance (including in the Gulf of Mexico) as part of a risk assessment for deepwater drilling in the Beaufort Sea, north of Alaska. The report, written by the consultant group Det Norske Veritas, which was subsequently contracted by the U.S. government to perform an extensive investigation into the *Deepwater Horizon*'s BOP in the wake of the April 2010 blowout and explosion, found that, in practice, blind shear rams on offshore BOPs had a failure rate of 45 percent.

140.    Defendant Hayward acknowledged in his deposition that he was aware that problems had been identified with BOPs and that those problems were generally known throughout the industry. Hayward Dep. at 774:9-780:20. Nevertheless, the existence of this report and its findings were not disclosed to the investing public, including Plaintiffs and the Class members, until June 20, 2010.

141.    BP exacerbated the risk of BOP failure by permitting rigs operating in the Gulf of Mexico to be equipped with just one single blind shear ram. In addition, BP contracted with

Transocean in 2004 to replace one of the variable bore rams on the Deepwater *Horizon*'s BOP with a test ram in order to speed up subsea testing procedures. Yet, the installation of this test ram lowered the unit's reliability even further. Indeed, in an agreement between BP and Transocean executed in October 2004, Transocean noted BP's awareness that the removal of the variable bore ram would "reduce the built-in redundancy" of the BOP and raise the rig's "risk profile." The existence of this agreement was not made public until June 20, 2010.

142.     Thus, despite all the knowledge and information about difficulties with cementing and BOPs, Defendants either knew, or recklessly disregarded, that BP failed to establish uniform process safety features for rig operators to follow during off shore drilling to address cementing issues and BOPs.

**3.      BP Received No Less Than One Hundred Safety Warnings for its Safety Protocol Lapses in its North Sea Deepwater Drilling Operations**

143.     Defendants knew of the significant risks in its deepwater drilling operations during the Class Period that were pervasive across BP's deepwater operations. Yet, Defendants knew, or recklessly disregarded, that BP's process safety protocols failed to properly and sufficiently address these known risks.

144.     Unknown to the investing public, including Plaintiffs and the Class members, the UK HSE levied extensive citations and fines on BP, sending no fewer than 100 letters or notices to BP between 2006 and 2010, and citing BP for safety or environmental violations related to exploration or production rigs, pipeline or storage systems, or other facilities. Many of the communications related to offshore deepwater rigs operated by BP in the North Sea around Scotland, including the *Schiehallion, Unity, Bruce, Hutton, Magnus, Clair,* and *Miller* vessels. Some of these rigs and the ships that serviced them were decades old, and the safety issues, in many cases, concerned a failure to properly maintain and inspect equipment.

56

145.     According to UK HSE records, the *Schiehallion,* an aging floating production storage and offloading ("FPSO") ship in the far North Sea, experienced a 2005 engine room fire and a 2006 "mooring chain failure," resulting in special UK HSE inspections and meetings with BP officials, and notifications concerning various violations of safety and environmental violations during the Class Period.

146.     In correspondence in 2006, UK HSE strongly urged BP to dry-dock the *Schiehallion* for repairs. BP refused, arguing that they would instead prioritize efforts to improve the ship's condition through a focus on maintenance. UK HSE, in a letter to BP on February 2, 2007, strongly criticized BP's decision, noting several areas of maintenance backlog and numerous cases in which past UK HSE notices were not addressed, and listing various continuing operations which were not in compliance with "relevant statutory provisions" ("RSPs"):

> Finally, it is HSE's view that ***the overall magnitude of the various categories of maintenance backlog [on the Schiehallion] is such that BP does not have sufficient control of the situation. . . .*** [T]he situation means that there are concerns for BP's continued ability to comply with the fundamental duties under Sections 2 and 3 of the HASWA [Health and Safety at Work Act]. At the meeting of 29th January, we discussed with BP the issues associated with drydocking, shutting down production and prioritizing integrity management (i.e., the latter being BP's current approach) as a means of addressing the overall maintenance backlog. ***We listened to BP's opinions on the issues associated with the various options, but remain unconvinced that BP's proposed course of actions to remain on station, with an increased focus on integrity, is compatible with achieving compliance with the RSPs given the historic susceptibility of the FPSO Schiehallion to events or conditions that exacerbate ongoing maintenance backlogs*** (e.g., 2005 Compressor Fire, 2006 Mooring Chain Failure).

147.     The February 2, 2007 UK HSE letter continued, laying out concerns that were prescient of the *Deepwater Horizon* incident:

> [UK HSE maintains] the view that ***major accidents result when a series of failings with several critical risk control systems materialize concurrently.... The number and relatedness of backlogs on the Schiehallion is such that it appears as though there is a significant risk of such a series of failings arising.***

148.    The February 2, 2007 UK HSE letter concluded with criticism of BP's larger problem with its lax safety culture and inability to avoid a major incident that echoed the MMS's findings about BP in 2002: "BP's decisions on the *Schiehallion* have not in any way been informed by a systematic assessment [by independent safety inspectors] of the adequacy of the management system to achieve compliance with those RSPs . . . that are intended to avoid the failings that might align to cause major accidents."

149.    According to a 2009 UK HSE letter, BP again suffered a "significant Hydrocarbon Release" (*i.e.,* an oil spill or gas release) on the *Schiehallion* rig on August 4, 2008. The UK HSE said the release was attributable to a "failure to comply" with BP's own process safety procedures.

150.    Several other UK HSE letters were sent to BP between 2007 and 2010 as well. These letters outlined safety and maintenance problems on other rigs that could create a serious risk of hydrocarbon release:

- A March 5, 2009 UK HSE letter discussed inspections of BP's *Harding* rig, criticizing BP's failure to inspect several "high risk" systems for corrosion, as requested in previous notices. The inspector wrote: "This lack of progress is unsatisfactory. It is important that the condition of these systems is ascertained in a timely manner, in order to reduce the risk of loss of containment incidents" (*i.e.,* spills); and

- Additional letters to BP Exploration Operating Company Ltd. on March 25, 2008, March 5, 2009, and July 7, 2009 relating to the *Bruce, Magnus, Unity,* and *ETAP* platforms criticize BP for failing to conduct maintenance programs compatible with the intended lifespan of its rigs – suggesting, in other words, that BP was running its own equipment into ruin.

### 4.    BP's Internal Reporting Structures Mandated that the CEO and Board Review Process Safety and Risk

151.    ███████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████



*People, Training and Behavior:* "Roles, responsibilities and competencies for

152.     The Safety & Operations segment ("S&O") was a key component of OMS that BP utilized to achieve monitoring of process safety performance. Before and during the Class Period, BP utilized the S&O function for a variety of reporting mechanisms, progress updates and metrics which allowed for the Executive and Board to monitor process safety performance. ███████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████

153.     The Orange Book was a reporting format conceived of by Inglis and Defendant Hayward, to relay key safety information to GORC. Ellis Armstrong, CFO of BP Exploration and Production, was involved in the process of creating the Orange Book. Armstrong Dep. at 85:21-22. Armstrong testified that the purpose of the Orange Book was to cull safety metrics across BP and regional business units, including E&P in the Gulf of Mexico that "had the same level of standing in the firm as financial information." This information was reported on a quarterly basis to GORC and SEEAC in connection with the committees' safety monitoring roles. Armstrong Dep. at 86:4-11.

154.     ███████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████

### 5.    SEEAC Approved BP's Publications Regarding Safety

155.   As noted above, SEEAC responsibilities included: "[r]eviewing material to be placed before shareholders which addresses environmental, safety and ethical performance and make recommendations to the Board about their adoption and publication." Minutes of SEEAC meetings confirm that SEEAC reviewed and approved various documents regarding safety before those documents were published to shareholders.

156.   For example, on January 9, 2008, SEEAC held a meeting, attended by Defendant Hayward and Inglis, among other participants. At the meeting, SEEAC discussed "the approach being taken to the 2007 Sustainability Report[.]" The minutes state that "[a] full draft of the report would be presented to the March Committee meeting." Finally, "Dr. Hayward discussed the possible inclusion of a summary of the Independent Expert's Report in the Sustainability Report[.]"

157.   SEEAC met again on March 13, 2008. Defendant Hayward was present. The meeting minutes state:

> Dr. Bickerton [Director of Communications, BP corporate reporting team] described the structure of this year's Sustainability Report and that its publication would be principally web-based with only an 8 page summary available in printed form. He noted that the draft contained new disclosures on retail dismissals and on major integrity incidents and HIPOs [high potential situations]. The latter responded to a recommendation of the Baker Panel. He noted that certain environmental performance data would be included when finalized, and that a section had been provided for a summary of Mr. Wilson's first annual report.
>
> Committee members provided Dr. Bickerton with specific comments of [sic] the draft for inclusion in the final version which would be brought to the SEEAC in May.

158.   Likewise, on January 7, 2009, Defendant Hayward attended a SEEAC meeting where he and SEEAC "discussed the proposed structure and content of the Sustainability Report, and its relevance to the company's commitment to people, safety and performance." SEEAC also

"considered how the company's report of sustainable and environmental issues could be presented as a business case fundamental to the company's success," discussed the content of the "Annual Report and Form 20-F," and provided "detailed comments . . . to the [BP] Secretary and . . . Corporate Reporting team." The minutes note that "a full draft of the Sustainability Report would be presented to the March meeting."

159.   At SEEAC's March 12, 2009 meeting, attended by Defendant Hayward, "Dr. Bickerton introduced the draft Sustainability Review" and "[t]he Committee discussed the Review's narrative[.]" "[I]t was agreed that some additional text would be included on the company's community support activities and that the introductory section on strategy would be reworked."

160.   Also, BP's "Sustainability Reporting 2009 Safety" ("Sustainability Report") was published on April 15, 2010. Meeting minutes of SEEAC demonstrate that the committee specifically reviewed the Sustainability Report prior to its publication. On February 24, 2010, a meeting of SEEAC was convened, and was attended by Defendant Hayward and others. At that meeting, the participants discussed OMS implementation, gaps in OMS implementation, process safety audits, external (investor) perceptions of BP's reporting of sustainability (safety) issues, and the proposed content of the Sustainability Report. The minutes state, in part:

> Mr. Wilson [an independent expert embedded on BP's Board as recommended by the Baker Panel] also highlighted areas requiring continued attention. He referred to embedding OMS and closing remaining gaps, to establishing more formal documentation on roles and responsibilities and to improving incident investigations and subsequent learning. He also discussed closure dates on actions arising from process safety audits, and action item tracking and reporting more generally.

> * * *

> Dr. Bickerton reviewed the approach taken to the BP Sustainability Report for 2009 and outlined its proposed content. He discussed external perceptions of the company's reporting of sustainability issues, and reviewed the topics that are

material in the public's perception. He noted that the document in printed form would increase from 24 pages in 2009 to 32 pages in 2010 in a five chapter format.

161.    Just weeks before the publication of the Sustainability Report, SEEAC met again, and the top item on its agenda was commendation of the final draft form of the report. That meeting, on March 24, 2010, was attended by Defendant Hayward and Inglis, among others. At the meeting, Inglis presented to the members of SEEAC concerning implementation of OMS across all operating sites, Defendant Hayward stated that the Sustainability Review – a companion document to the Sustainability Reporting – encapsulated statements of BP's policies (in addition to being a report on BP's activities), and the committee commended the final draft of the Sustainability Report. The minutes state, in part:

> Dr. Bickerton introduced the 2009 BP Sustainability Report noting that it was in the final stages of drafting in preparation for publication on 15th April. He discussed the additional material that had been added on Canadian oil sands and noted that it was consistent with the recent presentation to investors by Dr. Hayward.

> * * *

> Dr. Hayward noted that the Sustainability Review had evolved to become a means of encapsulating statements of BP's policies, in addition to being a report on the company's activities.

> The Committee commended the report.

### 6.    Defendants Consciously Limited The Scope of Safety & Operations Audits So As Not To Apply To The Majority Of BP's Deepwater Drilling Fleet

162.    Contrary to BP's representations that OMS was a systematic management framework that provided superior monitoring of safety, Defendant Hayward and Inglis made the decision to exclude some of the most lucrative – and the riskiest – of all BP operations from S&O audits.

163.  These S&O audits were especially critical because they tested rig and rig personnel's compliance with safety standards and risk management practices, including requirements set by OMS.

164.  The July 31, 2009 GORC "Pre-Read" that was distributed to GORC (including Defendant Hayward and Inglis) prior to the monthly GORC meeting included a proposed prioritization scheme for S&O audits that was to be "reviewed and endorsed by GORC." This established which businesses received S&O audits. The Gulf of Mexico Developments, Gulf of Mexico Exploration and Deep Gas, and Gulf of Mexico Joint Ventures were excluded from the S&O Audit Programme and would not have received an S&O Audit. Defendant Hayward and Inglis made a conscious decision to exclude these risky BP operations, which were responsible for drilling the vast majority of BP's deepwater wells in the Gulf of Mexico, from the scope of the S&O audit function. Had such operations not been purposefully excluded, GORC and SEEAC (which received all S&O audits) would have received detailed information concerning the myriad process safety failures on the *Deepwater Horizon* (such as those identified throughout the Presidential Commission's Report).

165.  ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████  The decision to exclude Gulf of Mexico from BP's S&O Audits belied BP's repeated public statements regarding a systematic framework for improved process safety.

**B.** **Defendants' Knowledge Or Reckless Disregard Regarding Their Statements and Omissions Is Further Established By Their Disregard of Safety and Operational Concerns**

166. ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████

167. ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████

168.    On February 20, 2008, Barbara Yilmaz, Technology Vice President for Drilling & Completions, sent an e-mail to Inglis stating, in part, "[s]afety performance in [Drilling & Completions] continues to deteriorate and we have had a very poor month in January with no improvement in February." Yilmaz cautioned that she did not "expect the external environment to get better in the near future."

     **1.**     **Defendants Knew of, or Recklessly Disregarded, Significant Process Safety Problems with Third-Party Rigs and, in Particular, Rigs Leased From Transocean**

169.     During the Class Period, Defendants knew of, or recklessly disregarded, significant process safety problems with rigs operated or owned by third parties. These individuals knew of especially acute problems for Transocean-operated rigs.

170.     ███████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████

171.     On July 21, 2007, BP experienced a high-potential incident in the Gulf of Mexico. The incident involved Transocean rig operators dragging the BOP along the sea floor which almost severed underground pipelines. ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████

172.     ███████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████

173.    In GORC meeting minutes from February 15, 2008, Defendant Hayward and Inglis discussed two new safety incidents involving Transocean-owned rigs. As a result of these incidents, a joint safety improvement plan was to have been implemented to address rig-safety culture and joint standardization.

174.    Inglis himself expressed concerns that OMS standards were not being applied to contractor operated drilling rigs. In an email to the Upstream Senior Leadership Team dated July 13, 2009, Inglis stated:

> One of the emerging findings from our analysis of incidents is that conformance with Control of Work (CoW) practices, on many of our contractor operated drilling rigs, falls short of BP expectations. I have asked Barbara [Yilmaz] to clarify the expectations we have of our contractors in the matter of CoW and the bridging requirements between contractor practice and BP's CoW Standard.

175.    Control of Work is a component of OMS, and BP's OMS Framework defines Control of Work:  "BP entities employ a formal Control of Work process to provide a work environment that will allow tasks to be completed safely and without unplanned loss of containment causing environmental damage."

176.    Additionally, a "Pre-read" document for the July 31, 2009 GORC meeting complained of a "lack of contractor competency."

### 2.    Concerns about the Integrity of Safety Processes in Alaska

177.    On April 11-12, 2009, Marc Kovac ("Kovac"), a BP mechanic, welder and union representative, sent two emails to BP's Ombudsman's office — which was headed by the Honorable Stanley Sporkin (a retired federal judge) — copying numerous BP Exploration Alaska BPXA offices raising serious concerns about the integrity of pipelines in Alaska, overstretched staff and contractors, and general problems with inspections of oil wells in the western part of BP's

Prudhoe Bay facilities. The first email noted that "it's getting back to a very dangerous situation, too much overtime and too much responsibility and area to cover for each man. Anything can happen when [well] pads are not monitored. Anything can happen when workers work over 12 hours a day, every day. Things are not getting better." In a second email dated April 12, 2009, Kovac listed a host of specific examples of overstretched staff, concluding that the situation "sets us up for another major mishap. Who will they blame this time? This situation is not acceptable."

178.    Then, in June and August 2009, BP employees and representative members of the United Steelworkers met with BP management in Alaska about various safety and pipeline integrity issues and complaints about BP's culture making it difficult for employees to raise safety issues. Minutes released from the United Steelworkers revealed that union representatives raised detailed concerns to BP management about understaffing and excessive overtime (being required to work 16-18 hour shifts) and noted that these issues caused an "increased . . . risk for accidents."

179.    This concern was underscored in October 2009 by Phil Dziubinski ("Dziubinski"), BPXA senior officer for HSSE. Dziubinski noted that a shift greater than 16 hours impeded workers' ability to make sound decisions, describing the impaired decision-making ability as akin to "intoxication." He noted these conditions were persistent in BP's operations before and throughout the Class Period. Further, he believed that the failure to abate such work conditions would require BP to affirmatively acknowledge to HSE Committees, the Board, the Ombudsman and Congress that this situation put "production ahead of safety." In late 2009, Dziubinski was asked to resign from his post in what he believes was retaliation for voicing his concerns.

180.    In the June and August 2009 meetings, union representatives also raised concerns about delayed replacement or repair of equipment and old, corroded pipelines, including gas leak detectors. (Faulty gas leak detection devices were among the problems that led to the ignition of

flammable gases during the blowout and subsequent explosion on the *Deepwater Horizon.)* "*We have several lines ready to leak,*" the representatives are noted as stating. The minutes show union representatives urging BP not to simply "patch" pipelines: "These lines should be replaced."

181.    These were precisely the types of safety issues BP informed institutional investors like Plaintiffs and the Class members it would address after the Baker Report was released and the types of safety issues that BP represented were – purportedly – already being addressed and remedied throughout the Relevant  Period.

### 3.    Afraid-a-spill E-mail Raises Complaints about Alyeska's Operations

182.    In late 2009, another private employee "concern" was sent to the BP Ombudsman from an anonymous employee of BP-operated Aleyska, the BP-led consortium that operates the Trans-Alaska Pipeline in Alaska. The email was signed "Afraid-a-spill." The email raised a litany of complaints about Alyeska's operations, including serious safety and pipeline integrity concerns.

183.    Unidentified executives, the email stated, "told employees not to speak up or go against" the Alyeska CEO, Kevin Hostetler ("Hostetler"). The email stated that as a result of Hostetler's behavior, the work environment at Alyeska had degraded over several years to the point where: "*People are afraid to speak up on safety or integrity issues for fear of retaliation.*" According to a subsequent investigation into the allegations by BP-retained lawyers with the law firm Morgan Lewis & Bockius, the subject of the email was communicated to BP senior leadership in early 2010, and Judge Sporkin, the Ombudsman, discussed it with BP leadership, which led to the firm being hired to carry out a further investigation. The results of the investigation still are not public.

184.    Concerns about the risks of spills in BP's Alaska operations, and the inadequacy of BP's pipeline integrity and inspection programs, were not only being voiced internally or to the BP Ombudsman. BP also received enforcement letters sent to BP companies by the U.S.

Department of Transportation's "Pipeline and Hazardous Materials Safety Administration" ("PHMSA"). PHMSA letters communicate regulatory violations, enforcement actions, orders to comply, and warnings relating to pipelines. In 2008 through 2010, BP related companies operating in the United States received 40 separate enforcement letters from PHMSA, a far higher number than those sent in the same period to peer companies Exxon Mobil, Conoco Philips, Chevron, or Shell. (During the same period, Shell received only six PHMSA letters.) One PHMSA letter was sent to BP on April 20, 2010, the very day the *Deepwater Horizon* blast occurred. In that letter, PHMSA communicated that it had found serious shortcomings with BP's pipeline inspection and anti-corrosion systems in Alaska, increasing the likelihood of a major spill.

185.    These were precisely the types of safety issues BP informed institutional investors, like Plaintiffs and the Class members, it would address after release of the Baker Report and the types of safety issues that BP represented were – purportedly – already being addressed and remedied throughout the Relevant Period.

### 4.    Aftermath of BP's 2007 Criminal Plea

186.    During the Class Period, Defendant Hayward and Inglis knew, or recklessly disregarded, that the recommendations of the Baker Panel were not being adequately instituted throughout BP, especially in terms of improving its process safety practices. In particular, as set forth below, between 2008 and 2010, the Environmental Protection Agency warned BP's General Counsel, among other senior BP executives, that EPA investigators found BP to be operating unsafely.

187.    As described above, BP pled guilty to a violation of the U.S. Federal Water Pollution Control Act in connection with the Alaska pipeline oil spill, admitting that its "criminal negligence" had caused the corrosion and thus the spill. BP was sentenced to three years of probation, and fined $22 million. In late 2008, BP attempted to obtain an early release from

probation in Alaska, arguing to its federal probation officer, Mary Frances Barnes ("Barnes"), that BP had made "significant progress" in relevant areas of maintenance and inspection. Unbeknownst to investors, however, Barnes, found continuing safety issues and incidents with BP operations and denied BP's request. In September 2010, due to continuing complaints that she received about safety and pipeline integrity issues in 2008 through 2010, Barnes requested that the court revoke BP's probation and that additional fines and penalties be levied against BP.

188.    Also unknown to investors during the Class Period, BP was potentially facing serious disciplinary action by the EPA's Suspension and Debarment Division ("SDD"), in connection with past and ongoing misconduct in Alaska, Texas, and other states. The SDD has the authority to prevent BP from being a party to any U.S. government or state contract or grant funded with federal funds, which would materially affect BP's revenues.

189.    Beginning in early 2008 and through early 2010, Jeanne Pascal ("Pascal"), the EPA SDD Debarment Counsel for Region 10 (West Coast and Alaska) who handled EPA debarment oversight activities on the BP Group in the greater United States, communicated repeatedly by telephone and email with senior BP officials, including senior BP executive and Doug Suttles, BP General Counsel Jack Lynch ("Lynch"), and BP's counsel at Vinson & Elkins, Carol Dinkins, among other persons. The BP Ombudsman, Judge Sporkin, also raised Pascal's concerns with the President of BP America, McKay. In her communications, Pascal noted that her office was in receipt of information from BP employees and from EPA inspectors in Alaska and Texas demonstrating that BP was *in a state of continuing non-compliance* with numerous applicable laws and civil settlement agreements; that BP was continuing to run many of its operations unsafely; and that BP was continuing to retaliate against workers and contractors who raised safety and environmental issues. Thus, on several occasions during the Class Period, Pascal stated that,

because of BP's continuing misconduct, the EPA was entitled to file a debarment complaint, to strip BP and its subsidiaries of the right to bid for U.S. government contracts and to bid for U.S. government oil and gas concessions.

190.     BP was also informed of significant problems with its process safety with respect to refineries. For example, in May 2010, it was revealed that between June 2007 and February 2010, BP received a total of 862 citations for OSHA violations relating to its refineries in Texas City and Toledo, Ohio, of which 760 were classified as "egregious willful" and 69 were classified as "willful." The willful violations accounted for over 97 percent of all willful violations found by OSHA in all U.S. refineries during the same period – BP's main competitors' combined citations were 22. Center for Public Integrity, *OSHA Says BP Has "Systemic Safety Problem,"* May 16, 2010.

191.     These were precisely the types of safety issues BP informed institutional investors, like Plaintiffs and the Class members, it was addressing after release of the Baker Report.

**C.     Defendants' Knowledge Or Reckless Disregard Regarding Their Statements and Omissions Is Further Established By BP's Retaliation Against Individuals Who Raised Concerns About Its Operational Safety and Integrity**

**1.     Whistleblower Retaliation in the Gulf of Mexico**

192.     Throughout the Class Period, and contrary to BP's representations to its shareholders, BP engaged in continuous and systemic retaliation against employees who reported concerns about the safety and integrity of BP's operations. These whistleblowers provide further support of Defendants' knowledge or reckless disregard of the falsity and misleading nature of their Class Period statements.

193.     In August 2008, Kenneth Abbott ("Abbott"), a BP engineer working on design and blueprint management issues relating to the operations of BP's *Atlantis* rig (a major BP rig

involved in drilling deepwater exploration and production wells in the Gulf of Mexico), began to raise concerns with BP managers about BP's practices and policies for managing and updating designs and blueprints for its infrastructure and equipment on the *Atlantis.* One particular concern was that designs for critical units on the rig were not updated to reflect changes made during repairs, maintenance, or other modifications.

194.    On or around August 15, 2008, BP manager Barry Duff ("Duff"), who worked with Abbott, wrote to BP managers and corroborated Abbott's concerns, stating that a lack of properly-reviewed and approved designs could result in "***catastrophic operating errors"*** and that "***currently there are hundreds if not thousands of Subsea documents that have never been finalized,"*** a situation which Duff referred to as "***fundamentally wrong."***

195.    Abbott continued to raise the above concerns from November 2008 through January 2009 when he was fired in retaliation for his whistle-blowing. Shortly after his termination, Abbott raised his concerns with BP's Ombudsman. On June 17, 2010, Abbott was invited to testify before Congress to describe the circumstances that led him to initially report his concerns to senior BP management. During his testimony, Abbott stated, in part, that:

> *From my experience working in the industry for over 30 years, I have never seen these kinds of problems with other companies*. Of course, everyone and every company will make mistakes occasionally. *I have never seen another company with the kind of widespread disregard for proper engineering and safety procedures that I saw at BP and that we hear from the news reports about BP Horizon, or BP Texas City, or the BP's Alaska pipeline spills. BP's own investigation of itself,* by former Secretary of State James Baker, *reported that BP has a culture which simply does not follow safety regulations. From what I saw, that culture has not changed*.

196.    Among the documents sent to the BP Ombudsman, and forwarded to senior BP managers during the Ombudsman's investigation into Abbott's allegations in 2009 and early 2010, was a declaration by a safety engineer in Houston, Texas, Mike Sawyer, who independently reviewed Abbott's allegations, internal BP emails, and applicable regulations.

197.   The Sawyer affidavit affirmed that a "large portion of [the *Atlantis']* subsea safety critical drawings, documents, specifications, and certificates were not in final, 'as-built' status," and warned: "***The lack of 'as-built' design documents is a violation of Federal requirements under the Department of Interior MMS Safety and Environmental Management Systems as specified in 30 CFR Part 250 [including] 30 CFR 250.903 and 905.***" The Sawyer affidavit specifically warned that:

- Time is of the essence in avoiding an Outer Continental Shelf (OCS) environmental disaster, Atlantis production should be shut in until resolution of its design short comings is complete and a thorough inspection confirms that critical breaches have been satisfactorily resolved. . . . ***It is inconceivable that BP could justify the risk of commissioning Atlantis production without completed design documentation reflecting the latest approved design version*** . . . .

- The absence of a complete set of final, up-to-date, 'as-built' engineering documents, including appropriate engineering approval, introduces substantial risk of large scale ***damage to the deepwater Gulf of Mexico (GOM) environment and harm to workers,*** primarily because analyses and inspections based on ***unverified design documents can not accurately assess risk or suitability for service. . . .***

- "The wide spread pattern of unapproved design, testing, and inspection documentation on the Atlantis subsea project creates a risk of a catastrophic incident threatening the GOM deepwater environment and the ***safety*** of platform workers. ***The extent of documentation discrepancies creates a substantial risk that a catastrophic event could occur at any time.***

198.   In April 2010, BP's Ombudsman wrote to Abbott and affirmed that his allegations had been substantiated. More specifically, Abbot received a letter from BP's Deputy Ombudsman, Billie Garde ("Garde"), on April 13, 2010, stating: "Your concerns about the [Atlantis] project not following the terms of its own Project Execution Plan were substantiated. . . . [BP] did not do a comprehensive documentation audit regarding the documentation issues on Atlantis. . . . ***The concerns that you expressed about the status of the drawings upgrade project were... of concern***

*to others who raised the concern before you worked there, while you were there, and after you left."*

199.    In addition, the Presidential Commission Report found that a contributory factor to the *Deepwater Horizon* explosion and the problems in attempting to trigger the BOP related to BP's practice of not updating designs and plans from their original schematics – much like the problems complained about with regard to the *Atlantis.*

200.    On the issue of retaliation, the Presidential Commission Report also noted that a survey conducted in March 2010 indicated that crew members working on the *Deepwater Horizon* feared retaliation. The survey, which included workers on the *Deepwater Horizon* and three other rigs, was conducted between March 12 and March 16, 2010 – i.e., approximately one month prior to the *Deepwater Horizon* explosion. According to the Presidential Commission, the survey found that: "Some 46 percent of crew members surveyed felt that some of the workforce feared reprisals for reporting unsafe situations, and 15 percent felt that there were not always enough people available to carry out work safely."

### 2.    Whistleblower Retaliation in Alaska

201.    The BP Ombudsman conducted a robust investigation of Acuren, the company responsible for pipeline inspection and monitoring of BP's pipelines in Alaska, where BP contractor Marty Anderson ("Anderson") had worked until 2008 and who had begun to raise serious criticisms with his supervisors and BP intermediaries about BP's pipeline corrosion and inspection system in Alaska and Acuren's staffing for that program. According to 2009 communications between the BP Ombudsman's office and Lynch, in 2007 Anderson began to cite "a significant quality control breakdown" in Acuren's and BP's testing procedures, "inadequate record keeping," and "unqualified inspectors in the field performing inspections." BP's Ombudsman's office stated that "[t]he concerns were serious, and although people try to downplay

75

the significance of the issues, they reveal a complete breakdown." According to the BP Ombudsman's office, the audit confirmed Anderson's claims.

202.    The matters concerning Anderson and pipeline inspections were serious enough for the BP Ombudsman's office to raise them with BP and BP North America officials, including Rick Cape, BP's Vice President for Compliance and Ethics, *specifically recommending to him that Anderson's concerns be reported to the BP Board of Directors and to Lynch.* In addition, the Ombudsman himself, Judge Sporkin, communicated Anderson's concerns in 2008 with then-President of BP North America Malone. Garde wrote to Lynch about it in September 2009, and Anderson himself met with Lynch on August 3, 2009. BP did not adequately address the continuing concerns that had been raised. An internal email dated July 15, 2010, from Christine Anastos, a BP Ombudsman Inspector, to other Ombudsman staff, stated that "many of the issues identified by Marty [Anderson] years ago appear to be persisting" [*i.e.,* into mid 2010] and "it is clear that, over time, root causes have not been identified and/or addressed . . . ."

203.    A 2008 BP Ombudsman "Workforce Briefing" containing an assessment of Acuren's "Work Environment" reported that a survey of Acuren employees by the Ombudsman's office found significant problems with workers' perceptions of potential retaliation for reporting safety or environmental concerns. A "key insight" in the presentation stated that "[a]ctions and events in the past 18 months [*i.e.,* during the period BP vowed to improve safety practices in Alaska in the wake of the 2006 spills] have had a decidedly chilling impact on worker attitudes." The section noted: "[p]roduction is viewed by very many workers as the primary focus," (*i.e.,* as opposed to safety). The presentation also noted that the "actual or perceived presence of HIRD [Harassment, Intimidation, Retaliation, Discrimination] is high in the Acuren organization. . . ." In fact, one in three employees believed "recent resignations" were due to HIRD, and 38 percent of

employees – and 80 percent of the employees who worked on natural gas lines – indicated as the reason for not reporting safety concerns: "nothing seems to happen to reported items."

204.    The Ombudsman also noted that about one in ten Acuren employees said in the last 18 months that they had been asked to perform a job that was not in compliance with regulations or safety practices. (The number was even higher for workers who monitor BP natural gas pipelines: almost half of Acuren's workers indicated that they had been asked to perform "non-compliant work".)

205.    The 2008 presentation also included selected quotes from employees, including the following:

- "I've raised issues, now I'm labeled a troublemaker."

- "You get treated better when your supervisor doesn't hear from you."

- "[A] co-worker falsified production numbers and I brought it to my supervisor's attention with the result that I was ostracized, moved to a different shift, moved to the ghetto and told I should produce more in line with the guy who falsified the records."

- "Supervisors talk safety but when concerns are brought up they are viewed as irritating and just given lip service."

- "I have stopped jobs for safety reasons and they just hand it to the next guy till they find someone who will do it" [*i.e.,* the job that was stopped].

- "I was pressured to change my evaluation of some pipe which I deemed to be defective."

- "BP doesn't listen, they put too much emphasis on rules to look good but have no common sense when it comes to safety."

- "BP's support of safety comes off as lip service and seems to only be in place to lower their insurance rates. While superficially, BP delivers lip service about safety, their continually increasing demands accompanied by consistently decreasing resources create a 'results oriented' atmosphere where the ends justify the means."

- "BP creates the adverse and dysfunctional world we work in here. Many problems that occur are because they drive people too hard to perform with limited resources. . . ."

206. Furthermore, BP Ombudsman records from 2010 include numerous other examples of serious issues raised by Acuren employees. For instance, according to an article published by ProPublica on June 7, 2010, on December 9, 2009 a "Concerned Individual" at Acuren raised process safety concerns about other personnel "pencil whipping" test results (manipulating devices to change readings) and "falsified inspections." This individual's name is Stuart Sneed ("Sneed"). Sneed worked on BP's Alaska pipeline and stated that: "They [BP] say it's your duty to come forward . . . but then when you do come forward, they screw you. They'll destroy your life. . . . No one up there [in Alaska] is going to say anything if there is something they see is unsafe. They are not going to say a word."

**D.  Defendants' Knowledge Or Reckless Disregard In Making Post-Spill Misrepresentations And Omissions To Congress, Law Enforcement, Emergency Responders, and Investors About The Oil Flow Rate Into The Gulf Of Mexico From The Blown Macondo Well**

**1.  Defendants' Publicly Stated Estimates Of Oil Spilling Into The Gulf Were Contradicted By Contemporaneous Internal BP Documents, Data, Estimates, and Calculations**

207. Throughout the Class Period, BP, Rainey, Suttles, Hayward, McKay, and Dudley were aware or recklessly disregarded that their statements regarding estimates of the amount of oil spilling into the Gulf following the *Deepwater Horizon* explosion were not true and that their statements omitted material information concerning the true magnitude of the Macondo well oil spill.  Such statements were made, *inter alia*, on April 24, 2010; April 28-29, 2010; April 29-30, 2010; May 3, 2010; May 4, 2010; May 5, 2010; May 14, 2010; May 17, 2010; May 19, 2010; May 20, 2010; May 21, 2010; May 22, 2010; and May 24, 2010.

208.    By way of example, at a time when the publicly reported oil flow rate from the blown well was only 1,000 barrels per day, an internal BP document dated April 26, 2010 revealed that BP had actually estimated that 5,000 barrels per day were leaking into the Gulf (the following was linked to a May 27, 2010 article published in *The New York Times* entitled "Ruptured BP Well Tops Valdez as Worst U.S. Spill"):



(emphasis in downloaded version).   As was later discovered, however, and as described in greater detail below, even the larger 5,000 barrels per day figure was knowingly and grossly insufficient.

209.    Another internal BP document (dated April 27, 2010), also linked to the *New York Times* article in the preceding paragraph, that was provided to BP's senior management revealed that BP's low estimate of the oil spill was 1,063 barrels per day, BP's best estimate was 5,758 barrels per day and BP's high estimate was 14,266 barrels per day:



210.    As Chief Operating Officer for BP Exploration and BP's officer in charge of co-managing the spill response with the U.S. Coast Guard, Suttles knew BP's estimated spill rate from the Macondo well, or was reckless in not knowing.  Indeed, as described below, he knew of at least six, and likely more, internal pieces of data, estimates, and calculations indicating that oil spill flow rate was vastly larger than the figure being publicly reported.  Nonetheless, on April 28, 2010, as reported by the *Huffington Post*, Suttles reiterated earlier estimates that **1,000 barrels** of oil from the Macondo well were spilling into the Gulf of Mexico each day.  Then, on April 29, 2010, Suttles stated in interviews on *CBS's* "The Early Show" and other media outlets that "I think that somewhere between 1,000 and 5,000 barrels a day is probably the best estimate we have today" of the Macondo well spill rate.

211.    Thereafter, BP, Suttles, Hayward, McKay, and Dudley made false and misleading misrepresentations and omissions, with knowledge of their falsity, throughout the rest of April and May 2010.  As described below, in each such instance, they understated the then-stated oil flow rate, in the face of known facts to the contrary, including internal data, estimates, and calculations.

212.    In one particularly glaring example, as reported by the *Times-Picayune* on May 19, 2010, "[a]n engineering professor who has been monitoring the *Deepwater Horizon* disaster said . . . that **'there is scientifically <u>no chance</u>' that BP's estimate of a discharge of about 5,000 barrels of oil per day into the Gulf of Mexico is anything close to the actual number**.  Steve Wereley, associate professor of mechanical engineering at Purdue University, told the House Energy and Environment Subcommittee that his own review indicates that a 1.2-inch hole is producing about 25,000 barrels of oil a day by itself, and overall the daily spill could amount to **something '<u>short of 70,000</u> barrels** to as high as 115,000 barrels.'"

213.    BP immediately went on the attack, ensuring that Professor Wereley's message was strongly refuted by the one entity who the Congress, law enforcement, Gulf residents and business, and the investing public entrusted with knowing and conveying an accurate flow rate - - BP itself.  In response to Wereley's estimates, "BP America Chief Executive Lamar McKay, denied that his company is trying to obscure the size of the leak.  'This leak is not measurable through technology we know,' he said.  He also told the House Transportation and Infrastructure Committee that **anyone working on the spill would have a hard time believing the size is anything close to the 70,000 barrels per day projected last week by Wereley**."

214.    As noted herein, roughly 60,000 barrels of oil per day leaked into the Gulf from the blown Macondo well.  Coupled with the internal BP data, estimates, and calculations received by the Defendants (as described  below) and Wereley's estimates (and the information upon which

Wereley based his work, to which BP had access), Defendants knew, or at a minimum were reckless in not knowing, that their statements minimizing the spill rate were materially misleading. Here, the Defendants ignored, *inter alia*, contemporaneous reports provided to them, from among other sources BP's own senior engineers, utterly undermining the veracity of their public statements as to the oil flow rate of the Macondo well spill.

215. Indeed, BP admitted in its November 15, 2012 Consent with the SEC that by April 28, 2010, BP had possessed at least four internal pieces of data, estimates, or calculations and one external calculation that showed potential flow rates significantly higher than 5,000 barrels per day. They were:

(a) BP engineers and at least one BP-hired consultant were modeling the "worst case" discharge from the well in the April 21-22, 2010 time period, with models that returned numbers from 64,000 to 138,000 barrels per day (*see* MDL 2185 Doc. No. 777-2 at ¶¶372-375; Doc. No. 857 at 28);

(b) By April 22, 2010, a BP engineer had modeled possible oil flow path scenarios within the well, with corresponding rates **between 64,000 barrels per day and 146,000 barrels per day**.

(c) On April 23, 2010, BP's Ryan Malone sent an email, on which Suttles was copied, that estimated the flow rate at 31 gallons per minute, or 1,063 barrels per day. On April 24, 2010, before Suttles made the above-referenced misstatements and omissions at issue, Mr. Malone sent another email – against copying Suttles – stating "[d]isregard the [1,063 barrels per day] estimate for flowrate" because "[i]t is wrong" (*see* MDL Doc. No. 777-2 at ¶376; Doc. No. 857 at 28);

(d)     Suttles later testified that he never "engage[d] with [BP's] flow assurance people" – *i.e.*, the engineers and consultant mentioned – before he made the April 24, 2010 statement (*see* MDL 2185 Doc. No. 777-2 at ¶377; Doc. No. 857 at 28)

(e)     On or before April 24, 2010, BP was aware of an estimate that showed that immediately following the explosion, oil was flowing through the still-attached riser at a rate of 100,000 barrels per day.

(f)     By April 25, 2010, BP engineers were told of an external analysis of the oil on the water that reached the conclusion that the flow rate could be as high as 10,000 barrels per day.

(g)     On April 27, 2010, a BP engineer estimated the oil flow rate to be approximately 5,000 to 22,000 barrels per day on the basis of temperature readings along the riser pipe, among other factors;

(h)     By April 28, 2010, Rainey's own spreadsheets showed a flow rate ranging up to over 14,000 barrels per day.

216.    Moreover, BP admitted in its November 15, 2012 Consent with the SEC that between April 30, 2010 and May 24, 2010, BP generated or was aware of *eleven* additional pieces of data, estimates, and calculations - - of which Suttles received at least six, Rainey received at least four, and Hayward knew of all eleven - - showing a range of flow rates *significantly higher than 5,000 barrels per day*.  They were:

(a)     On April 30, 2010, an analysis performed by a BP engineer yielded a range of possible flow rates *from 5,000 barrels per day to 40,000 barrels per day*.

(b)     In early May 2010, a video analysis by a BP engineer resulted in an estimate of *20,000 barrels per day*, attributable to just the riser pipe.

(c)      On May 9, 2010, modeling done by a BP contractor led to a range of possible flow rates *from 37,000 to 87,000 barrels per day*.

(d)      On May 10, 2010, a video analysis done by a BP contractor led to the conclusion that for just oil leaking from the riser pipe, it could not be "ruled out" that the flow rate was "in the order of *40,000 bopd*."

(e)      On or about May 10 and May 11, 2010, reservoir modeling done by a BP engineer yielded a range of potential flow rate estimates *from 14,000 bopd to 96,000 bopd*.  This senior engineer shared his work internally with senior BP executives during the second week of May 2010.  As described above, on May 15, 2010, he expressed concerns in an email to a senior and a junior executive in BP's Exploration and Production business regarding BP's public statements reaffirming the 5,000 barrels per day figure and refuting a professor's calculated estimate of 70,000 barrels per day.  In the email, this engineer stated that the flow rate could be anything up to 100,000 barrels per day.

(f)      From May 14 to May 15, 2010, a critique was authored by a BP engineer of a Purdue University professor's analysis estimating a flow rate of 70,000 barrels per day.  The critique identified what the BP engineer stated were potential errors made by that professor that, when corrected for, yielded a revised estimate of 15,000 barrels per day, just attributable to the riser pipe, from which the BP engineer stated that a further reduction appropriately could be made.

(g)      On May 16, 2010, a reservoir-depletion/pressure-drop analysis done by a BP engineer yielded a flow rate calculation of 86,600 barrels per day, based on the then-estimated pressure.

(h)      From May 19 to May 20, 2010, a collection of a portion of the oil from the riser pipe with the Riser Insertion Tube Tool ("RITT") showed average collection rates of

approximately 5,000 barrels per day for a 12-hour period, capturing only a portion of the oil leaking from the riser, therefore indicating that the total amount of oil leaking was in excess of 5,000 barrels per day.

(i)      On May 22, 2010, an external surface expression analysis showed a range of estimated flow rate from 6,154 to 11,609 barrels per day.

(j)      On May 23, 2010, an analysis created by a BP engineer of the flow rate attributable only to the flow coming from the "kink" in the riser pipe showed an estimate of 11,600 barrels per day;

(k)      On May 24, 2010, the RITT collected approximately 6,100 barrels of oil during the 24-hour period from midnight to midnight, despite the fact that it was not collecting all of the oil flowing out from the well, therefore indicating again that the total amount of oil leaking was in excess of 5,000 barrels per day.

217.      The facts alleged herein have been previously found to support an inference of scienter as to Hayward and Suttles.  *See BP I*, 843 F. Supp. 2d at 782-84, 786-88.  In addition, the facts alleged herein were the basis upon which BP pled guilty to, *inter alia*, felony obstruction of Congress and agreed to pay the highest criminal penalty ever in U.S. history - $4 billion.  They were the basis upon which Rainey has been criminally indicted.  They were also the basis upon which BP admitted its liability and settled the SEC's civil securities fraud case for the third highest penalty in the SEC's history - $525 million.   Simply put, the facts alleged herein overwhelmingly indicate that BP and the Individual Defendants knowingly perpetrated a massive fraud on the investing public, including the Plaintiffs and the Class members.

### 2.    Defendants Misrepresented the Scope of the Leak in a Brazen Attempt to Whittle Down the Amount BP Would Owe in Fines

218.    Civil fines under the U.S. Clean Water Act are based on the number of barrels spilled.  According to the *Wall Street* Journal, the final government estimate of the amount of oil spilled was between 53,000 and 62,000 barrels of oil per day, or 4.9 million barrels spilled overall, which translates to $5.4 billion to $21 billion in fines, depending on whether investigators find that BP was grossly negligent. Faced with that crude reality, Defendants were motivated to lie about the amount of oil gushing into the Gulf in order to skirt the amount of civil fines and penalties it owed under the Clean Water Act.

### 3.    BP Agreed To Pay The Third-Highest Civil Fine In The SEC's History - $525 Million – To Settle The SEC's Well-Pled Allegations That It And Its Executives Hid From Investors, Including Plaintiffs and the Class Members, Critical Information About the Spill

219.    The facts alleged herein, among others, gave rise to the SEC's securities fraud complaint against BP filed on November 15, 2012.  On that same day, BP filed a Consent in the SEC action in which it agreed to entry of a Final Judgment and admitted that the allegations in the SEC's complaint were true.  In doing so, BP agreed to pay a $525 million penalty to settle with the SEC, thereby incurring the third-largest civil fine *ever* imposed by the SEC and a permanent injunction barring BP from violating the federal securities laws.  As described in greater detail below, Defendants and other BP personnel engaged in a massive deception by knowingly fabricating and repeatedly asserting to the public an artificially low oil spill flow rate figure in April and May 2010, at times directly refuting scientists who dared challenge its veracity.  They did so despite internal knowledge of at least *sixteen* different sources of data, estimates, and calculations – many of them created by BP's own senior engineers – indicating that the spill was greater by many orders of magnitude.  Each of those sixteen was undisputedly known to some or all of the Defendants.

220.     At the announcement of the settlement, SEC officials were unambiguously harsh in their criticism of BP's conduct in misleading investors.  For instance:

(a)     Robert Khuzami, Director of the SEC's Division of Enforcement said in an SEC press release:

> The oil spill was catastrophic for the environment, but by hiding its severity BP also harmed another constituency – its own shareholders and the investing public who are entitled to transparency, accuracy, and completeness of company information, particularly in times of crisis.   Good corporate citizenship and responsible crisis management means that a company can't hide critical information simply because it fears the backlash.

(b)     Daniel M. Hawke, Director of the SEC's Philadelphia Regional Office and Chief of the Enforcement Division's Market Abuse Unit said in the same press release, "Without accurate critical flow rate data known only to BP, the company denied its shareholders and investors the opportunity to fairly assess BP's potential liabilities and true financial condition."

(c)     At a news conference, Mr. Khuzami further reprimanded BP's executives, the Defendants in the instant action, for standing behind an oil flow estimate of 5,000 barrels per day "despite an ever-growing body of evidence that this estimate was unreasonably low," until "eventually, outside groups realized that the flow rate estimate was 10 times what BP had fraudulently communicated to investors."  He summarized the SEC's case against BP:

> [T]he eyes of the world were on BP in the spring and summer of 2010.  The company had an opportunity to provide fulsome, accurate disclosure about the facts needed by the public to make informed investment decisions.  And, instead, BP chose to mislead the public.

> That is not what we expect from public companies and their management.  In fact, it is exactly in times of crisis that the need for accurate information is most acute.

4.      **BP Pled Guilty to Felony Manslaughter, Environmental Crimes and Felony Obstruction of Congress And Agreed to Pay The Largest Criminal Fine in U.S. History – $4 Billion – To Resolve A DOJ Investigation That Revealed Defendants' Concealment Of Critical Spill Information From Congress And The Public**

221.    On April 23, 2012, federal prosecutors filed criminal charges against BP engineer Kurt Mix for obstruction of justice in connection with a criminal investigation of the *Deepwater Horizon* disaster.  In a press release issued the next day, the DOJ reported that "Mix worked on internal BP efforts to estimate the amount of oil leaking from the well and was involved in various efforts to stop the leak.  Those efforts included, among others, Top Kill . . . . ."  The DOJ's April 24, 2012 press release also states the following:

> Mix allegedly deleted on his iPhone a text string containing more than 200 text messages with a BP supervisor.  The deleted texts, some of which were recovered forensically, included sensitive internal BP information collected in real-time as the Top Kill operation was occurring, which indicated that Top Kill was failing . . . . Mix deleted a text he had sent on the evening of May 26, 2010, at the end of the first day of Top Kill.  In the text, Mix stated, among other things, "Too much flowrate – over 15,000."  Before Top Kill commenced, Mix and other engineers had concluded internally that Top Kill was unlikely to succeed if the flow rate was greater than 15,000 barrels of oil per day (BOPD).  At the time, BP's public estimate of the flow rate was 5,000 BOPD – three times lower than the minimum flow rate indicated in Mix's text.

222.    The Wall Street Journal reported on May 28, 2012 that during DOJ's investigation into whether BP's representatives lied to Congress about the oil flow rate of the Macondo well spill, federal investigators examined an email by a BP engineer warning not to share data "outside the circle of trust."  In particular, the prosecutors uncovered a May 27, 2010 email written by a senior BP engineer, Rupen Doshi, in the midst of the first effort to stop the leak, known as the "top kill," warning that "NO ONE is to get the data files from the Top Kill method that is being pumped from yesterday or today except for Paul Tooms' group."  Mr. Doshi was referring to Paul Tooms, then head of upstream engineering at BP.  "The purpose of the note was meant to put a limit on the people outside the circle of trust getting the data," Mr. Tooms wrote in an email later that day.

223.     On November 15, 2012, DOJ announced that BP E&P agreed to plead guilty to 11 counts of felony manslaughter, felony obstruction of Congress, and criminal violations of the Clean Water and Migratory Bird Treaty Acts.  In its plea, BP agreed to pay a record **$4 billion** in criminal fines and penalties for its conduct regarding the *Deepwater Horizon* disaster and the ensuing coverup – the single largest criminal fine *ever* in U.S. history.  In addition to the record monetary penalty, BP agreed to extensive monitoring and reforms.  Among other things, BP must retain a process safety and risk management monitor and an independent auditor, who will oversee BP's process safety, risk management and drilling equipment maintenance with respect to deepwater drilling in the Gulf of Mexico.  BP also must retain an ethics monitor to improve BP's code of conduct to ensure BP's future candor with the U.S. government.  These unprecedented sanctions underscore the severity of BP's deception at issue in this case.

224.     In the wake of BP's guilty plea, Assistant Attorney General Lanny A. Breuer of the Justice Department's Criminal Division put it bluntly:  "***The explosion of the rig was a disaster that resulted from BP's culture of privileging profit over prudence***."  He added:

> As the oil spill continued, BP made a tragic situation worse: it began misleading Congress and the American people about how much oil was pouring out of the Macondo well.  As BP now admits, in responding to Congress, the company lied and withheld documents, in order to make it seem as though less damage was being done to the environment than was actually occurring.  Acknowledging those lies, BP has agreed to plead guilty to felony obstruction of Congress.

225.     Among other things, DOJ's 14-count information details that BP, through Rainey, obstructed an inquiry by the U.S. Congress into the amount of oil being discharged in the Gulf while the spill was ongoing – the very facts at issue here.  As part of the plea agreement, BP admitted that, through Rainey, it withheld documents and provided false and misleading information in response to the U.S. House of Representatives' request for flow-rate information.  BP admitted that, *inter alia*, Rainey manipulated internal estimates to understate the amount of oil

flowing from the Macondo well and withheld data that contradicted BP's publicly stated estimate of 5,000 barrels of oil per day.  BP also admitted that, while Rainey was preparing his manipulated estimates, BP's internal engineering response teams were using sophisticated methods that generated significantly higher estimates.  All of this information was withheld not only from Congress, but also Plaintiffs, the Class members, and other BP investors.

226.   Pertinent here, DOJ's criminal information, with respect to which BP admitted its guilt, charged the following (as quoted from the information):

**Early Flow-Rate Estimates**

    i.  The amount of oil leaking from the Macondo well was directly relevant to various efforts to stop the leak and also relevant to potential civil and criminal litigation, including the calculation of penalties.

    ii.  On or about April 24, 2010, very soon after it was determined that the Macondo well was leaking oil and natural gas, Unified Command, with BP's input, issued a preliminary public estimate that the well was flowing at a rate of approximately 1,000 barrels of oil per day ("BOPD").

    iii.  On or about April 26, 2010, a scientist at the National Oceanic and Atmospheric Administration ("NOAA") prepared a written flow-rate estimate of approximately 5,000 BOPD.  The NOAA scientist's estimate, which was based in part on a very preliminary assessment of oil that had started to float to the surface of the Gulf, cautioned that the methodologies used were "highly unreliable" and that the estimate was accurate "to only an order of magnitude," such that the actual flow amount could exceed 5,000 BOPD by ten times.  As a result of this NOAA estimate, on or about April 28, 2010, Unified Command raised its public estimate to 5,000 BOPD.

**Rainey's "Estimates"**

    iv.  After learning of NOAA's preliminary and heavily-qualified 5,000 BOPD estimate, Rainey, an executive who had no prior experience in spill estimation, surfed the Internet for information about how to conduct oil-spill-volume estimates based on observations of oil floating on the surface of a water body, known as "mass balance" estimates.  Rainey's internet search led him to a website where he found a Wikipedia entry that described some generally accepted mass balance

methodologies, including the American Society for Testing and Materials ("ASTM") method and the European "Bonn" method.

v. Between on or about April 26, 2010 and on or about April 30, 2010, despite having no experience performing mass balance estimates and despite knowing that BP had employees who were trained in generating such estimates, defendant BP, through Rainey, performed and caused to be performed daily estimates purportedly using the ASTM and Bonn methods,

vi. Defendant BP's Bonn estimates, prepared by Rainey, resulted in "best guess" estimates significantly higher than 5,000 BOPD and "high end" estimates of up to 92,000 BOPD. Defendant BP, through Rainey, withheld these Bonn estimates from individuals working on flow rate within Unified Command and, later, also withheld them from Congress.

vii. Defendant BP's "ASTM" estimates, prepared by Rainey, did not conform to ASTM standards but instead were manipulated to consistently arrive at or near a "best guess" of between 5,000 and 6,000 BOPD. In effect, defendant BP, through Rainey, conducted the estimates in a manner designed to reverse engineer results consistent with NOAA's preliminary 5,000 BOPD estimate. Defendant BP, through Rainey, labeled the estimates as "ASTM" estimates even though the estimates did not conform to the ASTM method.

viii. As described below, defendant BP, through Rainey and other BP executives, consistently maintained that 5,000 BOPD was the "best guess" estimate, without disclosing internal BP information suggesting the flow rate was considerably higher.

**Defendant BP's Actual Estimates**

ix. In its engineering response to the Macondo oil spill, defendant BP did not rely internally on Rainey's contrived and inaccurate flow-rate numbers. Instead, defendant BP and its affiliated companies had numerous expert teams assessing the flow rate using sophisticated methodologies that focused on the conditions at the seafloor where the oil and natural gas were gushing out. These teams were generating flow-rate estimates much higher than Rainey's purported "best guess" of between 5,000 and 6,000 BOPD.

x. For example, on or about April 22, 2010, BP subsurface engineers, including Kurt Mix, separately charged, estimated "various release scenarios" with potential flow rates ranging from 64,000 to 146,000 BOPD (the "Subsurface Team Estimates").

91

xi.   Also, on or about May 11, 2010, a team of BP engineers working under the direction of an engineering supervisor ("Engineer 1") prepared a series of possible flow rates that ranged from 14,000 BOPD to 82,000 BOPD depending on potential flow paths and other known and unknown variables (the "Engineer 1 Slide Deck").

**Defendant BP's Public Estimates Questioned**

xii.   On or about May 13, 2010, a university professor with expertise in fluid mechanics measurement publicly estimated that the Macondo well was leaking oil at a rate of approximately 70,000 BOPD, based on a review of video footage of the leak that BP had recently released.

xiii.  On or about May 14, 2010, defendant BP and its affiliated companies publicly rejected the university professor's work and continued defending 5,000 BOPD as the "best" estimate, even though 70,000 BOPD was within the range of Rainey's Bonn estimates and other internal BP engineering estimates, including the work of Engineer 1 described above.

xiv.  On or about May 14, 2010, Engineer 1 sent an email to two executives at BP, including BP's then-Chief Executive Officer for Exploration and Production, expressing concern over BP's continued public embrace of the 5,000 BOPD number.  The email stated:

I just read an article on CNN (May 14, 2010 1:00 p.m.) stating that  a researcher at [a university] believes that the Macondo well is leaking up to 70,000bopd and that BP stands by a 5,000bopd figure.  With the data and knowledge we currently have available, we cannot definitively state the oil rate from this well.  **We should be very cautious standing behind a 5,000bopd figure as our modeling shows that this well could be making anything up to ~ 100,000 bopd** depending on a number of unknown variables, such as: flow path either through the annulus behind the production casing or through the production casing float shoe, the height of reservoir exposed, if drill pipe is suspended in the BOP and sealed by VBR rams, reservoir skin damage, choking effects and etcetera. We can make the case for 5,000 bopd only based on certain assumptions and in the absence of other information, such as a well test.

xv.   Engineer 1's email caused concern within BP because it contradicted BP's public position regarding flow rate.

**The Rainey Memo**

xvi.  On or about May 17, 2010, defendant BP, through Rainey, prepared a memorandum purporting to summarize the efforts that had been

92

undertaken within Unified Command to estimate flow rate (the "Rainey Memo"). The Rainey Memo, which sought to justify BP's 5,000 BOPD estimate, was false and misleading in numerous respects, including:

a.  Defendant BP, through Rainey, omitted Rainey's Bonn   estimates, which were significantly higher than 5,000 BOPD.

b.  Defendant BP, through Rainey, falsely labeled the estimates in the memorandum as "ASTM" calculations.

c.  Defendant BP, through Rainey, omitted that the estimates included in the memorandum were premised on data and other inputs defendant BP, through Rainey, knew were inaccurate.

d.  Defendant BP, through Rainey, omitted other documents relating to flow-rate estimates that contradicted defendant BP's 5,000 BOPD estimate, including, among others, the work performed by Engineer 1, the Subsurface Team Estimates, and a critique by another BP engineer ("Engineer 2") of the university professor's work that used different assumptions than those used by the professor and concluded that 15,000 BOPD was an appropriate assessment of the flow rate based on the same video footage of the spill.

e.  Defendant BP, through Rainey, falsely stated that Rainey's estimates ranging from 5,000 to 6,000 BOPD "played an important part in Unified Command's decision [on April 28, 2010] to raise the estimate of flow rate from 1,000-5,000 barrels per day."  In fact, as defendant BP, through Rainey, well knew, defendant BP had not yet provided these purported "ASTM" estimates to Unified Command by the time that Unified Command raised its estimated flow rate to up to 5,000 BOPD.

**The Flow Rate Technical Group**

xvii.  On or about May 19, 2010, as a result of the growing concern that BP was understating the amount of oil spilling from the Macondo well, Unified Command announced the creation of the Flow Rate Technical Group ("FRTG"), made up of independent and government experts, to determine the flow rate.  Later, following independent analysis, the FRTG announced on or about August 2, 2010, its conclusion that the flow rate after the blowout had initially been approximately 62,000 BOPD—over twelve times BP's public estimate of 5,000 BOPD—and had been approximately 53,000 BOPD at the time the well was shut in on or about July 15, 2010.  The FRTG concluded that a total of approximately 4.9 million barrels of oil had been released during the course of the spill.

**The Congressional Inquiry and Investigation**

93

xviii. The House Subcommittee on Energy and Environment (the "Subcommittee") was a subcommittee of the Committee on Energy and Commerce of the House of Representatives of the United States Congress.  The Subcommittee had oversight authority over matters including the regulation of energy, drinking water and soil and water contamination.  The Subcommittee's oversight authority included the authority to analyze the effectiveness of existing laws and to evaluate the need to propose new or additional legislation.  The Subcommittee was a "Committee" for purposes of Title 18, United States Code, Section 1505.

xix. Following the Deepwater Horizon blowout, the Subcommittee commenced an inquiry and investigation of the blowout and oil spill, including the amount of oil flowing from the well.  Congress's inquiry and investigation included, among other things, requests for information from BP.

xx. On or about May 4, 2010, in response to a Congressional request for a briefing of members and staff of Congress, defendant BP, through Rainey, falsely informed the Subcommittee that 5,000 BOPD was the most accurate flow-rate estimate.  Defendant BP, through Rainey, further stated to Congress that, while defendant BP had calculated a hypothetical "worst case" scenario of 60,000 BOPD, the worst case scenario was not possible, in part because it assumed removal of the blowout preventer from the wellhead, which remained in place at that time.  During the May 4 briefing, defendant BP, through Rainey, did not disclose any information that contradicted defendant BP's purported "best guess" of 5,000 BOPD, including the Bonn estimates and other BP internal information of which defendant BP, through Rainey, was aware indicating that the actual flow—not a hypothetical worst case scenario assuming the non-existent condition of the blowout preventer being removed—was much higher than 5,000 BOPD.

xxi. On or about May 14, 2010, the then-Chairman of the Subcommittee ("the Subcommittee Chairman") sent a letter to BP accusing BP of understating the amount of oil leaking from the well.  The letter noted that BP had recently "reaffirmed the 5,000 barrels per day estimate" despite recent news reports that the "actual amount of oil being released into the Gulf of Mexico could be upwards of 70,000 barrels per day."  The letter further stated that Congress was concerned that an "underestimation of the flow may be impeding the ability to solve the leak and handle management of the disaster."  The Subcommittee requested answers to fifteen questions relating to flow rate and requested that BP "update [its] response or provide additional documents at such time as such information becomes available."  Among other things, the Subcommittee requested:

94

a. "What is the BP method and scientific basis for the estimate of 5,000 barrels per day? Was this estimate based solely on surface monitoring of the size of the spill?

b. "All documents created since the incident that bear on, or relate to, in any way, estimates of the amount of oil being released"; and

c. "BP's current estimate of the amount of oil flowing from the well, including the basis and methodology for that estimate, along with any uncertainty or error ranges for the estimate."

xxii. On or about May 21, 2010, defendant BP, through Rainey, began working on a response to the May 14 Congressional request. Rainey was the primary source of flow-rate information for defendant BP's eventual written response to Congress on or about May 24, 2010 (the "BP Response") that continued to embrace 5,000 BOPD as the "best guess" estimate. During the preparation of the BP Response, defendant BP, through Rainey, continued to receive information that contradicted a "best guess" of 5,000 BOPD, including that the amount of oil actually being collected via a riser insertion tube tool (the "RITT") confirmed that the flow rate was in excess of 5,000 BOPD and an email that "everyone" within the FRTG at that time agreed that "5,000 barrels/day was too low." Aware of this and other information contradicting the 5,000 BOPD estimate, defendant BP, through Rainey, withheld such information from other BP employees and from BP in-house and outside lawyers working on the BP Response. Defendant BP, through Rainey, also prepared false and misleading responses to the Congressional request, and provided false and misleading information to others working on the BP Response.

xxiii. On or about May 24, 2010, defendant BP, through Rainey, caused to be submitted to the Subcommittee the BP Response, which appended the false and misleading Rainey Memo and its attachments, which were selected by defendant BP, through Rainey. As a result of defendant BP's actions, through Rainey, in withholding information and also providing false and misleading information, the BP Response made false and misleading statements to Congress, withheld and concealed information, and otherwise impeded Congress's inquiry and investigation. For example:

a. The BP Response omitted all of Rainey's Bonn estimates, which contained estimates of oil spill up to 92,000 BOPD

b. The BP Response omitted key parts of Engineer 1's work, including flow-rate estimates up to 82,000 BOPD.

c.  The BP Response omitted Engineer 1's email expressing concern about BP's public defense of the 5,000 BOPD estimate.

d.  The BP Response falsely labeled Rainey's estimates as having been calculated using the "ASTM" method, when, in fact, the estimates did not conform to that method.

e.  The BP Response omitted that Rainey's purported "ASTM" estimates were premised on data and other inputs Rainey knew were inaccurate.

f.  The BP Response omitted that Rainey had manipulated his purported "ASTM" estimates to arrive near 5,000 BOPD.

g.  The BP Response omitted Engineer 2's conclusion that a proper assessment of the video footage relied upon by the university professor resulted in an estimate of 15,000 BOPD—three times higher than the 5,000 BOPD estimate contained in the BP Response that Rainey asserted was the best estimate.

h.  The BP Response omitted the Subsurface Team Estimates ranging from 64,000 to 146,000 BOPD.

i.  The BP Response falsely stated that Rainey's purported "ASTM" estimates played an important part in Unified Command's decision to raise its early estimate from 1,000 to 5,000.

j.  The BP Response omitted data Rainey received on or about May 22, 2010, that the amount of oil actually being collected via the RITT confirmed that the flow rate was in excess of 5,000 BOPD.

k.  The BP Response omitted a May 23, 2010 email from the head of the FRTG to Rainey and others stating, among other things, that "everyone is at least comfortable with saying that the 5,000 barrels/day was too low."

227.    BP E&P (referred to in the Guilty Plea Agreement as "BP") plead guilty to making the following omissions and false and misleading statements in its May 24, 2010 response ("Markey Response") to the Committee on Energy and Commerce:

i.  BP, through a former vice president, withheld information and documents relating to multiple flow-rate estimates prepared by BP engineers that showed flow rates far higher than 5,000 BOPD, including as high as 96,000 BOPD.

96

ii.   BP, through a former vice president, withheld information and documents relating to internal flow-rate estimates he prepared using the Bonn Agreement analysis, that showed flow rates far higher than 5,000 BOPD, and that went as high as 92,000 BOPD.

iii.   BP, through a former vice president, falsely represented that the flow-rate estimates included in the Response were the product of the generally-accepted ASTM methodology.  At the time that this false representation was made, BP's former vice president knew that those estimates were the product of a methodology he devised after, among other things, a review of a Wikipedia entry about oil spill estimation.

iv.   BP, through a former vice president, falsely represented that the flow-rate estimates included in the Markey Response had played "an important part" in Unified Command's decision on April 28, 2010, to raise its flow-rate estimate to 5,000 BOPD.  At the time this false representation was made, BP's former vice president knew that those flow-rate estimates had not played "an important part" in Unified Command's decision to raise its flow-rate estimate and had not even been distributed outside of BP prior to that decision.

v.   BP falsely suggested, in its May 24, 2010 letter, that the Unified Command's flow rate estimate of 5,000 barrels of oil per day ("BOPD") was the "most scientifically informed judgment" and that subsequent flow rate estimates had "yielded consistent results."  In fact, as set forth above, BP had multiple internal documents with flow rate estimates that were significantly greater than 5,000 BOPD that it did not share with the Unified Command.

vi.   On or about June 25, 2010, in a BP letter to Congressman Markey, BP's former vice president inserted language that falsely stated that BP's worst case discharge estimate was raised from 60,000 BOPD to 100,000 BOPD after subsequent "pressure data was obtained from the BOP stack."  At the time this false representation was made, BP's former vice president knew that the 100,000 BOPD figure was not first derived after subsequent pressure data had been obtained, but instead, he had been aware of a 100,000 BOPD worst case discharge since as early as on or about April 21, 2010.

228.   A separate indictment was also unsealed on November 15, 2012, charging Rainey with obstructing a Congressional investigation and making false and misleading statements to law enforcement officials.  Simply put, he is charged with lying about the very facts at issue in this

case to authorities attempting to manage the worst ecological disaster in U.S. history as it was unfolding.

229.    When the DOJ criminal pleas, SEC securities fraud settlement, and resulting fines and penalties were announced on November 15, 2012, Defendant Dudley issued a statement stating, in part, "We apologize for our role in the accident, and as today's resolution with the U.S. government further reflects, *we have accepted responsibility for our actions*."  Plaintiffs, via this lawsuit, seek to hold BP to its word, by accepting responsibility for its lies and deceptions and those of its executives which caused Plaintiffs and the Class members to suffer the losses alleged herein.

### 5.    The U.S. EPA Barred BP From New Contracts With The U.S. Government

230.    On November 28, 2012, in the wake of BP's guilty pleas, BP was barred from doing new business with the U.S. government.  The effects on BP were profound.  In a statement on its website, EPA stated, "EPA is taking this action due to BP's lack of business integrity as demonstrated by the company's conduct with regard to the Deepwater Horizon blowout, explosion, oil spill and response."  The U.S. Interior Department confirmed that the ruling temporarily barred BP from winning any new federal oil leases, including the roughly 20 million new acres of federal waters in the Gulf of Mexico that the Interior Department had opened for auction the same day.  BP was barred from bidding on any of those parcels.  The ban was expected to impact BP's extensive business with the U.S. military as well, including an estimated $1.35 billion in Defense Department fuel contracts.

231.    Following this announcement, analysts stated that a lengthy government contract ban could seriously impact BP's bottom line, particularly given BP's previously stated intent to ramp up U.S. production.

### E.    Additional Allegations Regarding Defendants' Knowledge Or Reckless Disregard As To The Falsity Of Their Class Period Statements And Omissions

232.    In addition to the foregoing, certain of the Individual Defendants' actual knowledge of the falsity of the alleged misstatements is established by their signing of certifications pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, which certified that the SEC filings to which they were appended "fully complie[d] with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and information contained [therein] fairly presents, in all material respects, the financial condition and results of operations of the company."  In order to so certify, the certifying Defendants were obligated to familiarize themselves with the contents of the SEC filings and the underlying operations of BP described therein.

233.    The Individual Defendants who made, signed, or otherwise were quoted in the other statements to investors described herein, who thereby presented themselves as knowledgeable about the subject matter thereof, were under a similar obligation to familiarize themselves with the subject matter of those statements to ensure that they conveyed truthful, non-misleading information.

234.    Moreover, the subject matter of the misrepresentations and omissions alleged herein were firmly within the core operations of BP, such that knowledge is in any event imputable to the Individual Defendants due, among other reasons, to their high-ranking positions within BP, their high level of involvement in the day-to-day operations of BP, and their oversight and control of BP, BP America and BP E&P.

235.    Defendants had a duty to disclose the whole truth to Plaintiffs, the Class members, and other investors in BP securities:

(a)      By choosing to speak on the topics and subjects outlined herein, in the allegedly false and misleading statements described herein, Defendants had a duty to familiarize themselves with the subject matter thereof and a correlating duty to speak accurately and completely about it;

(b)      By choosing to disclose information about these topics and subjects, Defendants were under a duty to disclose the whole truth;

(c)      In any instance where Defendants made partial disclosures that conveyed false impressions, they had a duty to disclose the whole truth;

(d)      To the extent that new information later arose that made any of Defendants' earlier alleged misstatements misleading or untrue, Defendants were obligated to disclose the whole truth and to correct their prior misstatements.

236.     Defendants breached the foregoing duties.  As outlined herein, they voluntarily disclosed and discussed information concerning BP that, even when viewed in the best light imaginable to them, disclosed only partial, deceptive information and misleading half-truths (and in a more realistic light, was utterly false).

237.     The Individual Defendants' knowledge and reckless disregard is further evidenced by and can be inferred by their highly unusual mass resignations, departures, and employment changes during or shortly after the Class Period, including, *inter alia*:

(a)      Hayward was removed as BP's CEO in October 2010 and as a BP executive director in November 2010;

(b)      Suttles left his position as COO of BP Exploration and as a member of BP's Board of Directors in or about January 2011;

(c)      Inglis left his position as CEO of BP E&P and as an executive director of BP in October 2010;

(d)      Rainey left BP in May or June 2011;

(e)      Prosser retired as Deputy Chairman and senior independent Director on BP's Board

in April 2010; and

(f)      Browne left BP in April 2007.

## VIII.   THE MATERIALIZATION OF THE UNDISCLOSED RISKS – DEEPWATER HORIZON OIL SPILL AND ITS AFTERMATH

### A.     BP's Systematic Failures Caused the Explosion on and the Sinking of the *Deepwater Horizon Rig*

#### 1.     BP Acquires the Rights to the Macondo Well and Began Its Preparation to Drill Despite Having an Inadequate and Error-Filled Oil Spill Response Plan

238.     The tragedy of the Macondo well explosion was avertable, but BP's overarching

culture of indefensible risk-taking prevailed. At every turn, BP's conduct evidenced a systematic

departure from recognized industry safety practices. Thus, the Presidential Commission found that

"*the cumulative risk that resulted from these decisions and actions was both unreasonably large*

*and avoidable[.]*"

239.     In March 2008, BP paid approximately $34 million to acquire the exclusive drilling

rights from the MMS for the Mississippi Canyon Block 252, a nine-square-mile plot in the Gulf

of Mexico that encompasses the Macondo well. Although the Mississippi Canyon area has many

productive oil fields, BP knew little about the specific geology of Block 252 and, in fact, the

Macondo was BP's first well on the new lease. BP planned to drill the well to 20,200 feet in order

to learn the geology of the area and to determine whether the oil and gas reservoir would warrant

installing production equipment. The Macondo well was located 47.6 miles off the coast of

Louisiana. It was believed that the well could hold as much as fifty (50) million barrels (or 2.1

billion gallons) of producible oil.

101

240.    Throughout the Class Period, MMS required BP to prepare and file oil spill response plans demonstrating BP's specific strategy and ability to respond to an oil spill if one occurred while drilling in the Gulf of Mexico. MMS regulations required that an oil spill response plan include, *inter alia:* (i) an emergency response action plan; (ii) disclosure of the equipment available to combat an oil spill; (iii) any oil spill response contractual agreements with third-parties; (iv) calculations of the worst-case discharge scenarios; (v) a plan for dispersant use in case of a spill; (vi) an in-situ oil burning plan; and (vii) information regarding oil spill response training and drills. *See* 30 C.F.R. § 254.21.

241.    The first of these requirements, the "emergency response action plan," is the "core" of the overall operational response plan and required BP to disclose, among other things: (i) information regarding BP's oil spill response team; (ii) the types and characteristics of oil at the facility; (iii) procedures for early detection of a spill; and (iv) procedures to be followed in the event of an oil spill. *See* 30 C.F.R. § 254.23.

242.    BP publicly filed its oil spill response plan for the Gulf of Mexico – entitled "Regional Oil Spill Response Plan – Gulf of Mexico" – with the MMS on December 1, 2000 and last revised the plan on June 30, 2009 ("BP's Regional OSRP for the GOM"). A regional oil spill response plan is designed to cover multiple facilities or leases of a lessee that have: (i) similar modeled spill trajectories and worst case discharge scenarios, (ii) the potential to affect the same ecological or socioeconomic resources, and (iii) are located in close enough proximity to be served by the same response equipment and personnel. BP's Regional OSRP for the GOM covers a massive area, including all of the United States' interests in the Gulf of Mexico. This area encompasses the coastal waters of Texas, Louisiana, Alabama, Mississippi, and Florida. BP has

approximately 600 leases and operates roughly 70 oil wells in the Gulf of Mexico. BP's Regional OSRP for the GOM applied to all of these wells.

243.    According to BP's Regional OSRP for the GOM, the "***TOTAL WORST CASE DISCHARGE*" scenarios in the Gulf of Mexico ranged from a release of 28,033 barrels of oil per day to 250,000 barrels of oil per day.** More specifically, BP's Regional OSRP for the GOM stated: (i) an oil spill occurring less than ten miles from the shoreline could create a worst case discharge of 28,033 barrels of oil per day; (ii) an oil spill that occurred greater than ten miles from the shoreline could create a worst case discharge of 177,400 barrels of oil per day; and (iii) an oil spill caused by a mobile drilling rig that is drilling an exploratory well could create a worst case discharge of 250,000 barrels of oil per day. BP's Regional OSRP for the GOM explicitly states that BP and its subcontractors ***could recover approximately 491,721 barrels of oil per day*** (or more than 20.6 million gallons) in the event of an oil spill in the Gulf of Mexico. Moreover, BP claimed and provided certified statements to the MMS that BP and its subcontractors "*maintain the necessary spill containment and recovery equipment to respond effectively to spills.*"

244.    On March 10, 2009, the MMS deemed BP's initial exploration plan for Mississippi Canyon Block 252 ("BP's EP") "submitted." BP's EP included the area encompassing the Macondo well.[1] In connection with the EP, BP sought a permit from the MMS to drill to a total depth of 19,650 feet at the Macondo Well. Following the sinking of the *Deepwater Horizon,* a BP crewman admitted that this depth had been misrepresented to the MMS, and that BP had in fact drilled in excess of 22,000 feet, in violation of its permit.

---

[1] BP's Regional OSRP for the GOM and EP are collectively referred to herein as "BP's Oil Spill Response Plan."

245.    According to BP's EP, the worst case scenario of an oil spill occurring in Mississippi Canyon Block 252 would be the release of approximately *162,000 barrels of oil per day.*

246.    In BP's EP, BP claimed it would have no difficulty responding to a worst case scenario while drilling the Macondo well:

> **Since BP ... has the capability to respond to the appropriate worst-case scenario included in its regional OSRP ..., and since the worst-case scenario determined for our [EP] does not replace the appropriate worst-case scenario in our regional OSRP, I hereby certify that BP ... has the capability to respond, to the maximum extent practicable, to a worst-case discharge, or a substantial threat of such a discharge, resulting from the activities proposed in our [EP].**

* * *

> **[D]ue to the distance to shore (48 miles) and the response capabilities that would be implemented, no significant adverse impacts are expected.**

247.    Because the worst case scenario discharge figures in BP's EP – which BP calculated – fell below the threshold established in BP's Regional OSRP for the GOM, BP was not required to submit a site-specific drilling plan for the Macondo well itself.

248.    In October 2009, the semi-submersible Transocean rig *Marianas* began drilling the Macondo well. However, operations were halted at approximately 4,000 feet below the sea floor due to damage caused to the rig by Hurricane Ida.

249.    The replacement rig, the *Deepwater Horizon,* arrived at the Macondo well on January 31, 2010. Although the rig was in place on that date, several steps needed to occur prior to beginning any drilling operation, including connecting the rig's BOP to the wellhead. BP completed these steps by February 10, 2010 and the *Deepwater Horizon* began drilling shortly thereafter.

250.    Once the rig was connected to the BOP via the riser, BP inserted the drill bit and drilling pipe through the riser and BOP in order to reach the wellbore in the ocean floor. As drilling

progressed, so-called "drilling mud" was pumped down through the drilling pipe and emerged through holes in the drill bit.

251.    Drilling mud is not mud in the traditional sense; it is a blend of synthetic fluids, polymers and weighting agents costing approximately $100.00 per barrel. Drilling mud accounts for as much as 10% of the total cost in drilling a deepwater well. Drilling mud is a critical part of the drilling process. For example, as it is circulated down the drilling pipe and back up the wellbore to the rig, drilling mud clears the wellbore of broken rock and other debris (referred to as "cuttings"), cools the drill bit and maintains stable pressure within the well, which is critical to the mechanical stability and integrity of the wellbore.

252.    When drilling a deepwater well like the Macondo – which lies approximately 5,000 feet (or about 1 mile) below the ocean's surface and extends another 13,000 feet below the ocean floor – controlling pressure is a paramount concern. The inward or "pore" pressure (*i.e.,* the pressure exerted by the fluid in the surrounding rock formation on the wellbore) must be balanced with the outward or "fracture" pressure (*i.e.,* the pressure exerted by the drilling fluids in the wellbore on the surrounding rock formation). Following proper safety procedures is critical because uncontrolled well pressure can cause an explosion.

253.    On April 9, 2010, the weight of the drilling mud being pumped into the Macondo well was too high and fractured the surrounding formation; drilling mud began flowing into the cracks in the formation. In an attempt to plug the fractures and stop the outflow of drilling fluid, BP circulated 172 barrels of thick, viscous fluid, referred to as a "lost circulation pill," into the wellbore. The lost circulation pill succeeded in staunching the outflow of drilling mud, but the episode underscored the sensitivity of the Macondo well. As noted by the Presidential Commission: "*BP's on-shore engineering team realized the situation had become delicate. They*

had to maintain the weight of the mud in the wellbore at approximately 14.0 pounds per gallon (ppg) in order to balance the pressure exerted by the hydrocarbons in the pay zone." Thus, BP's engineers were on notice that they must be even more vigilant in monitoring and controlling the competing pressures within the wellbore.

### 2.    Casing and Cementing the Well

254.    Once the initial drilling of the well was complete, BP then needed to insert casing to seal off the walls of the wellbore to provide structural integrity. BP considered two casing methods: a long-string casing and a liner/tie-back casing. The long-string casing involves hanging a single continuous wall of steel from the wellhead on the ocean floor down to the bottom of the well over thirteen thousand feet below. The liner/tie-back method entails hanging shorter segments of casing to one another in order to form a stronger and less flexible piece of metal. A critical distinction between the two methods is that the long-string casing method provides two barriers to flow up the annular space (once cementing is complete) whereas the liner/tie-back casing provides four barriers to annular flow. This means that the liner/tie-back method provides twice the safety precautions as compared with the long-string casing method. In addition, BP knew that obtaining a reliable primary cement job with the long-string casing would be much more difficult.

255.    In fact, between April 14 and 15, 2010, the BP engineering team in Houston, Texas modeled the likely success of the cementing process using the two casing methods and determined that ***the long- string method would fail in effectively cementing the Macondo well.***

256.    In light of this determination, the engineering team elected to proceed with the liner/tie-back method, but, according to the Presidential Commission, others at BP opposed the decision. In the end, despite the conclusion that the long-string method could not be cemented reliably, BP's view prevailed and the crew proceeded with the long-string casing method.

257.     The next step in the drilling process was to thread the long-string casing through the center of the wellbore down to the bottom of the well. Centering the casing is of vital importance to obtaining a secure cement job. As the cement mixture flows out of the casing, it ascends through the annular space surrounding the casing. If the space around the casing is uneven (*i.e.,* there is more space on one side than on the other), the cement begins to fill in the annular space in an uneven manner, leaving channels of drilling mud in the cement. These channels are pathways through which highly pressurized hydrocarbons can flow.

258.     To ensure that the long-string casing will be centered, guides called "centralizers" are placed around the casing at regular intervals. For the Macondo well, BP decided that it would use only six centralizers because that was the amount currently available on the rig. It does not appear that BP's reasoning was based on any scientific or engineering calculations. However, before BP could actually place the centralizers in the well, it needed Halliburton – who BP contracted for this cementing job – to verify that six centralizers would be sufficient.

259.     On or about April 15, 2010, Halliburton engineer Jesse Gagliano ("Gagliano") performed computer simulations to assess the likelihood of a satisfactory cement job using six centralizers. Gagliano's calculations demonstrated a high likelihood of channeling resulting in a cement failure if BP used only six centralizers. Computer simulations showed that twenty-one centralizers were necessary – i.e., almost four times as many as BP intended to use.

260.     After reviewing the modeling data himself, BP Drilling Team engineer Gregory Walz ("Walz") agreed with Gagliano's conclusions. On April 16, 2010, Walz wrote to other BP engineers and stated, in part, that the operation needs "to honor the ... modeling to be consistent with our previous decisions to go with the long string." Walz proceeded to make arrangements to obtain the additional centralizers.

261.    However, BP Well Team Leader John Guide ("Guide"), who was also based in BP's Houston office, opposed using the additional centralizers because the installation would delay the team by approximately ten hours and would therefore cost BP money. Although BP ordered additional centralizers, when they arrived on the *Deepwater Horizon* it was determined that the centralizers were the wrong type. Despite the serious threat of channeling identified in the modeling data, however, Guide's view prevailed and only six centralizers were used to center the more than thirteen thousand foot long-string casing in the wellbore.

262.    BP's culture of unreasonable, indefensible risk taking is echoed in an email by Brett Cocales (a drilling operations engineer in BP's Houston office), dated April 16, 2010, in which he stated:

> Even if the hole is perfectly straight, a straight piece of pipe even in tension will not seek the perfect center of the hole unless it has something to centralize it. ***But, who cares, it's done, end of story, will probably be fine*** and we'll get a good cement job.

263.    On April 17, 2010, after learning that BP would proceed with only six centralizers, Gagliano re-ran the computer simulations and modeling using seven centralizers and the conclusion was the same: the well would have "***a SEVERE gas flow problem.***" BP, however, continued to ignore its own expert's opinion.

264.    On April 18, 2010, BP began lowering the long-string casing into the wellbore. To enable the drilling mud located in the wellbore to flow smoothly and distribute evenly as the long-string casing is lowered, two trap doors within the long-string casing, referred to as the "float collar," are propped open with a tube called an "auto fill tube."

265.    On April 19, 2010, after the long-string casing reached the bottom of the wellbore, BP needed to dislodge the auto fill tube, converting the float collar from a two-way valve to a one-

way valve. Successfully converting the float collar insures that the pumped cement will only flow downward through the casing, a critical step in the cementing process.

266.    Two events should have indicated to BP that the conversion of the float collar was not proceeding properly. First, the tube should be dislodged once the flow through the tube reaches six barrels of mud per minute (6 bpm), equivalent to six hundred pounds of pressure per square inch (600 psi). Yet, as the crew pumped drilling mud down the casing, pressure began to climb beyond the 600 psi threshold which should have converted the float collar, but still the crew was unable to establish flow. The pressure continued to rise, peaking at 3,142 psi (more than five times more pressure than should have been needed to convert the float collar) before suddenly dropping precipitously. It appears that BP assumed that this meant the float collars had converted. This is a scientifically indefensible position, however, because, as noted by the Presidential Commission: "[t]he auto fill tube was designed to convert in response to *flow-induced* pressure. Without the required rate of flow, an increase in *static* pressure, no matter how great, will not dislodge the tube."

267.    Second, after the tube is dislodged and the float collar is converted to a one way passage, the amount of pressure needed to circulate drilling mud from the rig, down the drilling pipe and up the annular space to the rig again should have been 570 psi. Yet, as BP began the process of converting the float collars, the results differed considerably. After the spike and sudden drop in pressure, the circulation pressure was only 340 psi.

268.    BP personnel on the rig erroneously ignored the mounting evidence that something was amiss, and proceeded to the next step in the well abandonment plan — mud circulation.

269.    Correct mud circulation requires a complete circulation of drilling mud in the wellbore, referred to as "bottoms up" circulation. The process, which requires about 12 hours,

allows workers on the rig to test the mud for gas influxes, safely remove any gas pockets, and evacuate any debris or other foreign matter that could contaminate the cement. Given the heightened challenges of cementing a long-string (as opposed to a liner/tie-back) casing, this step was critical. In addition, "bottoms up" circulation would allow the BP crew to test the mud at the bottom of the well for hydrocarbons, the presence of which would indicate a leak in the cement job at the bottom of the well.

270.    In order to complete a "bottoms up" circulation, BP needed to circulate 2,760 barrels of drilling mud. Instead, as noted by the Presidential Commission, BP circulated only 350 barrels of mud – eight times less than the amount required to properly complete the "bottoms up" circulation of the well.

271.    In cementing the Macondo well, BP used nitrogen foam, a cement with which it had little experience in the Gulf of Mexico. In February 2010, Gagliano conducted tests regarding the stability of the nitrogen foam cement. The tests showed that the mixture was unstable and therefore represented an additional risk of well failure. According to the Presidential Commission Report, these test results were communicated to BP personnel in Houston on March 8, 2010, however, the warnings were ignored and BP pumped nitrogen foam cement into the Macondo well.

272.    BP's internal guidelines dictated that the top of the annular cement should be 1,000 feet above the uppermost hydrocarbon zone. For the Macondo well, BP injected just enough cement to extend the annular cement barrier half the distance, or only 500 feet above the uppermost hydrocarbon zone. According to the Presidential Commission Report, this deviation reduced the safety margin for this procedure by 50% and meant that a total of sixty barrels of cement would be used to cement the well, which BP's own engineers recognized left absolutely no margin for error. Also according to the Presidential Commission Report, BP was also keenly aware that it was

pumping the cement at an unsafe rate (four barrels per minute rather than six barrels per minute), further impeding the efficiency with which cement would be displaced from the annular space, and reducing its safety margin even further.

273.    At 12:40 a.m. on April 20, 2010, the crew finished pumping the primary cement job. A team of outside technicians was on hand to conduct the battery of tests needed including, but not limited to, the "cement log," which was designed to evaluate and test the sufficiency of the cement job. The cement log is an acoustical test used to identify areas (if any) where the cement failed to channel up through the annular space in a uniform fashion. If cement channeling is uneven, pockets form, creating the possibility that hydrocarbons will enter the wellbore where they can ascend (and expand) rapidly.

274.    The acoustical test was especially critical given BP's prior erroneous decisions regarding the construction of the Macondo well, which included, *inter alia:* (i) using the difficult-to-cement long-string casing method; (ii) foregoing the "bottoms up" mud circulation; (iii) failing to use twenty one centralizers as BP's expert recommended; (iv) ignoring scientifically accepted data pertaining to the float collar conversion; (v) electing to use nitrogen foam cement deemed unstable in prior testing; (vi) pumping the cement at reckless rates; and (vii) halving the safety margin by setting the cement 500 (rather than 1,000) feet above the hydrocarbon bearing "pay zone." BP decided to forego the acoustical test and sent the team of technicians home by helicopter at 11:15 a.m. that morning. Forgoing the acoustical test saved BP approximately ten hours and $100,000. This decision was contrary to industry practice and the recommended safe practices of the American Petroleum Institute.

### 3.    BP Begins the Temporary Abandonment Process

275.    The *Deepwater Horizon* rig is a drilling rig as opposed to a production rig. Once drilling operations are complete, the well is placed in "temporary abandonment" until the arrival

of the production rig, which will connect to the well and begin pumping oil and gas from the site. Placing the well into temporary abandonment means that that the drilling rig will be removing its own BOP and riser from the wellhead. There are several key features in the temporary abandonment process to insure that the well is secure before the BOP and riser are removed. For one, a cement plug, which acts like a cap, is placed in the well. Typically this cap is placed at or near the mudline. The area in the well *beneath* the cap is filled in with heavy drilling mud, which applies additional downward pressure on the hydrocarbon bearing zone. If the cement plug is placed at a greater depth, this necessarily means that there will be less heavy drilling mud in the well underneath the cement plug. Finally, the crew will install a "lockdown sleeve" at the wellhead. Throughout this process, the well is monitored and a series of tests are performed to insure that the well is secure — *i.e.,* that no hydrocarbons are leaking into the well. According to the Presidential Commission, neither the BP Well Site leaders, nor any of the rig's crew, had seen the temporary abandonment plan for the Macondo well prior to 10:43 a.m. on the day abandonment procedure began. Indeed, the temporary abandonment plan had undergone numerous changes leading up to April 20, 2010, but, according to the Presidential Commission: "It does not appear that the changes to the temporary abandonment procedures went through any sort of formal review at all."

276.    Prior to abandonment, the well must be tested to insure that there are no leaks. In part, this involves conducting a "negative-pressure test" to assess whether hydrocarbons are flowing into the well. To conduct this test, BP needed to simulate the pressure conditions that would exist in the well once it was placed into temporary abandonment. As part of the negative pressure test, the crew removed 3,300 feet of mud from the wellbore.

277.    To remove the drilling mud from the wellbore (and later the riser), BP pumped "spacer" through the drilling pipe followed by seawater. Spacer is a synthetic blend that acts as a

barrier between the drilling mud and seawater. Although the use of spacer is a common and accepted practice, BP's spacer concoction was mixed on board the rig from leftover chemicals that would enable BP to save money and skirt environmental regulations. As explained by the Presidential Commission:

> While drilling crews routinely use water-based spacer fluids to separate oil-based drilling mud from seawater, *the spacer BP chose to use during the negative pressure test was unusual.* BP had directed . . . mud engineers on the rig to *create a spacer out of two different lost-circulation materials left over on the rig - the heavy, viscous drilling fluids used to patch fractures in the formation . . . .*
>
> *BP wanted to use these materials as spacer in order to avoid having to dispose of them onshore as hazardous waste pursuant to the Resource and Conservation Recovery Act*, exploiting an exception that allows companies to dump water-based "drilling fluids" overboard if they have been circulated down through a well. *At BP's direction, the [mud engineers] combined the materials to create an unusually large volume of spacer that had never previously been used by anyone on the rig or by BP as a spacer, nor been thoroughly tested for that purpose.*

278.     Testimony before the Presidential Commission indicates that this concocted, untested spacer may have clogged the BOP's kill line, interfering with the results of later testing designed to assess the integrity of the well.

279.     After removing drilling mud from the wellbore, BP began a negative-pressure test to determine whether the well was sealed such that gas or liquid could not permeate into the well. This negative pressure test is the ***only*** test that assesses the integrity of the cement job at the bottom of the well. BP had no established procedure or protocol for conducting a negative pressure test.

280.     To conduct the negative-pressure test, the crew "bled off" pressure from the drilling pipe until it was 0 psi. The pipe was then sealed and monitored. For a successful negative pressure test, the pressure within the drilling pipe must remain at 0 psi for a certain period of time. The BP crew went through this process ***three*** times – bleeding down the pressure and then sealing the pipe – and all ***three*** times the pressure within the drill pipe jumped, reaching 1400 psi on the third attempt. Thus, the pressure test failed three times, in identical fashion.

281.    The negative-pressure test performed exactly as intended. It gave the clear, unequivocal warning that the integrity of the well was compromised. As noted by the Presidential Commission: "[B]ased on available information, *the 1400 psi reading on the drill pipe could only have been caused by a leak* into the well." In May 2010, BP admitted in Congressional testimony that these pressure test results clearly signaled a "very large abnormality" in the well. Yet, notwithstanding the unequivocal results of the negative pressure test and without communicating the results to safety experts in Houston, BP ignored the warnings and instead applied the same test to the "kill line," one of the pipes used to circulate fluids into and out of the well.

282.    After conducting the negative-pressure test a *fourth* time (this time on the kill line), BP achieved what it considered to be a successful test result, and continued with the temporary abandonment process. During this last test, the crew was able to maintain 0 psi on the kill line, but the pressure on the drill pipe continued at 1400 psi. The Presidential Commission Report found that "BP used a spacer that had not been used by anyone at BP or on the rig before, that was not fully tested, and that may have clogged the kill line," leading to the so-called successful test result.

283.    As part of the negative-pressure testing of the well, the crew had already removed 3,300 feet of drilling mud below the sea floor from the well and replaced it with seawater. This decision was driven by BP's choice to place the "cement plug" at a depth of 3,000 feet. The cement plug is a three hundred foot cap, which is placed in the well as an additional safety measure to secure the well while it is in temporary abandonment. Placing the cement plug 3,300 feet below the ocean floor is not in accordance with accepted industry practice for performing this function. Indeed, placing the cement plug three *thousand* feet below the mud line was inconsistent with MMS regulations and required special dispensation.

284.    The associated risks were amplified by BP's decision: (i) to leave 3,300 feet of the well below the ocean floor filled with only seawater, rather than heavy drilling mud and (ii) to postpone placement of the cement plug in the well. As a result, once BP opened the annular preventers on the BOP to facilitate the removal of mud from the riser, the only remaining barriers between the rig and the highly pressurized hydrocarbons in the well were the drilling mud remaining in the bottom section of the well and, beneath that, the cement job at the very bottom of the well.

285.    At this stage, there was nothing to prevent leaked hydrocarbons (if present in the wellbore) from traveling up the riser to the rig. An influx of hydrocarbons is called a "kick" and is exceedingly dangerous due to the highly pressurized conditions. One gallon of gas at the bottom of the well is capable of expanding to 1,000 gallons by the time it reaches the rig on the ocean's surface. As the gas expands, it accelerates the kick. It is therefore imperative that the well be monitored closely for any evidence of a mounting kick.

286.    At 8:02 p.m. on April 20, 2010, BP began to remove the drilling mud from the riser. As operations proceeded, the drilling mud was returning to the rig, but BP failed to monitor the rate of return. The returned mud should have been placed in a subset of the rig's mud pits, referred to as the "active mud pits," to facilitate monitoring. Instead, the returned mud was being dispersed over a number of pits and mud from other operations was being routed to the active mud pits. As a result, there was no way to know whether more mud was returning to the rig than was being pumped into the well, a fact that would have been evidence that a kick was in progress.

287.    At 9:01 p.m. on April 20, 2010, pressure measurements in the well signaled the impending crisis. Pressure in the well should have remained constant or decreased because the

pumping pressure remained constant. However, the pressure in the drilling pipe slowly began to *increase,* signaling an influx of hydrocarbons into the well.

288.    The crew did not respond to the pressure reading until approximately 9:30 p.m., when driller Dewey Revette ordered a crew member to bleed pressure from the drilling pipe. Despite the strong evidence of a kick, BP and its crew took no steps to assess the cause of the pressure reading or to seal the well. In addition, no employee in BP's Houston office was monitoring the pressure in the Macondo well. As Fred Bartlit ("Bartlit"), a Presidential Commission investigator, made clear during a Commission presentation on November 9, 2010, drill pressure data was "available" in BP's office in Houston, but BP did not in fact monitor it the night of the *Deepwater Horizo*n blowout: "There was nobody in that B.P. Macondo well office that night," Bartlit said. "Everybody had gone home."

289.    Sometime after 9:40 p.m. on April 20, 2010, drilling mud began spewing onto the rig floor and, a few minutes later, the crew began its initial attempt to activate the BOP.

### 4.    Explosion on the Deepwater Horizon

290.    The crew initially attempted to activate the rig's BOP annular preventer, a doughnut-shaped rubber and steel seal that fits around the drill pipe and seals the hydrocarbons from flooding the rig itself. However, the annular preventer failed to stop the flow of oil, most likely because the device had been ruptured four weeks earlier when the drilling pipe was moved through the annular preventer while the preventer was in the closed position, sending a plume of drilling fluid filled with chunks of rubber to the surface.

291.    Well data indicates that at 9:38 p.m., the first hydrocarbons passed through the BOP.

292.     At 9:46 p.m. the crew attempted to activate the variable bore ram, which (like the annular preventer) should have sealed off the area around the drilling pipe. This effort also failed to stop the flow of hydrocarbons.

293.     At 9:49 p.m., the hydrocarbon-filled drilling mud that was continuing to spew onto the deck of the rig ignited, causing the first explosion aboard the *Deepwater Horizon.* One eyewitness referred to "a cascade of liquid" pouring out twenty stories above the main deck of the rig. Another described hearing an explosion that sounded like a "blown tire, times 100." Barrels filled with explosive materials were catching fire and launching into the sky like missiles.

294.     After the explosion, workers on the bridge did not immediately act to deploy the Emergency Disconnect System ("EDS"). Andrea Fleytas ("Fleytas"), a Dynamic Positioning Operator for the *Deepwater Horizon* who was in the bridge at the time of the explosion, told *The New York Times* that it did not occur to her to use the EDS and, in fact, she had never been taught how to use it. With respect to the EDS system, Fleytas stated, "I don't know of any procedures."

295.     Sometime after the explosion, BP's Subsea Supervisor Christopher Pleasant made his way to the bridge and attempted to activate the EDS, which should have activated the BOP's blind shear ram. The blind sheer ram – the last line of defense – is designed to seal a wellbore by cutting through the drilling pipe and pinching it closed, as the rams close off the well. However, the blind shear ram failed to respond.

296.     Despite the failure of the EDS, the BOP's "deadman switch" (an automatic response mechanism) should have triggered the blind sheer ram. The deadman switch also failed to activate the blind shear ram. Later inspections revealed that the device had a myriad of problems due to lack of inspection and poor maintenance, including low battery charges in the critical

components responsible for deploying the blind shear ram and defective relays that supply the power to close the blind sheer ram.

297.    At this point, the only option left to the crew to activate the BOP would have been an acoustical control signal that would trigger deployment of the blind sheer ram via an encoded pulse of sound transmitted by an underwater transducer. However, BP decided not to install the acoustic switch. While an acoustic switch is not required in the United States, it is mandated in many places throughout the world. In those foreign locations, BP uses rigs that do include such a safety device.

298.    Witnesses on a supply ship stood horrified as they watched the fire growing on the rig and crew members leaping from the main deck and jumping 100 feet into the sea. With no way to bring the explosion under control, crew members abandoned ship, struggling to fight their way to safety. The *Deepwater Horizon* burned for thirty-six hours before finally tipping and sinking. The impact to human lives was stark – 11 crew members were killed and 17 more were injured.

### 5.    BP Continues to Attempt to Activate the BOP Following the Abandonment of the Deepwater Horizon

299.    Beginning at 1:15 a.m. on April 21, 2010, BP and other personnel began attempts to activate the BOP with remotely operated vehicles ("ROVs"). Over the ensuing days, BP attempted to activate the blind shear ram on several occasions. All efforts failed.

300.    First, the ROVs applied hydraulic pressure to a panel controlling the blind shear ram, a method of activating the ram, referred to as "hot stab." It would take BP ten days to learn that the method would necessarily fail because the targeted panel was actually attached to a useless test ram.

301.    The ROVs also cut electrical wires in an attempt to simulate the deadman switch and attempted to activate the ram by triggering the autoshear (an automated disconnect that is

triggered if the rig drifts too far from the well, threatening to break the riser). Still the ram did not deploy.

302.    At 10:22 a.m. on April 22, 2010, the *Deepwater Horizon* sank, wrenching and further damaging the riser.

303.    On May 5, 2010, after learning that the attempts to activate the blind shear ram through the "hot stab" method were actually targeting a useless test ram, BP ceased its attempts to activate the BOP.

### B.    BP Was Wholly Unprepared to Contain the Oil Spill

#### 1.    BP Was Knowingly or Recklessly Unprepared to Manage and Respond to a Spill in the Gulf of Mexico

304.    In the wake of the *Deepwater Horizon* catastrophe, it has become evident that BP's OSRP was materially false and misleading when filed. Indeed, the Presidential Commission has described BP's OSRP as outright "***embarrassing.***" Indeed, Suttles admitted on May 10, 2010 that BP failed to have an oil spill response plan with "***proven equipment and technology***" in place that could contain the oil spill. Similarly, in a November 9, 2010 interview with the BBC, Hayward ultimately confirmed that BP had failed to draw up sufficient emergency response plans, admitting that "***we were making it up day to day.***"

305.    For example, since BP claimed that it was prepared to recover approximately 500,000 barrels of spilled oil per day, and the worst case scenario for the Macondo well was the release of only 162,000 barrels of oil per day, BP should have had no problems containing the oil spill. However, as noted by the Presidential Commission: "*Despite [BP's claims that it 'could recover nearly 500,000 barrels of oil per day'], the oil-spill removal organizations were quickly outmatched.*"

306.    Furthermore, while BP's Regional OSRP for the Gulf of Mexico claimed that an oil spill occurring under the three different scenarios – i.e., less than ten miles from the shoreline, more than ten miles from the shoreline, and from a mobile drilling rig that is drilling an exploratory well – could cause differences in the amount of oil spilled, BP consistently stated that the "shoreline impact" under each scenario would be identical. This led the Presidential Commission to find that BP's Regional OSRP for the Gulf of Mexico "*evidenced [a] serious [lack] of attention to detail.*"

307.    The Presidential Commission also noted several other errors in BP's OSRP. For instance, the Presidential Commission found that BP's Regional OSRP for the Gulf of Mexico was false when issued because "half of the 'Resource Identification' appendix (five pages) ... was copied from material on [The National Oceanic and Atmospheric Administration ("NOAA")] websites, without any discernible effort to determine the applicability of that information to the Gulf of Mexico. *As a result, the BP Oil Response Plan described biological resources nonexistent in the Gulf— including sea lions, sea otters, and walruses.*"

308.    Likewise, BP's Regional OSRP for the Gulf of Mexico named Dr. Peter L. Lutz ("Lutz") from the University of Miami's School of Marine Sciences as a wildlife expert. Lutz was a pioneer in whole-organism integrative physiology, but the Presidential Commission found that he "*had died several years before BP submitted its plan.*" Not only had Lutz been deceased since 2005, but he left the University of Miami almost twenty years prior to chair the marine biology department at a different university.

309.    Similarly, BP's Regional OSRP for the Gulf of Mexico included incorrect contact information for the Marine Spill Response Corporation ("MSRC"). According to the Presidential Commission, the MSRC was "BP's main oil-spill removal organization in the Gulf," but,

inexplicably, "*a link in [BP's Regional OSRPJ that purported to go to the Marine Spill Response Corporation website actually led to a Japanese entertainment site.*" Likewise, the names and phone numbers of several Texas A&M University marine specialists were wrong and the listing of certain mammal stranding network offices in Louisiana and Florida were outdated and, in certain cases, had been closed.

310.    On June 8, 2010, journalist Tim Dickinson from *Rolling Stone* magazine published an article decrying BP's OSRP. The article's powerful message was clear: "***The effect of leaving BP in charge of capping the well,*** says a scientist involved in the government side of the [clean up] effort, ***has been 'like a drunk driver getting into a car wreck and then helping the police with the accident investigation'*** or, in other words, allowing a fox to guard the hen house and hoping that it does not get hungry. The article also stated, in part, that:

> 'This response plan is not worth the paper it is written on,' said Rick Steiner, a retired professor of marine science at the University of Alaska, who helped lead the scientific response to the Valdez disaster. 'Incredibly, this voluminous document never once discusses how to stop a deepwater blowout.'

311.    Likewise, these gross deficiencies, errors and misrepresentations, among others, caused the Associated Press to publish an article on June 10, 2010 entitled "BP Spill Response Plans Severely Flawed" which detailed the "***glaring errors and omissions in BP's oil spill response plans.***" The article states, in relevant part, as follows:

> ***BP PL C's 582-page regional spill plan for the Gulf, and its 52-page, [EP] J vastly understate the dangers posed by an uncontrolled leak and vastly overstate the company's preparedness to deal with one,*** according to an Associated Press analysis.

> \* \* \*

> In the spill scenarios detailed in the documents, fish, marine mammals and birds escape serious harm; beaches remain pristine; water quality is only a temporary problem. And those are the projections for a leak about 10 times worse than what has been calculated for the ongoing disaster.

121

\* \* \*

*The plans contain wildly false assumptions about oil spills. BP's proposed method to calculate spill volume judging by the darkness of the oil sheen is way off. The internationally accepted formula would produce estimates 100 times higher.*

\* \* \*

In early May, at least 80 Louisiana state prisoners were trained to clean birds by listening to a presentation and watching a video. It was a work force never envisioned in the plans, which contain no detailed references to how birds would be cleansed of oil.

\* \* \*

There are other examples of how BP's plans have fallen short:

**Beaches where oil washed up within weeks of a spill were supposed to be safe from contamination because BP promised it could marshal more than enough boats to scoop up all the oil before any deepwater spill could reach shore a claim that in retrospect seems absurd.**

"The vessels in question maintain the necessary spill containment and recovery equipment to respond effectively," one of the documents says.

**BP asserts that the combined response could skim, suck up or otherwise remove 20 million gallons of oil each day from the water. But that is about how much has leaked in the past six weeks and the slick now covers about 3,300 square miles,** according to Hans Graber, director of the University of Miami's satellite sensing facility. *Only a small fraction of the spill has been successfully skimmed. Plus, an undetermined portion has sunk to the bottom of the Gulf or is suspended somewhere in between.*

*The plan uses computer modeling to project a 21 percent chance of oil reaching the Louisiana coast within a month of a spill. In reality, an oily sheen reached the Mississippi River delta just nine days after the April 20 explosion. Heavy globs soon followed. Other locales where oil washed up within weeks of the explosion were characterized in BP's regional plan as safely out of the way of any oil danger.*

BP's site plan regarding birds, sea turtles or endangered marine mammals ("no adverse impacts") also have proved far too optimistic.

While the exact toll on the Gulf's wildlife may never be known, the effects clearly have been devastating.

More than 400 oiled birds have been treated, while dozens have been found dead and covered in crude, mainly in Louisiana but also in Mississippi, Alabama and

122

Florida. More than 200 lifeless turtles, several dolphins and countless fish also have washed ashore.

*The response plans anticipate nothing on this scale. There weren't supposed to be any coastline problems because the site was far offshore.*

"Due to the distance to shore (48 miles) and the response capabilities that would be implemented, no significant adverse impacts are expected," the site plan says.

* * *

*Perhaps the starkest example of BP's planning failures. The company has insisted that the size of the leak doesn't matter because it has been reacting to a worst-case scenario all along.*

*Yet each step of the way, as the estimated size of the daily leak has grown from 42,000 gallons to 210,000 gallons to perhaps 1.8 million gallons, BP has been forced to scramble to create potential solutions on the fly, to add more boats, more boom, more skimmers, more workers. And containment domes, top kills, top hats.*

*While a disaster as devastating as a major oil spill will create unforeseen problems, BP's plans do not anticipate even the most obvious issues, and use mountains of words to dismiss problems that have proven overwhelming.*

### 2.   The Failed Use of Unprecedented Amounts of Dispersants

312.   As set forth below, BP's extensive and potentially problematic use of dispersants further demonstrated its lack of preparedness to respond to the spill.

313.   On April 22, 2010, BP began spraying massive amounts of dispersants — namely "Corexit" — on the oil that had reached the surface of the Gulf of Mexico. Dispersants such as Corexit are not intended to remove oil from the water; rather, energy from wind and waves naturally disperses oil and dispersants may accelerate the process by allowing the oil to mix with water more easily, dispersing the oil vertically and horizontally in the water column.

314.   However, dispersants pose several serious health and environmental threats. For example, dispersants — including Corexit — decrease the amount of oil on the surface of the water, but *increase* the amount of oil in the water column. Corexit therefore enables the oil to spread over a wider area, significantly increasing the exposure of marine life to toxic chemicals

and oil. In addition, chemically dispersed oil can be toxic not just in the short term, but also over the long term. Accordingly, the decision to engage in wide-spread use of dispersants must be carefully considered, particularly given the fact that studies have found that dispersants may not increase biodegradation rates and *might even inhibit biodegradation.*

315.    Furthermore, Corexit is a chemical dispersant that contains 2-butoxy ethanol. According to the New Jersey Department of Health, 2-butoxy ethanol "may be a carcinogen in humans. There may be no safe level of exposure to a carcinogen, so all contact should be reduced to the lowest possible level." BP's OSRP for the Gulf of Mexico makes no mention of this serious side effect.

316.    Between April 22, 2010 through April 26, 2010, BP and its subcontractors applied 14,654 gallons of Corexit to the surface of the Gulf of Mexico. Then, from April 27, 2010 to May 3, 2010, BP and its subcontractors applied another 141,358 gallons of Corexit to the surface of the Gulf of Mexico. The following week, they applied an additional 168,988 gallons of Corexit to the surface of the Gulf of Mexico. The Presidential Commission found that BP's extreme use of Corexit was "*novel*" and had never been used in these "*unprecedented volumes.*" The Presidential Commission stated that while oil spill "responders had often deployed dispersants to respond to spills" it had "***never***" been done "in such volumes; during the Exxon Valdez spill, responders sprayed about *5,500 gallons [of dispersants], and that use was controversial.*"

317.    As the volume of dispersants sprayed on the surface grew dramatically, BP then raised the idea of applying dispersants directly at the well. Once again, however, the Presidential Commission found that oil spill responders "*had never before applied dispersants in the deep sea*" and "*responders were concerned about the absence of information of the effects of dispersants in*

124

*the deepwater environment. No federal agency had studied subsea dispersant use and private studies had been extremely limited."*

318.    Because no federal agency had ever allowed the subsea release of dispersants in a deepwater environment, on May 10, 2010, the U.S. Coast Guard and EPA prohibited its use "until initial testing demonstrates the effectiveness of subsurface dispersant application." Then, during a May 24, 2010 press conference, EPA Administrator Lisa Jackson announced that the government was instructing BP to "take immediate steps to significantly scale back the overall use of dispersants" and expressed EPA's belief that BP "can reduce the amount of dispersant applied by as much as half, and I think probably 75 percent, maybe more." Based on the unknown and highly risky side effects of dispersants, on May 26, 2010, the U.S. Coast Guard and EPA issued a joint letter and directive stating, in part, as follows:

> Reduction in Use of Dispersants. BP shall implement measures to limit the total amount of surface and subsurface dispersant applied each day to the minimum amount possible. *BP shall establish an overall goal of reducing dispersant application by 75%* from the maximum daily amount used as follows:
>
> a.  Surface Application. *BP shall eliminate the surface application of dispersants.* In rare cases when there may have to be an exemption, BP must make a request in writing to the [Federal On Scene Coordinator ("FOSC")] providing justification which will include the volume, weather conditions, mechanical or means for removal that were considered and the reason they were not used, and other relevant information to justify the use of surface application. The FOSC must approve the request and volume of dispersant prior to initiating surface application.
>
> b.  Subsurface Application. *BP shall be limited to a maximum subsurface application of dispersant of not more than 15,000 gallons in a single calendar day.* Application of dispersant in amounts greater than specified in this Addendum 3 shall be in such amounts, on such day(s) and for such application (surface or subsurface) only as specifically approved in writing by the FOSC.

319.    "*Despite this directive,*" the Presidential Commission noted that "*surface use of dispersants continued.*"   While BP did seek exemptions from the directive, "*EPA expressed frustration that BP sought regular exemptions, and it repeatedly asked for more robust*

*explanations of why BP could not use mechanical recovery methods, such as skimming and burning, instead of dispersants.*" On July 14, 2010, EPA ultimately prohibited the use of dispersants altogether.

### 3.    The Failed Use of A Cofferdam

320.    Knowing that dispersants would be unable to significantly lessen the environmental catastrophe, BP began to theorize other ways that it might be able to contain and/or recover the spewing oil. BP's new idea – which was noticeably absent from BP's OSRP – was to place a large containment dome (or "cofferdam") over the larger of the two leaks, with a pipe at the top channeling oil and gas to a ship on the surface of the Gulf of Mexico, the *Discoverer Enterprise*. BP had several cofferdams already, but those had been designed, and had only been utilized, in shallow water scenarios and had never been tested in a similar deepwater environment. Thus, BP was forced to quickly attempt to modify one of its existing cofferdams for these new and unintended purposes. The modification of the preexisting cofferdam was complete on or about May 4, 2010. BP began its attempt to place the 98-ton dome to the sea floor late in the evening on May 6, 2010.

321.    It was essentially guaranteed that the *ad hoc* modifications that were hurriedly made to the cofferdam would be unsuccessful. In his book on the *Deepwater Horizon* incident published in late 2010, *Disaster on the Horizon,* former drilling engineer Bob Cavnar ("Cavnar") described the initial containment dome effort as the "*silliest contraption*" that BP built in the aftermath of the incident, and that the steps to construct and lower it down to the leaking BOP "never made much sense . . . they were more for show – to look like they were doing something while they were trying to come up with a real plan." Cavnar stated in an interview that the cofferdam was "destined to fail" due to the "scientific certainty" that gas hydrates would immediately form in the device

and clog it, and describes in his book the results of its deployment as "almost instantaneous failure."

322.    Likewise, the Presidential Commission noted:

BP's Suttles publicly cautioned that previous successful uses had been in much shallower water. BP recognized that chief among potential problems was the risk that methane gas escaping from the well would come into contact with cold sea water and form slushy hydrates, essentially clogging the cofferdam with hydrocarbon ice. *Notwithstanding the uncertainty, BP, in a presentation to the leadership of the Department of Interior, described the probability of the containment dome's success as "Medium/High." Others in the oil and gas industry were not so optimistic. many experts believed the cofferdam effort was very likely to fail because of the hydrates.*

323.    Not surprisingly, the effort did fail. Hydrates accumulated during the installation of the dome, yet BP only had a plan to deal with hydrates once the cofferdam was in place. Thus, when crews started to maneuver the cofferdam into position on May 7, 2010, hydrates formed before they could even place the dome over the leak, immediately clogging the opening through which oil was to be funneled. This error in planning almost led to another catastrophe. As noted by the Presidential Commission:

Because hydrocarbons are lighter than water, the containment dome became buoyant as it filled with oil and gas while BP tried to lower it. BP engineers told [the Company's Vice President overseeing the project Richard] Lynch that they had "lost the cofferdam" as the dome, full of flammable material, floated up toward the ships on the ocean surface. Averting a potential disaster, the engineers were able to regain control of the dome and move it to safety on the sea floor. *In the wake of the cofferdam's failure, one high-level government official recalled Andy Inglis, BP's Chief Executive Officer of Exploration and Production, saying with disgust, "If we had tried to make a hydrate collection contraption, we couldn't have done a better job."*

324.    In the days after the failure of the cofferdam, BP temporarily utilized a device known as a "riser insertion tube" to collect some of the oil. However, BP abandoned the effort after only a few days because of the relatively minor amount of oil the device actually managed to collect.

### 4.    The "Top Kill" and "Junk Shot" Efforts Fail

325.    Following the failure of BP's cofferdam experiment, BP tried to stop the flowing oil by embarking on so-called "top kill" and "junk shot" efforts. Both methods are industry techniques that have been historically applied to stop the flow of oil from a blown-out well.

326.    BP, like the rest of the oil industry, was well aware of the Ixtoc I Oil Spill in 1979 in which a rig exploded, caught fire, sank, killed workers and released millions of gallons of oil into the Gulf of Mexico. In the Ixtoc spill, the same two techniques were attempted and it took approximately 290 days to bring that well under control. BP's Oil Spill Response Plan made no mention of having to rely on either of these methods let alone provide any qualification as to how effective each method might be in a similar circumstance. Further, the Presidential Commission noted that neither technique "*had [lever been used in deepwater.*" In the end, both efforts failed to control the proliferation of oil from the Macondo well.

327.    A top kill – also known as a momentum or dynamic kill – involves pumping heavy mud into the top of the well through the BOP's choke and kill lines, at rates and pressures high enough to force escaping oil back down the well and into the reservoir. A junk shot complements a top kill and involves pumping material (including pieces of tire rubber and golf balls) into the bottom of a BOP through the choke and kill lines. That material is supposed to get caught on obstructions within the BOP and impede the flow of oil and gas. By slowing or stopping the flow of oil, a successful junk shot makes it easier to execute a top kill.

328.    BP's top kill and junk shot plan began on the afternoon of May 26, 2010. In this regard, the Presidential Commission concluded, in relevant part, as follows:

> As with the cofferdam, BP struggled with public communications surrounding the top kill. ***At the time, both industry and government officials were highly uncertain about the operation's probability of success.*** *One MMS employee estimated that probability as less than 50 percent,* ***while a BP contractor said that he only gave***

*the top kill a "tiny" chance to succeed But BP's Hayward told reporters, "We rate the probability of success between 60 and 70 percent*."

329. During three separate attempts over the next three days, BP pumped mud at rates exceeding 100,000 barrels per day and fired numerous shots of "junk" into the BOP. After the third unsuccessful attempt, BP acknowledged that the plan was a failure. BP's explanation of the failed attempts focused on the well's 16-inch casing, the outermost barrier between the well and the surrounding rock for more than 1,000 vertical feet. That casing was fabricated with three sets of weak points, or "rupture disks." During the well's production phase, the hot oil coursing through the production casing, which is inside the 16-inch casing, would lead to a buildup of pressure in the well. If the pressure buildup was too high, it could cause the collapse of one of the two casings. The disks were designed to rupture and relieve this potential buildup of pressure before a casing collapsed. According to BP, pressures created by the initial blowout could have caused the rupture of disks to collapse inward, compromising the well's integrity.

330. The Presidential Commission, however, disagreed with BP's explanation and found, in part, that the "[c]ollapse of the rupture disks *was only one of BP's possible explanations for the unsuccessful top kill. But the company presented it to the government as the most likely scenario.*" Indeed, the U.S. Government noted that it "*did not fully accept BP's analysis of what happened*" and, in contrast, believed that "*the top kill likely failed because the rate at which oil was flowing from the well was many times greater than the then-current 5,000 barrels-per day estimate.* Because BP did not pump mud into the well at a rate high enough to counter the actual flow, oil and gas from the well pushed mud back up the BOP and out of the riser."

### 5. The "Top Hat" Failed to Collect the "Vast Majority" of the Spewing Oil

331. In the aftermath of the failed top kill and junk shot plan, BP began shifting its main focus to collecting the oil rather than killing the well itself. On May 29, 2010, BP announced that

it would attempt to cut off the portion of the riser still attached to the top of the BOP and install a collection device – or "top hat," which would then be connected via a new riser to the *Discoverer Enterprise* vessel. As before, BP's Oil Spill Response Plan failed to mention the top hat technique as a potential remedy in the event of an oil spill. BP began installing the top hat on June 1, 2010 and had it in place by 11:30 p.m. on June 3, 2010. By June 8, 2010 – forty-nine days after the explosion occurred – the *Discoverer Enterprise* was collecting about 15,000 barrels of oil per day – or approximately 25% of the oil being released.

332.    BP also developed a system to bring oil and gas to the surface through the choke line on the BOP. More specifically, BP outfitted a vessel called the *Q4000* with collection equipment, including an oil and gas burner imported from France. This vessel and resource was also never mentioned in BP's Oil Spill Response Plan.

333.    While BP was able to slowly start collecting some of the oil, BP was, in the words of the Presidential Commission, once again "overly optimistic about the percentage of the oil it could remove or collect." Indeed, the Presidential Commission found, in part, as follows:

> On June 1, Suttles said that he expected the top hat, when connected to the Discoverer Enterprise, to be able to collect the "vast majority" of the oil. Within days, it became apparent that the top hat and Discoverer Enterprise were inadequate. On June 6, Hayward told the BBC that, with the Q4000 in place, "we would very much hope to be containing the vast majority of the oil." But when the Q4000 came online in mid-June, the two vessels' joint capacity of 25,000 barrels per day was still insufficient.

334.    In the wake of the failure to contain most of the oil using the top hat, the U.S. Coast Guard continued questioning BP's response to the spill. As noted, in part, by the Presidential Commission:

BP's Lynch said that the speed at which the company brought capacity online was limited solely by the availability of dynamically positioned production vessels.[2]

One senior Coast Guard official challenged BP's definition of availability: he suggested that BP did not consider options such as procuring ships on charter with other companies until the government pushed it to do so. Obtaining another production vessel might have enabled BP to collect oil through the BOP's kill line at a rate comparable to that of the *Q4000*.

### 6.    The Well Is Finally Capped

335.    Following the limited success of the top hat procedure, BP began presenting its final well-control plans to government experts. According to the Presidential Commission Report:

> The [U.S. government] science advisors would question BP's assumptions, forcing it to evaluate worst-case scenarios and explain how it was mitigating risk. *The government saw its pushback as essential because BP would not, on its own, consider the full range of possibilities. **According to one senior government official, before the increased supervision, BP "hoped for the best, planned for the best, expected the best."*** [Paul] Tooms, BP's Vice President of Engineering, believed that the government science advisors unnecessarily slowed the containment effort, arguing that scientists consider risk differently than engineers and that BP had expertise in managing risk. *BP, however, was not in the best position to tout that expertise: its well had just blown out*.

336.    By late June, BP was working towards deploying a "capping stack," yet another *post hoc* measure nowhere reflected in BP's OSRP for the Gulf of Mexico. The capping stack was essentially a smaller version of a BOP, designed to sit atop the BOP and stop the flow of oil and gas.

337.    On July 9, 2010, Coast Guard Admiral Thad Allen ("Admiral Allen") authorized BP to install the capping stack, but not to close it. Sealing the capping stack would increase the pressure in the well. There was a concern that if one or more of the rupture disks had in fact ruptured, the increased pressure could force hydrocarbons into the surrounding formation, leading to uncontrolled eruptions from the ocean floor at other locations.

---

[2] Dynamically positioned vessels have computer-controlled systems that maintain the vessel's exact position and direction, despite external factors such as wind, waves, and current.

338.     The installation of the capping stack was completed on July 12, 2010. The next day, experts conducted a "well integrity test" to determine if the well had been compromised and to see whether oil could flow into the rock formation. According to the Presidential Commission: "[t]he test was to last from 6 to 48 hours, and BP had to monitor pressure, sonar, acoustic, and visual data continuously, as recommended by the [U.S. government's] Well Integrity Team."

339.     On July 15, 2010, after a 24-hour delay to repair a leak, BP shut the capping stack and began the well integrity test. For the first time in 87 days – and after approximately five million barrels of oil had already seeped into the Gulf of Mexico – the well had finally stopped spewing oil. Unfortunately, however, by that time, the vast environmental damage had already occurred and, as noted by *The New York Times* on August 6, 2010, "BP's containment efforts had captured only approximately 16 percent of the spill."

340.     Meanwhile, on July 19, 2010, BP publicly raised the possibility of actually killing the well through a procedure called a "static kill." Like the top kill, the static kill involved pumping heavy drilling mud into the well in an effort to push oil and gas back into the reservoir. However, because the oil and gas were already static, the pumping rates required for the static kill to succeed were far lower than the top kill. The U.S. government approved the static kill procedure on August 2, 2010. By 11:00 p.m. on August 3, 2010, the static kill appeared to have worked. On August 8, 2010, Admiral Allen reported that the cement had been pressure-tested and was holding.

341.     In mid-September 2010, the first relief well — which BP had begun to drill in early May — finally intercepted the Macondo well, allowing BP to pump in cement and permanently seal the reservoir.  Thus, on September 19, 2010 — 152 days after the blowout — the U.S. government finally announced that "*the Macondo well is effectively dead.*"  In total, 206 million

gallons of crude oil spilled into the Gulf of Mexico, thousands of square miles of fishing grounds were closed through 2010 and billions of dollars of tourist revenue in the area were lost.

## IX.    DEFENDANTS MADE MATERIALLY FALSE AND MISLEADING STATE-MENTS AND OMITTED MATERIAL FACTS DURING THE CLASS PERIOD

342.    During the Class Period, Defendants engaged in a series of direct communications and meetings with Plaintiffs and the Class Members, through their outside investment manager, █████████████████████████████ to whom each Plaintiff and each Class Member had delegated full investment authority and who through actions universally applicable to all of them served as their investment advisor and agent throughout the Class Period.

A.    ██████████████████████████████████████████████

343.    ██████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████

(a)    ████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

(b)

”

(c)

(d) 

(e)

**B.**

344.

(a)

(b)

345.

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

346.    Defendants intended to induce reliance on the statements they made ████████

████████, and did induce it, just as they intended to induce reliance on the publicly issued

statements described *supra*. ██████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████. These ██████████████

misrepresentations were repeated and amplified in Defendants' statements to investors (including

Plaintiffs and the Class members) in BP's securities filings, other BP public statements, and

teleconferences with analysts and investors.

347.    In addition, the foregoing misstatements and omissions by BP and its executives

were false and misleading when made, for all the reasons set forth herein.

348.    The foregoing misstatements and omissions are actionable under the negligent

misrepresentation claim pled herein. ██████████████████████████████████

████████████gave Defendants actual knowledge as to the existence of Plaintiffs and the Class

members as institutional shareholders of BP.  These facts gave rise to a duty owed by Defendants

to Plaintiffs and the Class members.

## X.   DEFENDANTS' CONDUCT CAUSED PLAINTIFFS' AND THE CLASS MEMBERS' LOSSES

349.   Defendants' wrongful conduct, as alleged herein, directly and proximately caused Plaintiffs and the Class members to suffer economic losses related to their purchases of BP securities during the Class Period.

350.   Throughout the Class Period, the market prices of BP securities (including those purchased by Plaintiffs and the Class members) were artificially inflated as a direct result of Defendants' materially false and misleading statements and omissions.  For example, prior to the *Deepwater Horizon* explosion, securities analysts touted BP's renewed dedication to safety and BP's operations in the Gulf of Mexico as one of the main focuses for BP's future results:

(a)   A February 28, 2008 analyst report from JP Morgan stated that "Safety and operations: although BP has already made significant progress in this area through the implementation of the Baker panel recommendation and their 'sixpoint plan,' safety and operations remain one of BP's main priorities."

(b)   An October 9, 2009 analyst report from Bank of America stated that "[w]e believe that the focus of results will center around . . . the ongoing exploration effort in the Gulf of Mexico (GoM) . . .

(c)   A February 1, 2010 analyst report from Dolmen Stockbrokers stated "we also foresee better production figures as a consequence of early restoration of operations at the company's US refineries and the ramping up of production in the Gulf of Mexico."

(d)   A March 3, 2010 analyst report from Bank of America stated that "the development of recent deepwater discoveries in the GoM (e.g., Tiber field) along with further growth from TNKBP is [sic] set to be the key drivers."

(e)     A March 3, 2010 analyst report from JP Morgan described BP's Gulf of Mexico projects as "high margin."

(f)     A March 12, 2010 analyst report from Bank of America stated that "whilst BP has limited experience in Brazil, we would argue that their knowledge of the GoM—particularly in the Lower Tertiary area—is second to none and are clearly taking a positive view here."

351.    As set forth below, the price of BP securities significantly declined when the truth about Defendants' misrepresentations and the information alleged herein to have been concealed from the market began to be disclosed, and/or the effects thereof began to be materialized, causing a correction in the price of BP securities, resulting in the Plaintiffs and the Class members suffering losses.  As a result of their transactions in BP's securities during the Class Period, Plaintiffs and the Class members suffered damages under English common law.

352.    The relevant truth about BP's operations slowly emerged following the April 20, 2010 explosion on the *Deepwater Horizon* and BP's failed efforts to control the resulting oil spill. Immediately prior to the explosion, BP's ADSs traded on the NYSE at approximately $60.48 per ADS and its common stock traded at approximately 655.4 pence per share on the LSE.  Following the explosion, the price of BP ADSs began a nearly continuous decline as the artificial inflation created by the Defendants' misrepresentations and material omissions was removed from the price of the securities.

353.    In addition, Defendants' fraudulent inducement of Plaintiffs' and the Class members' purchases and non-sales of BP securities during the Class Period, through Defendants' false and misleading statements as alleged herein, proximately caused Plaintiffs and the Class members to suffer consequential losses, following the April 20, 2010 explosion and the start of the oil spill, as a result of the price declines in BP's securities as delineated below.

354.    On April 26, 2010, government officials announced that attempts to stop the spill had failed and that oil was flowing into the Gulf of Mexico.  This news caused the price of BP securities to plummet.  Specifically, BP's ADSs declined $1.97 per ADS, from $59.88 per ADS on Friday, April 23, 2010 to close at $57.91 per ADS on Monday, April 26, 2010, while BP's ordinary shares fell from 639.7 pence per share on April 23, 2010 to close at 626.8 pence per share on April 26, 2010, a decline of 12.9 pence per share.  These declines were directly related to and were proximately caused by the market absorbing information partially revealing risks Defendants had concealed throughout the Class Period as discussed *supra*, including, *inter alia*, that, contrary to Defendants' public statements, BP had been recklessly conducting its drilling operations in the Gulf, without a legitimate spill response plan, and Defendants had mislead investors, through the misrepresentations and omissions discussed *supra*, about BP's purported reforms and process safety enhancements, such as, among other things, the purported implementation of the Baker Panel recommendations, OMS, the Operations Academy and Operating Essentials program, and the S&O audit across BP's global operations without exceptions or exclusions.

355.    After the market closed on April 28, 2010, NOAA held a press conference during which it increased its estimate of the amount of oil spewing into the Gulf of Mexico from 1,000 to 5,000 barrels per day – five-times greater than that previously estimated by BP.  On April 29, 2010, Homeland Security Secretary Janet Napolitano declared the spill a crisis of "national significance." This news caused the price of BP securities to fall again.  Specifically, BP ADSs fell from a closing price of $57.34 per ADS on April 28, 2010 to close at $52.56 per ADS on April 29, 2010, a decline of $4.78 per ADS (or more than 8%), while BP's common stock fell from 625.0 pence per share on April 28, 2010 to 584.2 pence per share on April 29, 2010, a decline of 40.8 pence per share. These declines were directly related to and were proximately caused by the market absorbing

information partially revealing risks Defendants had concealed throughout the Class Period as discussed *supra*, including, *inter alia*, that, contrary to Defendants' public statements, BP had been recklessly conducting its drilling operations in the Gulf, without a legitimate spill response plan; Defendants had mislead investors, through the misrepresentations and omissions discussed *supra*, about BP's purported reforms and process safety enhancements, such as, among other things, the purported implementation of the Baker Panel recommendations, OMS, the Operations Academy and Operating Essentials program, and the S&O audit across BP's global operations without exceptions or exclusions; and Defendants' post-spill statements had misrepresented the amount of oil believed to be spilling into the Gulf on a daily basis.

356.    On April 30, 2010, when it was reported that the oil slick caused by the disaster reached Louisiana's coastline, BP ADSs closed at $52.15 per ADS, a decline of over $8.00 per ADS since April 20, 2010.  Over the same time span, BP's common stock declined over 79.9 pence per share, to close at 575.5 pence per share on April 30, 2010.  These declines were directly related to and were proximately caused by the market absorbing information partially revealing risks Defendants had concealed throughout the Class Period as discussed *supra*, including, *inter alia*, that, contrary to Defendants' public statements, BP had been recklessly conducting its drilling operations in the Gulf, without a legitimate spill response plan, and Defendants had mislead investors, through the misrepresentations and omissions discussed *supra*, about BP's purported reforms and process safety enhancements, such as, among other things, the purported implementation of the Baker Panel recommendations, OMS, the Operations Academy and Operating Essentials program, and the S&O audit across BP's global operations without exceptions or exclusions.

357.    In the days and weeks that followed, additional news and information emerged on a seemingly continuous basis, further partially revealing BP's wanton disregard for conducting its Gulf drilling operations in a safe manner, BP's lack of any legitimate oil spill response plan, and BP's having misrepresented its purported reforms and process safety enhancements, such as, among other things, the purported implementation of the Baker Panel recommendations, OMS, the Operations Academy and Operating Essentials program, and the S&O audit across BP's global operations without exceptions or exclusions.  These revelations, along with additional revelations as to the significantly larger scope of the oil spill, caused BP's securities to plummet further.

358.    On May 3, 2010, BP claimed responsibility for the cleanup efforts related to the spill, with Hayward calling it "our responsibility."  BP's ADSs fell from $52.15 to $50.19 (a decline of 3.8%).  BP's common stock was not traded on the LSE on May 3, 2010, due to a holiday, but closed at 575.5 pence per share on April 30, 2010 and opened at 546 pence per share on May 4, 2010 (representing a 5.1% decline).  These declines were directly related to and were proximately caused by the market absorbing information partially revealing risks Defendants had concealed throughout the Class Period as discussed *supra*, including, *inter alia*, that, contrary to Defendants' public statements, BP had been recklessly conducting its drilling operations in the Gulf, without a legitimate spill response plan, and Defendants had mislead investors, through the misrepresentations and omissions discussed *supra*, about BP's purported reforms and process safety enhancements, such as, among other things, the purported implementation of the Baker Panel recommendations, OMS, the Operations Academy and Operating Essentials program, and the S&O audit across BP's global operations without exceptions or exclusions.

359.    On May 8, 2010, BP disclosed that its attempts to contain the spill through the deployment of a large dome-like structure over the blown well, which had begun on May 6, 2010,

had failed.  At this time, tar began to wash up on the Alabama coast.  On May 10, 2010, BP released a statement updating the public on the Gulf oil spill response and revealed that oil spill costs to date had reached $350 million.  In reaction to this news on May 8-10, 2010, BP's ADSs fell from $49.06 per ADS on Friday, May 7, 2010 to close at $48.75 on Monday, May 10, 2010, a decline of $0.31 per ADS, while BP's ordinary shares feel from 553.9 pence per share on Friday, May 7, 2010 to close at 549.2 pence per share on Monday, May 10, 2010.  This decline was directly related to and were proximately caused by the market absorbing information partially revealing risks Defendants had concealed throughout the Class Period as discussed *supra*, including, *inter alia*, that, contrary to Defendants' public statements, BP had been recklessly conducting its drilling operations in the Gulf, without a legitimate spill response plan, and Defendants had mislead investors, through the misrepresentations and omissions discussed *supra*, about BP's purported reforms and process safety enhancements, such as, among other things, the purported implementation of the Baker Panel recommendations, OMS, the Operations Academy and Operating Essentials program, and the S&O audit across BP's global operations without exceptions or exclusions.

360.    On May 12, 2010, *Bloomberg* published an article entitled "BP Tells Congress Gulf Well Failed Tests Before Blast."  The article stated, in relevant part:

> A Gulf of Mexico oil well failed a pressure test hours before a drilling rig exploded last month, an executive for well owner BP Plc told the U.S. House Energy Committee that's investigating the incident.
>
> Such pressure tests are aimed at ensuring the integrity of cement poured into the well to keep out natural gas, said Committee Chairman Henry Waxman, a California Democrat, citing a report to the panel from James Dupree, BP senior vice president for the Gulf.   The tests before the April 20 blast showed "discrepancies" in pressure levels, Waxman said.

*             *             *

145

*"BP, one of the largest oil companies, assured Congress and the public that it could operate safely in deep water and that a major oil spill was next to impossible,"* Waxman said. *"We now know those assurances were wrong."*

\*       \*       \*

**'Serious Questions'**

"BP promised to make safety its number one priority," Stupak said. "This hearing will raise serious questions about whether BP and its partners fulfilled this commitment. The safety of its entire operations rested on the performance of a leaking and apparently defective blowout preventer."

361.    These revelations caused BP ADSs to close at $48.50 per ADS on May 12, 2010, a decline of $0.24 per ADS from the previous day's closing price and approximately $11.98 (or 19.8%) per ADS since April 20, 2010; they caused BP's common stock to close at 541.6 pence per share on May 12, 2010, down 3.9 pence from the previous day's closing price and 113.8 pence per share (or 17.4%) from April 20, 2010. These declines were directly related to and were proximately caused by the market absorbing information partially revealing risks Defendants had concealed throughout the Class Period as discussed *supra*, including, *inter alia*, that, contrary to Defendants' public statements, BP had been recklessly conducting its drilling operations in the Gulf, without a legitimate spill response plan, and Defendants had mislead investors, through the misrepresentations and omissions discussed *supra*, about BP's purported reforms and process safety enhancements, such as, among other things, the purported implementation of the Baker Panel recommendations, OMS, the Operations Academy and Operating Essentials program, and the S&O audit across BP's global operations without exceptions or exclusions.

362.    On May 13, 2010, *The Wall Street Journal* published an article entitled "Red Flags Were Ignored Aboard Doomed Rig." This article stated, in relevant part:

Managers at oil giant BP PLC decided to forge ahead in finishing work on the doomed *Deepwater Horizon* rig despite some tests suggesting that highly combustible gas had seeped into the well, according to testimony released by congressional investigators and documents seen by *The Wall Street Journal*.

146

363.     On May 13, 2010, as a result of these continuing revelations about BP's operations, BP ADSs closed at $48.10 per ADS, $0.40 per share below the previous day's closing price, while BP's common stock closed at 547.6 pence per share, 6 pence per share below the previous day's closing price.  These declines were directly related to and were proximately caused by the market absorbing information partially revealing risks Defendants had concealed throughout the Class Period as discussed *supra*, including, *inter alia*, that, contrary to Defendants' public statements, BP had been recklessly conducting its drilling operations in the Gulf, without a legitimate spill response plan, and Defendants had mislead investors, through the misrepresentations and omissions discussed *supra*, about BP's purported reforms and process safety enhancements, such as, among other things, the purported implementation of the Baker Panel recommendations, OMS, the Operations Academy and Operating Essentials program, and the S&O audit across BP's global operations without exceptions or exclusions.

364.     On May 14, 2010, *The Wall Street Journal* published an article entitled "BP Wasn't Prepared for Leak, CEO Says."  This article stated, in relevant part:

> BP has been particularly vulnerable to criticism because among the large oil companies it is by far the biggest player in deepwater oil exploration.  *Some in the industry have said a company with such a strong focus on deepwater drilling should have had much better contingency plans for dealing with an underwater oil leak at this depth.*
>
> *Mr. Hayward, speaking to a small group of journalists Wednesday night in Houston, admitted the oil giant had not had the technology available to stop the leak.  He also said in hindsight it was "probably true" that BP should have done more to prepare for such an emergency of this kind.*
>
> "It's clear that we will find things we can do differently, capability that we could have available to deploy instantly, rather than be creating it as we go," he said.

365.     On May 14, 2010, due to these revelations, BP's shares dropped $1.23 per ADS from the previous day's closing price to close at $46.87 per share, while BP's common stock fell 17.4 pence per share from its prior day's closing price to close at 530.20 pence per share.  These

declines were directly related to and were proximately caused by the market absorbing information partially revealing risks Defendants had concealed throughout the Class Period as discussed *supra*, including, *inter alia*, that, contrary to Defendants' public statements, BP had been recklessly conducting its drilling operations in the Gulf, without a legitimate spill response plan, and Defendants had mislead investors, through the misrepresentations and omissions discussed *supra*, about BP's purported reforms and process safety enhancements, such as, among other things, the purported implementation of the Baker Panel recommendations, OMS, the Operations Academy and Operating Essentials program, and the S&O audit across BP's global operations without exceptions or exclusions.

366. On May 24, 2010, BP announced that the costs for addressing the Gulf oil spill had more than doubled, from $350 million to $760 million. Additionally, BP announced that it was recovering less oil than it expected. Finally, pressure on BP continued to grow because the U.S. government threatened to take over the oil spill response effort because of BP's lack of progress. On this news, BP's ADSs fell from $43.86 per ADS on Friday, May 21, 2010 to close at $41.86 per ADS on Monday, May 24, 2010, a decline of $2.00 per ADS, while BP's ordinary shares fell from 506.7 pence per share on May 21, 2010 to close at 493 pence per share on May 24, 2010. These declines were directly related to and were proximately caused by the market absorbing information partially revealing risks Defendants had concealed throughout the Class Period as discussed *supra*, including, *inter alia*, that, contrary to Defendants' public statements, BP had been recklessly conducting its drilling operations in the Gulf, without a legitimate spill response plan, and Defendants had mislead investors, through the misrepresentations and omissions discussed *supra*, about BP's purported reforms and process safety enhancements, such as, among other things, the purported implementation of the Baker Panel recommendations, OMS, the Operations

Academy and Operating Essentials program, and the S&O audit across BP's global operations without exceptions or exclusions.

367.    On May 26, 2010, BP began its "top kill" efforts, the goal being to put heavy drilling mud into the well to reduce outward pressure and flow from the well and thereby to permit it to be plugged.

368.    On May 27, 2010, the Flow Rate Technical Group, a group comprised of engineers and scientists from various federal agencies and universities that was tasked with creating its own estimate of the oil spill rate from *Deepwater Horizon*, issued a public report estimating the oil spill flow rate to be between 11,000 and 25,000 barrels per day.  In response to this news, the price of BP ADSs fell $1.74 per ADS in after-hours trading, from a closing price of $45.38 on May 27, 2010, to open at $43.64 per ADS on May 28, 2010, while BP's common stock fell in after-market trading from a closing price of 520.8 pence per share on May 27, 2010 to open at 517.0 pence per share on May 28, 2010.  BP's securities fell throughout the day on May 28, 2010 as the market continued to digest this information, with BP's ADSs closing at $42.95 per ADS, for a total loss of $2.43 per ADS (or 5.35%) and BP's common stock closing at 494.8 pence per share, for a total loss of 26 pence per share (or 4.99%).  These declines were directly related to and were proximately caused by the market absorbing information partially revealing risks Defendants had concealed throughout the Class Period as discussed *supra*, including, *inter alia*, that, contrary to Defendants' public statements, BP had been recklessly conducting its drilling operations in the Gulf, without a legitimate spill response plan; Defendants had mislead investors, through the misrepresentations and omissions discussed *supra*, about BP's purported reforms and process safety enhancements, such as, among other things, the purported implementation of the Baker Panel recommendations, OMS, the Operations Academy and Operating Essentials program, and

the S&O audit across BP's global operations without exceptions or exclusions; and Defendants' post-spill statements had misrepresented the amount of oil believed to be spilling into the Gulf on a daily basis.

369.    On May 29, 2010 (a Saturday), BP revealed that its "top kill" efforts had failed. The failure of the "top kill" indicated that BP would be unable to stop the oil spill absent completion of a relief well and would have to rely on efforts to try to merely contain the spill while it completed work on two relief wells.  The failed attempt to kill the well by using the "top kill" and "junk shot" efforts shocked observers, the media, and investors.  For instance:

(a)    As noted by ABC News on Saturday, May 29, 2010: "We begin tonight with breaking news from the Gulf.  After so much talk that Top Kill was the best bet to plug the oil spill in the Gulf, BP announced just a short time ago that the effort has failed.  That live picture so many Americans have been keeping track of [*i.e.*, the oil spewing from the Macondo well], us included, confirms that the oil is still gushing into the Gulf.  This is another crushing blow when it comes on what is now day 40 of this crisis."

(b)    Similarly, on that same day, the Agence France Presse reported, in part, that: "The announcement [that the top kill and junk short plans failed] is a stunning setback for efforts to halt what has become the worst oil spill in US history. . ." Moreover, The Business Insider made clear that the failure of the top kill would lead to BP's securities being "slaughtered in London trading on Monday."

(c)    Also on May 29, 2010, *The New York Times* published an article entitled "Documents Show Early Worries About Safety of Rig."  This article stated, in relevant part:

> Internal documents from BP show that there were serious problems and safety concerns with the *Deepwater Horizon* rig far earlier than those the company described to Congress last week.

*      *      *

The documents show that in March, after several weeks of problems on the rig, BP was struggling with a loss of "well control." And as far back as 11 months ago, it was concerned about the well casing and the blowout preventer.

370.   On Sunday, May 30, 2010, Dudley conducted a series of interviews with U.S. media outlets in which he admitted that BP's original oil flow estimates – which he himself had personally reiterated just two weeks prior – were vastly understated.

371.   On June 1, 2010 (the first trading day since the failure of the "top kill" effort), United States Attorney General, Eric Holder, reported that the DOJ had opened formal criminal and civil probes of BP.

372.   On these May 29 – June 1, 2010 disclosures, BP's ADS fell from $42.95 per ADS on Friday, May 28, 2010, to close at $36.52 per ADS on Tuesday, June 1, 2010, a decline of $6.43 per ADS (or approximately 15%), while BP's common stock fell from 494.8 pence per share on May 28, 2010 to close at 430.0 pence per share on June 1, 2010, a decline of 64.8 pence per share (or approximately 12%).  These declines were directly related to and were proximately caused by the market absorbing information partially revealing risks Defendants had concealed throughout the Class Period as discussed *supra*, including, *inter alia*, that, contrary to Defendants' public statements, BP had been recklessly conducting its drilling operations in the Gulf, without a legitimate spill response plan; Defendants had mislead investors, through the misrepresentations and omissions discussed *supra*, about BP's purported reforms and process safety enhancements, such as, among other things, the purported implementation of the Baker Panel recommendations, OMS, the Operations Academy and Operating Essentials program, and the S&O audit across BP's global operations without exceptions or exclusions; and Defendants' post-spill statements had misrepresented the amount of oil believed to be spilling into the Gulf on a daily basis.

373.   BP's closing price on June 1, 2010 represented a cumulative decline in the value of BP's ADSs of nearly $24.00 per ADS since April 20, 2010 (or approximately 40%) and a total

decline in BP's common stock of more than 225 pence per share (or approximately 34%). These aggregate declines were directly related to and were proximately caused by the market absorbing information partially revealing risks Defendants had concealed throughout the Class Period as discussed *supra*, including, *inter alia*, that, contrary to Defendants' public statements, BP had been recklessly conducting its drilling operations in the Gulf, without a legitimate spill response plan; Defendants had mislead investors, through the misrepresentations and omissions discussed *supra*, about BP's purported reforms and process safety enhancements, such as, among other things, the purported implementation of the Baker Panel recommendations, OMS, the Operations Academy and Operating Essentials program, and the S&O audit across BP's global operations without exceptions or exclusions; and Defendants' post-spill statements had misrepresented the amount of oil believed to be spilling into the Gulf on a daily basis.

374.    Speaking to the Financial Times in Houston on June 2, 2010, Hayward admitted that it was "an entirely fair criticism" to blame BP for the disorganized and poor cleanup effort because "***[w]hat is undoubtedly true is that we did not have the tools you would want in your tool-kit***" to stop the leak from the Macondo well in the Gulf of Mexico in the aftermath of the explosion. This statement is a corporate admission, attributable to BP.

375.    On June 9, 2010, fears that BP would suspend dividends caused a further decline in BP Securities. For instance, an Associated Press article published on the afternoon of June 9, 2010, entitled "Dividend worries weigh on BP shares" explained, "[c]utting the dividend would have a big impact in Britain, as BP accounts for around 12-13 percent of payments from companies in the blue-chip FTSE 100 index . . . ." On this news, BP's ADS fell from $34.68 per ADS on June 8, 2010, to close at $29.20 per ADS on June 9, 2010, a decline of $5.48 per ADS (or almost 16%), while BP's common stock fell from 408.9 pence per share on June 8, 2010 to close at 391.5

pence per share on June 9, 2010, a decline of 17.4 pence per share.  These declines were directly related to and were proximately caused by the market absorbing information partially revealing risks Defendants had concealed throughout the Class Period as discussed *supra*, including, *inter alia*, that, contrary to Defendants' public statements, BP had been recklessly conducting its drilling operations in the Gulf, without a legitimate spill response plan; Defendants had mislead investors, through the misrepresentations and omissions discussed *supra*, about BP's purported reforms and process safety enhancements, such as, among other things, the purported implementation of the Baker Panel recommendations, OMS, the Operations Academy and Operating Essentials program, and the S&O audit across BP's global operations without exceptions or exclusions; and Defendants' post-spill statements had misrepresented the amount of oil believed to be spilling into the Gulf on a daily basis.

376.    On June 14, 2010, BP's Board of Directors officially met to discuss suspending BP's dividend payments in light of BP's agreement to set up a $20 billion claim fund for damages caused by the Deepwater Horizon catastrophe.  The press disclosed details of the meeting in negative reports that day, including, for example:

(a)     The New York Times reported, in part, as follows:

To make sure that all claims are paid, the Obama administration has stepped up the pressure on the company, demanding that it set aside money to pay for future liabilities before paying dividends to shareholders, which now amount to about $10.5 billion annually.  Senate Democrats are asking BP to set up a $20 billion cleanup fund.

BP, which has spent about $1.5 billion on the cleanup so far, has said it expects to be able to pay all spill costs from its regular operating funds.

But in response to the federal government's requests, BP's board met Monday to consider its options.  A spokesman said the company did not expect to announce decisions about its dividend until after its chairman and its chief executive spoke with Mr. Obama on Wednesday at a meeting the president had called.

A person with direct knowledge of the discussions said the board was considering three options: suspending payment of the dividend for two quarters, paying the dividend in bonus shares rather than cash, or placing an amount equal to the dividend payment in escrow while continuing to pay for the cleanup separately.

(b)      According to another news source: "Shares in BP plunged again Monday [June 14, 2010] as the company's board discussed U.S. demands that it suspend dividend payments until it pays for the cleanup of the Gulf of Mexico oil spill.

377.     On this news, BP's ADS fell from $33.97 per ADS on Friday, June 11, 2010, to close at $30.67 per ADS on Monday, June 14, 2010, a decline of $3.30 per ADS (or almost 10%), while BP's common stock fell from 391.9 pence per share on June 11, 2010 to close at 355.5 pence per share on June 14, 2010, a decline of 36.4 pence per share (or almost 9%).  These declines were directly related to and were proximately caused by the market absorbing information partially revealing risks Defendants had concealed throughout the Class Period as discussed *supra*, including, *inter alia*, that, contrary to Defendants' public statements, BP had been recklessly conducting its drilling operations in the Gulf, without a legitimate spill response plan; Defendants had mislead investors, through the misrepresentations and omissions discussed *supra*, about BP's purported reforms and process safety enhancements, such as, among other things, the purported implementation of the Baker Panel recommendations, OMS, the Operations Academy and Operating Essentials program, and the S&O audit across BP's global operations without exceptions or exclusions; and Defendants' post-spill statements had misrepresented the amount of oil believed to be spilling into the Gulf on a daily basis.

378.     The next day, on June 15, 2010, the FRTG released its latest public report, revising its oil flow rate estimates upward again, to between 35,000 barrels per day and 60,000 barrels per

day.[3]  On this news, BP ordinary shares fell from 355.45 pence per share on June 14, 2010 to close at 342.00 pence per share on June 15, 2010.  These declines were directly related to and were proximately caused by the market absorbing information partially revealing risks Defendants had concealed throughout the Class Period as discussed *supra*, including, *inter alia*, that, contrary to Defendants' public statements, BP had been recklessly conducting its drilling operations in the Gulf, without a legitimate spill response plan; Defendants had mislead investors, through the misrepresentations and omissions discussed *supra*, about BP's purported reforms and process safety enhancements, such as, among other things, the purported implementation of the Baker Panel recommendations, OMS, the Operations Academy and Operating Essentials program, and the S&O audit across BP's global operations without exceptions or exclusions; and Defendants' post-spill statements had misrepresented the amount of oil believed to be spilling into the Gulf on a daily basis.

379.    On June 21, 2010, at 2 a.m. EST, BP issued a press release updating the spill response and estimated the cost of the response to date to be approximately $2 billion, an increase compared to prior estimates.  Also, on June 21, BBC interviewed a Deepwater Horizon worker, Tyrone Benton ("Benton"), ***who claimed to have spotted a leak in safety equipment weeks before the explosion***.  Benton claimed the leak in the blowout preventer was not fixed at the time, but instead the faulty device was shut down and a second one used.  Benton said: "We saw a leak on the pod, so by seeing the leak ***we informed the company men***. . . . They have a control room where they could turn off that pod and turn on the other one, so that they don't have to stop production."  He said to repair the control pod would have meant temporarily stopping drilling work on the rig

---

[3] The FRTG maintained this estimate until August 2, 2010, when it issued its final report, estimating the oil flow rate at between 52,700 barrels per day and 62,200 barrels per day during the course of the leak, meaning a total of 4.9 million barrels of oil was spilled overall.

at a time when it was costing BP $500,000 per day to operate the Deepwater Horizon. Thus, **BP clearly chose to prioritize cost savings over safety**.

380. On this news, BP ADS fell $1.43 (or 4.5%) on June 21, 2010 to close at $30.33 and fell another 65 cents on June 22, 2010, while BP's common stock fell 7.95 pence per share to close at 349.5 pence per share on June 21, 2010 and another 15.3 pence per share (or 4%) on June 22, 2010. These declines were directly related to and were proximately caused by the market absorbing information partially revealing risks Defendants had concealed throughout the Class Period as discussed *supra*, including, *inter alia*, that, contrary to Defendants' public statements, BP had been recklessly conducting its drilling operations in the Gulf, without a legitimate spill response plan; Defendants had mislead investors, through the misrepresentations and omissions discussed *supra*, about BP's purported reforms and process safety enhancements, such as, among other things, the purported implementation of the Baker Panel recommendations, OMS, the Operations Academy and Operating Essentials program, and the S&O audit across BP's global operations without exceptions or exclusions; and Defendants' post-spill statements had misrepresented the amount of oil believed to be spilling into the Gulf on a daily basis.

381. On June 25, 2010, at 2 a.m. EST, BP issued a press release updating the spill response and estimated the cost of the response to date to be approximately $2.35 billion. There was also concern that tropical storm Alex may disrupt the clean-up response.

382. On this news, BP ADS fell $1.72 (or 6%) from its June 24, 2010 closing price of $28.74 to close at $27.02 on June 25, 2010, while BP's common stock fell 20.65 pence per share (or 6.4%) from its June 24, 2010 closing price of 325.25 pence per share to close at 304.6 pence per share on June 25, 2010. These declines were directly related to and were proximately caused by the market absorbing information partially revealing risks Defendants had concealed

156

throughout the Class Period as discussed *supra*, including, *inter alia*, that, contrary to Defendants' public statements, BP had been recklessly conducting its drilling operations in the Gulf, without a legitimate spill response plan; Defendants had mislead investors, through the misrepresentations and omissions discussed *supra*, about BP's purported reforms and process safety enhancements, such as, among other things, the purported implementation of the Baker Panel recommendations, OMS, the Operations Academy and Operating Essentials program, and the S&O audit across BP's global operations without exceptions or exclusions; and Defendants' post-spill statements had misrepresented the amount of oil believed to be spilling into the Gulf on a daily basis.

383.    In total, the price of BP ADS fell $33.68 between April 20, 2010 and June 25, 2010, from $60.70 to $27.02, representing a cumulative decline of over 55%.   During the same time span, the price of BP's common stock fell from 655.4 pence per share to 304.6 pence per share, representing a cumulative decline of 53.5%.  These aggregate declines were directly related to and were proximately caused by the market absorbing information partially revealing risks Defendants had concealed throughout the Class Period as discussed *supra*, including, *inter alia*, that, contrary to Defendants' public statements, BP had been recklessly conducting its drilling operations in the Gulf, without a legitimate spill response plan; Defendants had mislead investors, through the misrepresentations and omissions discussed *supra*, about BP's purported reforms and process safety enhancements, such as, among other things, the purported implementation of the Baker Panel recommendations, OMS, the Operations Academy and Operating Essentials program, and the S&O audit across BP's global operations without exceptions or exclusions; and Defendants' post-spill statements had misrepresented the amount of oil believed to be spilling into the Gulf on a daily basis.

384.   In addition, based on the foregoing, Defendants' fraudulent inducement of Plaintiffs' and the Class members' purchases of BP common stock during the Class Period, through Defendants' false and misleading statements and omissions as alleged herein, caused Plaintiffs and the Class members to suffer economic losses recognizable and recoverable under English law.  As described *supra*, the price of BP common stock purchased by or on behalf of Plaintiffs and the Class members significantly declined below their original purchase price(s) on the partial corrective disclosure dates set forth above, during which time Plaintiffs and the Class members held such shares.  In addition, as a result of Defendants' ongoing and continuing misrepresentations up through May 24, 2010, including Defendants' post-spill misrepresentations, Plaintiffs and the Class members continued to retain BP common stock (including those purchased prior to the spill) and suffered further losses, having been induced to do so by such ongoing and continuing misrepresentations, until Defendants' fraud was fully revealed on June 25, 2010.

385.   The price declines in BP ADSs and BP common stock, as described above, and Plaintiffs' and the Class members' resulting losses are a consequence of Defendants' inducement of Plaintiffs' and the Class members' purchases and/or continued holding of BP securities through the false and misleading statements alleged herein.  Accordingly:

(a)     In remedy of Defendants' negligent misstatements, Plaintiffs and the Class members are entitled under common law to recover at least the difference between the price(s) they paid for their BP securities and the actual value of those securities on the date(s) of purchase.  However, because Defendants' negligent misstatements were not fully withdrawn and therefore continued to operate throughout the Class Period, including the post-spill time period, Plaintiffs and the Class members were induced to retain their BP securities as alleged herein, and thus are entitled to recover instead the difference between the price(s) they paid for their BP

securities and the securities' value on the date the negligent misstatements at issue were fully withdrawn; and

(b)     Under English law, Plaintiffs and the Class members are also entitled to recover consequential measures of damages and lost profits on foregone opportunities flowing from Defendants' wrongful conduct as alleged herein, necessary to put Plaintiffs and the Class members as nearly as possible in the position they would have been if Defendants' such wrongful conduct had not occurred;

(c)     To the extent that Plaintiff's and the Class members' claims solely arise from inducement to continue holding previously-purchased BP securities, Plaintiff and the Class members are alternatively entitled to recover the difference between the price(s) of such securities on the date(s) on which they were induced to continue holding them by Defendants' deceit alleged herein and the price of such securities on the earlier of (i) the actual date(s) on which they sold such securities on or after April 26, 2010 up to and including June 25, 2010; or (ii) the actual dates on which they can establish they would have sold such securities but for the Defendants' ongoing deceit.

## XI.     NO SAFE HARBOR APPLIES TO DEFENDANTS' FALSE AND MISLEADING STATEMENTS

386.     To the extent that any safe harbor is provided for forward-looking statements under certain circumstances, such safe harbor does not apply to any of the false and misleading statements pleaded in this Complaint.  The specific statements pleaded herein were not identified as forward-looking statements when made.

387.     To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

388.    Alternatively, to the extent that any safe harbor does apply to any forward-looking statements pleaded herein, Defendants are nonetheless liable for making such statements because, at the time each statement was made, the speaker knew the statement was false or misleading.

## XII.   PLAINTIFFS' AND THE CLASS MEMBERS' DIRECT RELIANCE ON DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND MATERIAL OMISSIONS

389.   ███████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████

390.   ███████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████



391.

392.

393.

394.

395.

396.

397.

398.

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████

399.   ████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████

400.   ████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████

401.   ████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████

████████████

███████████████████████

402.   ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████

403.   ████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████

██████████████████████████████

404.   ████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████

████████

                              ████████████

405.   ████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████

406.   ████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████

**XIII.   ADDITIONAL RELIANCE ALLEGATIONS: (A) DEFENDANTS' INTENT TO INDUCE PLAINTIFFS' AND THE CLASS MEMBERS' RELIANCE; (B) PRESUMPTIONS OF RELIANCE; AND (C) RELIANCE ON DEFENDANTS'**

**MISSTATEMENTS AND OMISSIONS THROUGH DIRECT RELIANCE ON THE PRICE INTEGRITY OF BP SECURITIES**

407.    Defendants intended to induce Plaintiffs' and the Class members' reliance on the false and misleading statements and omissions alleged herein.

408.    BP and the Individual Defendants voluntarily disseminated the information in the false and misleading statements and omissions alleged herein to the market.

409.    Insofar as BP is a publicly-traded company, which by law is required to make certain filings and statements regarding its operations and financial performance, Defendants knew, understood and had reason to expect that: (1) their misstatements and omissions would artificially inflate the price of BP securities; (2) their statements would be distributed to or available to Plaintiffs, the Class members, and the investing public; (3) investors like the Plaintiffs and the Class members would rely on Defendants' statements and on the price of BP securities as reflecting accurate information known to BP and its principals; (4) Defendants' misstatements and omissions would induce Plaintiffs and the Class members and/or their agents, in this case ███████ to purchase BP securities, as well as to continue to hold such securities even after the April 20, 2010 *Deepwater Horizon* explosion and start of the resulting oil spill.

410.    The misrepresentations and omissions alleged herein were material, inflated the price of BP securities, and induced reasonable investors to misjudge the value of BP's securities.

411.    In purchasing BP's securities, ███████, acting on behalf of Plaintiffs and the Class members also justifiably or reasonably relied on the reasonable assumption that the market price of BP's securities was not affected by material misrepresentations and omissions by Defendants, and that the price of BP securities reflected accurate and truthful information issued by Defendants.

412.   ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████

413.   Without knowledge of the misrepresented or omitted facts alleged herein,

███████, acting on behalf of Plaintiffs and the Class members, purchased or otherwise acquired

BP securities during the Class Period, during which time the price of BP's securities was artificially

inflated by Defendants' misrepresentations and omissions.

414.   Defendants intended that the misrepresentations alleged herein be conveyed to

███████, and by extension to Plaintiffs and the Class members, all of which are institutional

investors, because those misrepresentations were directed to existing BP shareholders, investors,

and the market at large.  Thus, Defendants had every reason to expect that their misrepresentations

would materially inflate the price of BP securities, and thereby cause ████████ acting on behalf

of its clients, Plaintiffs and the Class members, to purchase BP's securities at artificially inflated

prices, in justifiable reliance on the misrepresentations.  Defendants knew that there was an

especial likelihood that the misrepresentations would reach ████████ and by extension Plaintiffs

and the Class members, and would influence their BP investment decisions.  The Defendants are

responsible for Plaintiffs' and the Class members' damages, which resulted from Defendants'

misconduct.

415.   Defendants were required to present BP's operations, including without limitation

its actions (or lack thereof) to enhance BP's process safety, and BP's Gulf oil spill response,

including without limitation the most accurate data on the oil flow rate, in a fair and accurate

manner in, among other documents, filings with U.S. and U.K. regulators, press releases and

Defendants' other public statements.  Defendants were required to file Forms 20-F, Forms 6-K

and other reports with the SEC pursuant to the Exchange Act, 15 U.S.C. § 78 *et seq.*, which mandates periodic filings of disclosure documents and is devised to protect Plaintiffs and the Class members as investors, and to publish similar annual, semi-annual and interim reports under the United Kingdom Listing Authority's Disclosure and Transparency Rules ("DTR"), which were enacted to protect investors such as Plaintiffs and the Class members from misrepresentations by public companies like BP. Thus, Defendants had reason to expect that Plaintiffs, the Class members, and the investing public would be influenced by and rely upon the statements in BP's public reports, as the class of persons intended by Congress to be protected by the Exchange Act, and the class of persons intended to be protected under the DTR and other European Directives, including the Transparency Obligations Directive. As described herein, Defendants made such filings in the U.S. and the U.K., which are alleged to have contained material misstatements and omissions, made with knowledge or reckless disregard for their falsity. As such, Defendants are presumed to have reason to expect that the false and misleading statements contained therein would reach and influence the Plaintiffs and the Class members, as they did, as the class of persons the above-referenced U.S. and U.K. laws are designed to protect.

416. Plaintiffs and the Class members are entitled to a presumption, under *Esso Petroleum Ltd v. Mardon* [1976] QB 801 and its English-law equivalents, that if the false statements and omissions of material fact alleged herein had not been made by Defendants to their investment manager ████ as alleged herein, Plaintiffs and the Class members would not have purchased the BP securities at issue.

417. Plaintiffs and the Class members are also entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972) and its English-law analogues,

because the claims asserted herein against Defendants are also predicated upon omissions of material fact which there was a duty to disclose.

## XIV.   THE CLAIMS ARE TIMELY

418.     The claims asserted herein were initially filed within applicable limitations and repose periods and/or benefit from tolling.

419.     The statute of limitation applicable to Plaintiffs' common law claims under English law is six years, subject to a discovery rule.  Due to the facts alleged herein, due to Defendants' continuing fraud and fraudulent concealment, Defendants' fraud was not fully revealed until June 25, 2010.

420.     Filing of the initial class action complaint in the first action that would become the ADS Action served to toll the statute of limitations and/or the statute of repose for all individual claims of putative class members, including state law and English law claims.  The Class members who Plaintiffs seek to represent were at one point absent class members of the putative class at issue in the ADS Complaint, and as such, they benefitted from its tolling effect.  Such tolling continued with respect to claims based on BP ordinary shares until at least February 13, 2012, when the Court dismissed all claims based on purchases of BP ordinary shares abroad.  Such tolling continues with respect to claims based on BP ADSs, in light of this Court's prior decisions certifying, in part, the putative class in the parallel Class Action.

## XV.    CLASS ACTION ALLEGATIONS

421.     Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23 on behalf of a class of all institutional investors who engaged ███████ to serve as their investment manager, who delegated full investment authority to ███████ and who, through such delegated authority to ███████ purchased or otherwise acquired BP ordinary shares during the Class Period of February 7, 2007 through June 25, 2010, both dates inclusive, in an account or accounts managed

by ████████ and were injured thereby (the "Class").  Excluded from the Class are Defendants,

directors and officers of BP, and their families and affiliates.

422.    This action seeks damages on behalf of Plaintiffs and the Class members only in

their investment accounts that were managed by ████████ during the Class Period.

423.    The members of the Class, which consists of all institutional investors who engaged

████████ with full investment authority to invest in BP securities during the multi-year Class

Period, are so numerous that joinder of all members is impracticable.  The disposition of their

claims in a class action will provide substantial benefits to the parties and the Court.

424.    Inasmuch as the Class is comprised of institutional investors who delegated full

investment authority to ████████, it is ████████'s actions that will be the basis for establishing

reliance on the misstatements and omissions alleged herein, all of which occurred during direct

face-to-face meetings between ████████ and Defendants.  ████████s subsequent investment

decisions in BP securities were made by the same ████████ personnel, based on the same

analytical process, for all Plaintiffs and Class members.

425.    Thus, there is a well-defined community of interest in the questions of law and fact

involved in this case.  Questions of law and fact common to the Class members which predominate

over questions which may affect individual Class members include:

(a)    Whether Defendants misrepresented material facts;

(b)    Whether Defendants' statements omitted material facts necessary in order to make

the statements made, in light of the circumstances under which they were made, not misleading;

(c)    Whether Defendants' actions as alleged herein constituted negligent misstatement

under English law;

(d)     Whether Defendants' negligent misstatements were not fully withdrawn and therefore continued to operate throughout the Class Period, including the post-spill time period;

(e)     Whether Defendants' negligent misstatements, by not being withdrawn, induced ████████ to maintain the Plaintiffs' and the Class members' holdings in BP securities;

(f)     Whether Defendants' misconduct as alleged herein caused the prices of BP ordinary shares to be artificially inflated; and

(g)     The extent of damage sustained by the Plaintiffs and the Class members and the appropriate measure of damages.

426.    Plaintiffs' claims are typical of those of the Class members.  Plaintiffs and the Class members all fully delegated investment authority to ████████ regarding their investments in BP securities in the investment accounts at issue.  ████████ employed the same personnel and the same analytical approach, based on the same factual circumstances, including the same face-to-face meetings with BP alleged herein to have been false and misleading due to misstatements or omissions of material facts, in making investment decisions in BP securities for Plaintiffs and all the other members of the Class.  Plaintiffs and the Class members have sustained damages in the same manner, due to the same violations of law and the same price inflation of BP's securities, as alleged herein.

427.    Plaintiffs will adequately protect the interests of the Class and have retained counsel who are experienced in class action securities litigation.  Plaintiffs have no interests that conflict with those of the other Class members.

428.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## XVI.   PLAINTIFFS' CLAIMS, PRAYER FOR RELIEF, AND DEMAND FOR JURY TRIAL ON THEIR BEHALF AND ON BEHALF OF THE CLASS MEMBERS

### FIRST CAUSE OF ACTION

### Common Law Negligent Misstatement

### (Against All Defendants)

429.   Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein, except all allegations speaking only to any Defendants' subjective state of mind.

430.   During the Class Period, Defendants expected, or it was reasonably foreseeable to them, that BP investors like Plaintiffs and the Class members, and their investment manager ███████, would rely on Defendants' statements in determining whether to buy BP securities.  To the extent necessary for this claim, Defendants owed duties of care and candor to Plaintiffs, the Class members, and other investors in BP and/or a professional or pecuniary duty to provide accurate information to Plaintiffs, the Class members, and their investment manager ███████.

431.   Moreover, Plaintiffs and the Class members were part of a limited group of persons, institutional investors which were pre-existing shareholders either before or at some point during the Relevant Period, who themselves or whose investment manager ███████ had direct, face-to-face meetings and teleconferences with Defendants and the identities of whom, either way, were known to BP, its Investor Relations personnel, and Defendants.  Thus, Plaintiffs and the Class members were actually known to Defendants, or Defendants should have known of them, further evidencing Defendants' duties owed to Plaintiffs and the Class members.

432.   Defendants breached their duties when they supplied false and materially misleading statements and omissions in the course of their business for the guidance of Plaintiffs, the Class members, and/or their investment manager ███████ to purchase and/or retain BP securities on Plaintiffs' and the Class members' behalf.

173

433.    When Defendants made the materially misleading misstatements and omissions alleged herein, they had no reasonable ground for believing them to be true.  Defendants failed to exercise reasonable care or competence in obtaining or communicating the information.

434.    Defendants made untrue statements of material fact or failed to disclose material facts which rendered their affirmative statements materially misleading.

435.    Plaintiffs and the Class members acted, through their investment manager ███████, in justifiable reliance on the Defendants' false and misleading statements, the market price of BP securities and/or the integrity of the market, without knowing the statements were false or misleading, when making investment decisions regarding BP securities, including not only whether to purchase such securities but also at what price to do so.  The Defendants' false and misleading statements and omissions also induced Plaintiffs and the Class members, acting through ███████ to retain Plaintiffs' and the Class members' holdings in BP securities during the Class Period.

436.    Had Defendants not made the false and misleading misrepresentations and omissions alleged herein, Plaintiffs and the Class members, acting through their investment manager ███████ would not have purchased BP securities, at least not at the artificially inflated prices that they paid.

437.    When ███████ purchased BP securities for Plaintiffs and the Class members, it did not know about the untrue and misleading nature of the statements and omissions alleged herein.

438.    As a direct and proximate result of the negligent misrepresentations made by Defendants, Plaintiffs and the Class members incurred damages, the amount of which will be proved at trial.

439. The misrepresentations and omissions, as set forth herein, constitute negligent misstatement under English common law.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs demand judgment in their favor and in favor of the other members of the Class and pray for judgement and relief as follows:

A.      Determining that this action is a proper class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3) on behalf of the Class as defined herein, and a certification of Plaintiffs as Class representatives pursuant to Fed. R. Civ. P. 23;

B.      An award in favor of Plaintiffs and the Class members against all Defendants, jointly and severally, for all damages, including compensatory and consequential damages as recognized and recoverable under applicable laws, sustained by them as a result of Defendants' wrongdoing, in an amount to be proved at trial;

C.      An award in favor of Plaintiffs and the Class members against all Defendants, jointly and severally, for all punitive damages they are entitled to as a result of Defendants' wrongdoing, in an amount to be proved at trial;

D.      An award in favor of Plaintiffs and the Class members of the costs, expenses, and disbursements of this action, including any attorneys' and experts' fees, if applicable, together with pre- and post-judgment interest; and

E.      An award in favor of Plaintiffs and the Class members of any other relief as this Court deems just, equitable, and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated April 12, 2016                    Respectfully submitted,


                                        **POMERANTZ LLP**

                                        Marc I. Gross
                                        Jeremy A. Lieberman
                                        Matthew L. Tuccillo
                                        Jessica N. Dell
                                        600 Third Avenue, 20th Floor
                                        New York, NY  10016
                                        Telephone:  (212) 661-1100
                                        Facsimile: (212) 661-8665

                                        **POMERANTZ LLP**
                                        Patrick V. Dahlstrom
                                        10 South LaSalle Street, Suite 3505
                                        Chicago, Illinois 60603
                                        Telephone: 312-377-1181
                                        Facsimile:  312-377-1184


                                        *Attorneys for Plaintiffs*